**ALICIA LEDUC MONTGOMERY, OSB 173963**
Email: alicia@leducmontgomery.com
**LEDUC MONTGOMERY LLC**
2210 W Main Street, Suite 107 #328
Battle Ground, Washington 98604
Telephone: 704.702.6934
www.leducmontgomery.com

**MARIANNE DUGAN, OSB 932563**
Email: mdugan@cldc.org
**CIVIL LIBERTIES DEFENSE CENTER**
1711 Willamette Street Ste 301 No. 359
Eugene, Oregon 97402
Telephone: 541.687.9180
www.cldc.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| STABBIN WAGON, an Oregon public benefit corporation; MELISSA JONES, an individual; and SAMANTHA STRONG, an individual, | Case No. 1:25-cv-1632 |
| Plaintiffs, | **COMPLAINT** |
| v. | Violations of 42 U.S.C. § 1983 – First Amendment Retaliation, *Monell* Liability; Violations of 42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights; Intentional Interference with Economic Relations; False Light |
| CITY OF MEDFORD, a municipal corporation; BRIAN SJOTHUN, an individual; RANDY SPARACINO, an individual; JUSTIN IVENS, an individual; DARRELL GRAHAM, an individual; GEOFF KIRKPATRICK, an individual; TREVOR ARNOLD, an individual; ARTURO VEGA, an individual; and JOHN and JANE DOES 1-10, individual employees or agents of the City of Medford, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## INTRODUCTION

1.    The City of Medford has a history of sundown town policy enforcement, anti-vagrancy laws, and intense public policy influence by law enforcement. Beginning in 2019, the City was attempting to remove homeless people from its downtown and greenway as part of an economic development project, and also actively opposed drug decriminalization measures in Oregon.

2.    Plaintiff Stabbin' Wagon was founded in 2020 and primarily serves drug users and homeless people in Medford, Oregon. Plaintiffs Melissa Jones and Samantha Strong were, at all relevant times, employees of Stabbin' Wagon.

3.    Plaintiffs serve people the cops don't like, vocally oppose the City's policy agendas, and, through social media videos and policy advocacy, expose the ways in which the city and its police engage in what Plaintiffs believe is unlawful or morally distasteful behavior against Stabbin' Wagon's clients. Stabbin' Wagon also has a policy of not cooperating with police, while Medford and Jackson County law enforcement sit on the boards of directors of the other non-profit drug treatment and housing service providers in Medford.

4.    By 2023, in the face of drug decriminalization legislation in Oregon, the City of Medford and Stabbin' Wagon were diametrically opposed, with the City publicly calling for recriminalization legislation and enforcing a downtown exclusion zone policy, while Stabbin' Wagon expanded its homelessness outreach and advocacy services, openly critiqued police enforcement against unhoused people, and received a $1.5 million state grant to open a peer respite center in Jackson County.

5.    The City of Medford responded by targeting and surveilling Plaintiffs, harassing

PAGE 2 – **COMPLAINT**

Stabbin' Wagon employees, launching a lobbying campaign to "undo" Plaintiffs' OHA grant, and arresting, jailing, and prosecuting Stabbin' Wagon's employees without probable cause during a public health event in downtown Medford in August 2023.

6.     In August 2024, ACLU of Oregon filed a lawsuit alleging the City of Medford Police Department's collection and monitoring of information regarding Plaintiffs' First Amendment organizing activity violated state law under ORS 181A.250. That lawsuit remains ongoing in state court.

7.     This case seeks redress for a years-long campaign by the City of Medford and its agents and employees to unlawfully target, harass, retaliate against, and suppress the speech, activism, and public health work of Plaintiffs. Plaintiffs are community organizers and health workers whose constitutionally protected outreach and expressive activities, including distribution of overdose prevention materials, participation in public demonstrations, and public health events, have been repeatedly and intentionally targeted by the Medford Police Department and Medford City officials, through unlawful arrests, surveillance, economic interference, and other retaliatory actions. Defendants' conduct has violated Plaintiffs' rights under the First and Fourth Amendments to the United States Constitution and Oregon law.

## JURISDICTION

8.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. §§ 1983, 1985, and 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

9.     Plaintiffs request this Court invoke its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to all causes of action based on Oregon law, because the state claims arise from the same nucleus of operative facts as the federal claims.

PAGE 3 – **COMPLAINT**

## VENUE

10.     Venue is proper in the District of Oregon under 28 U.S.C. § 1391(b), because the events giving rise to this claim occurred in this district, and all Defendants reside in this district.

11.     Venue is proper in the Medford Division because all events giving rise to Plaintiff's claims in this lawsuit took place in Jackson County, Oregon. 28 U.S.C. § 1391(b)(2).

## PARTIES

### A. Plaintiffs

12.     Plaintiff Stabbin' Wagon is an Oregon nonprofit public benefit corporation headquartered in Jackson County, Oregon. It is a 501(c)(3) organization that provides harm reduction, public health outreach, and crisis support services to unhoused and at-risk populations throughout Southern Oregon. Stabbin' Wagon and its staff regularly engage in expressive activities, such as publishing educational content, recording law enforcement interactions, organizing demonstrations, and advocating for systemic reform.

13.     Plaintiff Melissa Jones, at all relevant times, was a resident of Jackson County, Oregon, and is the Founder and, at all relevant times, was Executive Director of Plaintiff Stabbin' Wagon. Jones is an activist engaged in advocacy for housing rights, LGBTQIA2S+ rights, reproductive justice, drug decriminalization, and harm reduction. Jones has been subjected to targeted retaliation, arrest, and prosecution by the City of Medford and its employees for her constitutionally protected outreach and expressive activities.

14.     Plaintiff Samantha Strong is a resident of Jackson County, Oregon, and at all relevant times was an employee of Stabbin' Wagon. Strong is an activist engaged in advocacy for housing rights, LGBTQIA2S+ rights, reproductive justice, drug decriminalization, and harm reduction. Strong has been subjected to targeted retaliation, arrest, and prosecution by the City of

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

Medford and its employees for their constitutionally protected outreach and expressive activities.

### B. Defendants

15.    Defendant City of Medford is a municipal corporation organized under the laws of the State of Oregon and is the legal entity responsible for the operation of the Medford Police Department. The City is liable for the unlawful conduct of its policymakers, agents, and employees.

16.    Defendant Brian Sjothun is the former City Manager of the City of Medford. At all times relevant, he acted under color of state law and within the scope of his employment as City Manager. Defendant Sjothun participated in the retaliatory actions described herein. On information and belief, Defendant is a resident of Jackson County, Oregon.

17.    Defendant Randy Sparacino is the former Mayor and former Chief of Police of the City of Medford. At all times relevant, he acted under color of state law and within the scope of his employment as Mayor. Defendant Sparacino participated in the retaliatory actions described herein. On information and belief, Defendant is a resident of Jackson County, Oregon.

18.    Defendant Justin Ivens is the Chief of Police for the Medford Police Department. At all relevant times, he acted under color of state law and within the scope of his employment. Chief Ivens participated in or ratified the surveillance and retaliatory actions described herein. On information and belief, Defendant is a resident of Jackson County, Oregon.

19.    Defendant Darrell "DJ" Graham is the Deputy Chief of Police and formerly supervised the Medford Police Department's Livability Team, also known as the LVT. At all relevant times, he acted under color of law and participated in the acts of surveillance, targeting, and retaliation. On information and belief, Defendant is a resident of Jackson County, Oregon.

20.    Defendant Geoff Kirkpatrick is a Lieutenant with the Medford Police Department

PAGE 5 – **COMPLAINT**

and supervisor of the Livability Team. At all relevant times, he acted under color of law and was directly involved in coordinating or executing retaliatory enforcement actions against Plaintiffs. On information and belief, Defendant is a resident of Jackson County, Oregon.

21.    Defendant Trevor Arnold is the Deputy Chief of Police for the Medford Police Department. At all relevant times, he acted under color of state law and within the scope of his employment. He participated in or was aware of the policies, practices, or events giving rise to the claims herein. On information and belief, Defendant is a resident of Jackson County, Oregon.

22.    Defendant Arturo Vega is a police officer employed by the Medford Police Department. At all relevant times, he acted under color of state law and within the scope of his employment. Defendant engaged in stops, detentions, and harassment of Plaintiffs. Defendant Vega was also a School Resource Officer at North Medford High School where Plaintiff Jones' son attended school. On information and belief, Defendant is a resident of Jackson County, Oregon.

23.    Defendants John and Jane Does 1–10 are unidentified employees or agents of the City of Medford who participated in the events described in this Complaint. Plaintiffs will amend this Complaint to identify the Defendants once their identities are known. On information and belief, Defendants reside in Jackson County, Oregon.

## FACTUAL BACKGROUND

### A.  Medford Has a History of Enforcing "Sundown Town" Exclusion Policies

24.    Medford historically operated as a "sundown town" in which Black people, Chinese laborers, vagrants, and visibly poor persons were prohibited from being present after dark or forcibly removed by police and vigilantes. These exclusionary practices did not meaningfully differentiate between unhoused whites and racial minorities; rather, the line was drawn around public visibility, poverty, and disruption of social order. As one contributor wrote in the

PAGE 6 – **COMPLAINT**

Medford Mail Tribute on July 18, 1963:

## "Sundown" No More

Medford has long had a reputation as a "sundown" town. The reputation once was justified. Is it still?

This question was brought up at a recent meeting of the Human Rights Council. It is a good question, and one that needs answering, in these days when so much attention is being given to civil rights and equality of treatment and opportunity for all.

A "sundown" town, of course, is one where people of colored minorities are hustled out of town "by sundown" — either through official action, or by more subtle pressures. It is a town where the human right and need for accommodations and food is denied, out of prejudice and fear.

* * * * *

MEDFORD once was just such a place. Negroes and other racial minorities were definitely not welcome here. In some cases of record, many years ago, police officers were assigned to see that no such individuals were permitted to remain here overnight.

Later, overnight lodging was denied them. They were not welcome in restaurants. And it was rare indeed that any found a way to stay here.

What is the situation today?

Despite some lingering evidences of prejudice, Medford hostelries and eating places by and large accept minority race individuals without any fuss. And increasing numbers of them are staying here, partly as a result of this change, and partly simply because there are more Negroes on the West Coast, and thus more of them are passing through, on business or as tourists.

* * * * *

A MAN in Portland who is close to civil rights matters in the state recalls that at one time colored people coming through Medford would recount to their friends the difficulties they had here. Today, however, the discussion is more apt to be about the kind of accommodations they had and the unemotional and courteous treatment they received.

What has been responsible for this turn toward enlightenment and decency?

Most likely it has been a combination of things. These would include an ever-rising level of education, a new spirit of tolerance and good will, a realization that the money spent by a Negro is just as good as that spent by a white man, an understanding of the Oregon laws which forbid discrimination in places of public accommodation because of race.

* * * * *

WHATEVER the cause, it is good to know that Medford's long-standing reputation is no longer entirely justified, and to hear from people who should know that the "sundown" taint is fading.

As recently as a decade ago, it was a rare thing to see a colored face on Medford streets. Now hardly a week goes by without the sight of a Negro tourist entertainer.

And why not? We're all Americans.

Those who would deny their fellow-citizens the privileges and rights they demand for themselves only betray the ideals on which this nation was founded and has prospered. — E. A.

PAGE 7 – **COMPLAINT**

25.    Today, Medford operates an extensive "exclusion zone"[1] and anti-camping ordinance framework intended to deter unhoused and drug-addicted people from remaining in Medford.[2] Plaintiffs' clients are often denied the protections of the law because they are perceived as out-of-place in public, much like the targets of historical sundown policies.

## B. Medford has a History of Treating Homelessness and Drug Addiction as an Inter-related Issue to be Solved via Enforcement and Jailing

26.    Prior to 2019, the Medford Police Department had a Neighborhood Livability Team to address homelessness and nuisance property issues. Part of the Neighborhood Livability Team's role included working with property owners to clean up nuisance properties, and pressured property owners to report suspicious people or activities to the police and to not provide short-term rentals to local residents.

27.    The City of Medford later received a Community Oriented Police Services (COPS) Grant expanding the program to address homelessness issues. The COPS Grant expansion created the present Livability Team and expanded its mission. In June 2019, the City of Medford created the Community Engagement Division with the stated goal of improving livability issues in the City of Medford. This Division is comprised of one police Lieutenant, one Sergeant, and one Corporal, among others, who oversee the "Livability Team." The Medford Chief of Police publicly stated that the City of Medford "handpicked each of our livability team

---

[1] National Homelessness Law Center, *Letter to Medford City Attorney Eric Mitton Re: Medford, Oregon Homeless Exclusion Zones and Jail "Lodging"* ( Aug. 18, 2025), https://homelesslaw.org/wpcontent/uploads/2025/09/2025.8.18_Medford_Exclusion_Zones.pdf.

[2] Damian Mann, *City of Medford Expands Exclusion Zone, Increases Camping Restrictions*, ROGUE VALLEY TIMES (Sept. 30, 2024), https://rv-times.com/2024/09/30/city-of-medford-expands-exclusion-zone-increases-camping-restrictions-2/.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

members to have that personality and to be able to have compassion and to get to know these folks."[3]

28.    Historically, the City of Medford has sought to develop Medford into a recreation destination, viewing homelessness issues as an impediment to that goal as well as to downtown and greenway development.

29.    Defendant Kirkpatrick was the first Sergeant overseeing the Livability Team, and Wulff was a member of the Livability Team. Wulff had been involved with the Neighborhood Livability Team prior to June 2019. According to Defendant Kirkpatrick and Wulff, the purpose of the Livability Team was for the City to address homelessness as part of the Homeless Action Plan, a specific team of police officers to deal with "drinking in public" and "disorderly things" in the downtown areas in a new way, which included an "outreach piece," as it "was not always enforcement."

30.    According to Wulff, "Kirkpatrick's directive" was "go forth and conquer . . . . Let's find solutions that are creative," because "we realized really quickly 'enforcement always' is never going to solve this issue, there is a human element to it, there is to this illness . . . . We need to address these in a different fashion . . . . We know due to the logistical problems at our jail, if enforcement is the only avenue we are taking, we are solving a problem for maybe a few hours, but if have somebody we can help them – . . . get them in shelter, give them a chance, you can not only solve a livability issue for the City for a lifetime, you can also change a life in the process and impact people."

---

[3] *How Medford's new 'livability team' is tackling homelessness on the greenway*, KOBI 5 (Sept. 26, 2019), https://kobi5.com/news/top-stories/how-medfords-new-livability-team-is-tackling-homelessness-on-the-greenway-111680/.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

31.    According to Defendant Kirkpatrick, "We work with a lot of community organizations, and one in particular, the majority of their staff are all folks Mike [Wulff] and I have chased around for years . . . folks we thought were career lifetime criminals . . . and now they are part of the solution."

32.    According to the Defendant Kirkpatrick, the Livability Team is "a group of officers that are selected based on certain characteristics of compassion, hard work, outside the box thinking, and really with aim to address some of the issues, both behaviorally and societally, that we see with a burgeoning homeless population here in Medford. When the team was formed, we looked at 'what are we trying affect' . . . 'how are we trying to work with the homeless and homeless service providers' . . . and what we found was that the most effective way for us to interact int that community is to be that broker of resources, to be the boots on the ground in the camps creating relationships with the homeless, creating relationships with our service providers, and then trying to marry the two."[4]

33.    The Livability Team directly "[w]ork[s] with [the Jackson County] Continuum of Care Coordinator to refer individuals to programs," with the "[t]ypes of crimes the team would help address [including]: drinking in public, disorderly conduct, criminal mischief, occupied RVs, accumulation of junk, stored vehicles in the right-of- way."

34.    The Livability Team is "tasked with providing services and help assisting people in the community that have a lot of calls for service," with the promise that "jail isn't always the answer to every offense . . . . [T]hat is where the Medford Police Department's Livability Team

---

[4]    City    of    Medford,    *Medford    Livability    Team*,    FACEBOOK    (July    13,    2022), https://www.facebook.com/CityofMedford/videos/461519978675424/.

    **LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

seeks to help . . . . It's a group of officers . . . targeting a lot of their needs around those calls for service to help kind of reduce the future need for the law enforcement realm . . . and providing them the services they need to get off the streets or stop having problems within the community that have risen to the calls for service that Medford has received." The City's public information about this Team states that "Jackson County community justice is involved with a lot of the individuals, and so the Livability team is "kind of partnered with them in the services we offer . . . to provide a wrap around plan of services."

35.     The City of Medford promotes its Livability Team program as a positive human-centric approach to community policing of homeless people in Jackson County. But, as alleged herein, the City of Medford's policies regulating unhoused people in Medford included violent retaliation against people who speak out against law enforcement in Jackson County.

C.     **City of Medford Opposed Measure 110 and Drug Decriminalization in Oregon**

36.     In November 2020, Oregon voters passed referendum Measure 110, the Drug Addiction Treatment and Recovery Act. Measure 110 made Oregon the first state in the U.S. to decriminalize possession of small amounts of all drugs, also greatly expanding addiction services and social supports through redirected marijuana tax revenue and law enforcement savings.[5] According to the Drug Policy Alliance, "Before Measure 110, Oregon arrested people for drug possession while ranking nearly last in access to treatment. In response, voters approved Measure 110 as a needed intervention to the challenges Oregon was facing around the harms of arresting

---

[5] *Oregon's Measure 110: What Really Happened,* DRUG POLICY ALLIANCE, 1 (Feb. 2024), https://drugpolicy.org/wp-content/uploads/2024/02/DPA-WhatReallyHappenedM110.pdf.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

and jailing people for drugs and to provide more services and supports for people in need."[6]

37.    Measure 110 restricted law enforcement's authority to stop, detain, arrest, or jail someone solely on the suspicion of drug possession. It reduced penalties for most "possession of a controlled substance" (PCS) offenses from a crime to a new "Class E" violation, punishable with only a $100 maximum fine, effective February 1, 2021. No jail, supervision, or other criminal penalties could be imposed.[7] The majority of Oregon law enforcement agencies vehemently opposed Measure 110.

38.    Following the passage of Measure 110, Senate Bill 755 (2021) established Behavioral Health Resource Networks (BHRNs).[8] House Bill 2513 (2023) further clarified the role of BHRNs. A BHRN is an entity or group of entities working together to provide comprehensive, community-based services and supports to people with substance use disorders or harmful substance use. Each Oregon county has at least one BHRN. Each BHRN must provide trauma-informed, culturally specific, linguistically responsive services. Services include but are not limited to screening for health and social service needs, behavioral health screening and referral for substance use disorder, individualized intervention planning, low-barrier substance use disorder treatment, harm reduction services, peer support services, employment supports, housing supports, and referral to appropriate outside services. "It is the policy of the State of Oregon that

––––––––––––––––––––––

[6] *Id.* at 2.

[7] *Measure 110*, OREGON JUDICIAL DEPARTMENT (Sept. 6, 2024),
https://www.courts.oregon.gov/about/Documents/BM110Statistics.pdf.

[8] *Drug Addiction Treatment and Recovery Act (Measure 110)*, OREGON HEALTH AUTHORITY,
https://www.oregon.gov/oha/hsd/amh/pages/measure110.aspx.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

screening, health assessment, treatment and recovery services for drug addiction are available to all those who need and want access to those services."[9]

39.    The City of Medford opposed Measure 110 and drug decriminalization policy. By 2023, the City passed a Resolution requesting the Oregon legislature repeal Measure 110 and recriminalize drug possession.[10] The City resolution proposed restoring misdemeanor status for possession of drugs. Medford's then-Mayor Randy Sparacino, the former Medford Chief of Police, stated in a press release, "I am pleased to see that our council and city leadership are moving forward with a resolution seeking a repeal of Measure 110 by our state legislators and if that isn't possible, significant and necessary changes to the measure."[11]

40.    Defendant Medford City Manager Sjothun blamed harm reduction programs like Stabbin' Wagon's Syringe Service Program for "livability" issues, stating, "Medford residents have to endure more drug paraphernalia in parks and other public spaces, including needles which are handed out by organizations to drug users."[12] The City had issued 5,540 possession violations, and wanted to re-criminalize drug possession and build a larger jail in Medford.[13]

---

[9] *Id.*

[10] Agenda Item Commentary Item No.: 70.3 (Council Bill 2023-123), MEDFORD CITY COUNCIL, 11 (Sept. 7, 2023), https://www.oregonlegislature.gov/golden/Documents/Adopted%20Measure%20110%20Resolution%2009072023.pdf.

[11] Ella Hutcherson, *City of Medford Calls for Repeal or Modification of Measure 110*, JEFFERSON PUBLIC RADIO (Sept. 7, 2023), https://www.ijpr.org/politics-government/2023-09-07/city-of-medford-calls-for-repeal-or-modification-of-measure-110.

[12] Damian Mann, *Medford City Council Wants Measure 110 to Be Fixed or Repealed*, ROGUE VALLEY TIMES (Sept. 11, 2023), https://rv-times.com/2023/09/11/medford-city-council-wants-measure-110-to-be-fixed-or-repealed/.

[13] *Id.*

PAGE 13 – **COMPLAINT**

LeDuc Montgomery LLC
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

D.    **Police Exert Extensive Influence on Access to Housing and Addiction Service**

**in Medford**

41.    Medford city policy has historically, and in present times, been extensively influenced by law enforcement agendas and policy preferences.

42.    At all times relevant, addiction and homelessness service providers in Medford had active law enforcement officers serving on their boards of directors, embedding law enforcement perspectives directly into organizational leadership.

43.    At all times relevant, the former Medford Chief of Police Randy Sparacino served as the Mayor of Medford.

44.    At all times relevant, Jackson County Sheriff Deputy Chad Miller served on the Medford City Council.

45.    At all times relevant, Medford Police Chief Justin Ivens served on the Board of Directors of Addictions Recovery Center (ARC) in Medford.

46.    At all times relevant, Medford Deputy Police Chief Trevor Arnold was the President of the Board of Directors of OnTrack Rogue Valley (currently known as Continuum Behavioral Health & Recovery Services), which provides behavioral health treatment and addiction recovery services in Medford.

47.    At all times relevant, former Medford City Manager Brian Sjothun was the Board Chair of the Jackson County Continuum of Care Board (COC), which oversees homelessness project priorities and federal HUD funds in Jackson County. Defendant Sjothun was an architect of the 2020 Hawthorne Park sweep, which resulted in the Medford Police Department closing down an entire public park, "sweeping" out more than 100 unhoused people living in the park, and arresting and jailing several community volunteers, including Plaintiff Jones, as well as a reporter,

PAGE 14 – **COMPLAINT**

for simply remaining in the public park.[14]

48.    At all times relevant, Jackson County Sheriff Nathan Sickler also served on the Jackson County COC Board.

49.    At all times relevant, Medford Police Sergeant Jason Antley, who currently supervises the Livability Team, served on the Board of Directors of ACCESS, an organization that provides food, warmth, and shelter for homeless and vulnerable people in Medford and Jackson County. ACCESS is also the Lead Agency managing the Jackson County COC and federal HUD funding for housing and homelessness projects in Medford and Jackson County.

50.    At all times relevant, Medford Police Cultural Liaison Lilia Caballero also served on the Board of Directors of ACCESS.

51.    Medford Police also controlled access to the Medford Urban Campground, a service funded by City of Medford to permit homeless people to live in tents on City property, operated primarily by the non-profit organization Rogue Retreat. "To get a spot in the camp, residents have to receive a referral from the Medford Police Department's Livability Team. That's a group of police officers who do outreach with people experiencing homelessness."[15]

52.    The regional care ecosystem in Medford is significantly shaped by law enforcement priorities, particularly in the areas of addiction recovery, housing, and behavioral health. While some service organizations do not have law enforcement on their boards, they operate in a service

---

[14] *City of Medford v. April Rosemary Fonseca,* ACLU OF OREGON (Aug. 16, 2022), https://www.aclu-or.org/en/cases/city-medford-v-april-rosemary-fonseca.

[15] Sydney Dauphinais, *Medford's First Urban Campground Provides a Safe Space for Homeless Campers, but Not for Long,* OREGON PUBLIC BROADCASTING (Aug. 17, 2020), https://www.opb.org/article/2020/08/18/medfords-first-urban-campground-provides-a-safe-space-for-homeless-campers-but-not-for-long/?utm_source=chatgpt.com.

PAGE 15 – **COMPLAINT**

environment shaped by coordinated diversion programs, justice partnerships, and funding structures that reflect ongoing collaboration with and influence by police. Many of the organizations in which Medford Police exert influence are members of the Jackson County BHRN.

**E.      Stabbin' Wagon Was Founded in 2020 in Response to Unmet Community Needs for Homelessness and Drug Addiction Services Not Controlled by Police**

53.      Plaintiffs are well-known advocates for public health and housing rights in Medford.

54.      Plaintiffs Jones and Strong have been vocal in supporting unhoused communities and critical of Medford Police Department ("MPD") practices and are well-known locally as activists affiliated with Stabbin' Wagon.

55.      Between 2020 and 2023, Plaintiff Jones, and later Plaintiff Strong, were the primary employees and public face of Stabbin' Wagon. For Plaintiff Jones in particular, their work and reputation became synonymous with that of Stabbin' Wagon.

56.      Plaintiff Jones founded Stabbin' Wagon in 2020 shortly after the Almeda Drive Fire displaced many in Medford, among them unhoused people. Many displaced people temporarily settled in Hawthorne Park, which became a local hub for access to outreach services, meals, services, and resources. Jones engaged in outreach and mutual aid support, providing food and harm reduction supplies from a Radio Flyer wagon to displaced and unhoused residents living in Hawthorne Park. Jones' distribution of safer-use supplies, like clean syringes and naloxone, earned that project the nickname the "stabbin' wagon," which Jones continued.

57.      Today, Stabbin' Wagon is a fully operational 501(c)(3) organization with a small staff. A white cargo van has replaced the original Radio Flyer wagon. Stabbin' Wagon travels throughout the community to meet people where they are, providing harm reduction and public

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

health services to vulnerable populations in Jackson County, including a Syringe Service Program, overdose prevention, HIV testing, and until recently, a peer respite program.



58.     Stabbin' Wagon formed just before Measure 110, the statewide ballot measure which decriminalized drug possession in Oregon.

59.     Stabbin' Wagon's service model is unique compared to other care providers in Southern Oregon, including addiction and recovery organizations in the Jackson County BHRN, in that Stabbin' Wagon provides peer-led, non-clinical harm reduction services with no requirement for abstinence, respecting autonomy and self-determination rather than pressuring people into treatment.

60.     Stabbin' Wagon also has a controversial policy of not collaborating with police, distinguishing Stabbin' Wagon from other service providers in Jackson County and the BHRN.

61.     Stabbin' Wagon's community-centered harm reduction work is evidence-based and effective. The organization has been awarded millions of dollars in government and private grants since its inception. But these grant awards have drawn the ire of Medford Police Department and police-aligned service providers. It has also made Stabbin' Wagon the focus of national attention,

LeDuc Montgomery LLC
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

including being featured in New Yorker Magazine and discussed on the Joe Rogan Podcast.

F.    **Plaintiffs Openly Oppose and Expose the City of Medford's Attempts to Criminalize and Punish the Status of Homelessness and Simple Drug Possession**

62.    Plaintiffs' work has challenged entrenched local policies surrounding homelessness, substance use, and policing in Medford. Their public health outreach and advocacy are expressive, often critical of law enforcement, and supported by constitutionally protected speech and association.

63.    Plaintiffs have engaged in public advocacy regarding public housing and health issues, including speaking at Medford City Council meetings and public forums. Often Medford Police Department representatives would be present at these meetings. Plaintiffs would share stories of police abuse of unhoused people, and criticize the City's enforcement activities against unhoused and drug using residents.

64.    Plaintiffs engaged in constitutionally protected activities, including organizing events and protests, speaking at public meetings and public forums, publishing political speech and commentary, conducting harm reduction outreach, recording on-duty police officers, and advocating for systemic housing and health care reforms in Medford and Jackson County, Oregon.

65.    Plaintiffs also regularly engaged in non-violent political pranksterism and performative protest. For example, Plaintiffs attended a Medford City Council meeting with toy pigs that "oinked" when squeezed. Plaintiffs would "oink" the pigs when Medford Police spoke during the meeting.

66.    A large portion of Stabbin' Wagon's client base are homeless. Stabbin' Wagon staff regularly visit clients on the Bear Creek Greenway and other locations where homeless camps are established. Plaintiffs were often present when police sweeps and arrests in homeless camps were

PAGE 18 – **COMPLAINT**          **LeDuc Montgomery LLC**
                                2210 W Main St., Suite 107 #328
                                Battle Ground, Washington 98604
                                704.702.6934

occurring.[16]

67.     Plaintiffs routinely filmed such actions by Medford Police and posted them to Stabbin' Wagon's social media accounts, often with satirical or comedic commentary and editing. The Stabbin' Wagon social media posts often depicted Medford Police as acting in bad faith, incompetent, and laughable.

68.     For example, in December 2022, Stabbin' Wagon posted on social media offering free mini posters depicting a clown wearing a Medford Police badge.



69.     Unsurprisingly, MPD did not like the fact Plaintiffs were publicly exposing video footage of police sweeps of homeless people, and Plaintiffs' negative portrayal of law enforcement in Medford.

70.     MPD's Kirkpatrick openly expressed his irritation of Stabbin' Wagon's First

---

[16] *See, e.g.,* @stabbinwagonmf, *Medford's War on the Poor Ep. 2,* Instagram (Feb. 24, 2021), https://www.instagram.com/tv/CLsTF3pBARh/?utm_source=ig_web_copy_link&igsh=MzRlOD BiNWFlZA==.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

Amendment activities.

71.    As noted above, Defendant Kirkpatrick served as the lead of the MPD Livability Team. While on the that Team, Kirkpatrick was hostile and displayed animosity toward Jones, Stabbin' Wagon, and other housing rights activists who video-recorded Kirkpatrick and MPD officers and then posted the videos with commentary on social media.

72.    In one such video recorded July 29, 2021, Stabbin' Wagon caught Kirkpatrick threatening an activist for recording police during a homeless camp sweep, and then, when the activist stated he was going to call his attorney, Kirkpatrick threatened, "If you're not gone by Thursday morning I'm going to put handcuffs on you." Stabbin' Wagon posted the video to social media, along with non-violent commentary critical of Defendant Kirkpatrick's actions, mocking MPD, and celebrating community action that prevented some camps from being "swept."[17]

### G.    City of Medford Targeted Plaintiffs Based on their Protected Political Activity

73.    This case arises from a deliberate, sustained campaign by the City of Medford and its agents to retaliate against Plaintiffs for their constitutionally protected activities, activism, public health outreach, and expressive conduct, and to suppress dissent by weaponizing law enforcement powers.

74.    Defendant City of Medford, through its Police Department and municipal officials and employees, has engaged in a sustained campaign of harassment, intimidation, and retaliation against Plaintiffs, seeking to suppress their public health work and chill their protected First Amendment activity.

---

[17] @stabbinwagonmfr, *Medford Oregon unhoused residents stand up & fight back!*, INSTAGRAM (July    31,    2021),    https://www.instagram.com/tv/CSAE6Y-JK9b/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==.

LeDuc Montgomery LLC
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

75.    Rather than support or remain neutral to these lawful efforts, the City of Medford and its police officials adopted an adversarial and punitive posture, beginning at least in 2020 and escalating in 2023, as Plaintiffs' visibility and funding increased.

76.    Defendants have employed a combination of law enforcement shows of force, selective code enforcement and prosecution, and smear campaigns to obstruct, undermine, and punish Plaintiffs' outreach services, public protests, and policy advocacy.

**H.    2020: Targeting and Arrest During Homeless Sweep in Hawthorne Park**

77.    In September 2020, during a mass police action to displace homeless and wildfire-displaced people camping at Hawthorne Park, Plaintiff Jones remained on site to assist residents, engaging in peaceful humanitarian support work. Medford Police Department arrested Jones and charged her with criminal trespassing for simply remaining in the public park assisting displaced residents in packing their belongings. Medford Police arrested multiple other non-violent community observers, including an NPR-affiliate journalist, drawing public outcry.

78.    MPD's mass arrest at Hawthorne Park drew national condemnation. More than 50 media organizations objected to the arrests, including the local NPR journalist April Fonseca Erlich, on First Amendment grounds.[18] The City charged Fonseca Erlich, but those charges were dismissed as unconstitutional.

**I.    2021-2023: Retaliatory Stops and Surveillance Following Public Protests**

79.    In January 2021, MPD officers, including Defendants Vega and Barringer, stopped and detained Jones without cause after she completed a shift providing food to unhoused people.

---

[18] *Judge Dismisses Charges Against Oregon Journalist April Fonseca Ehrlich*, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Sept. 8, 2022), https://www.rcfp.org/april-ehrlich-charges-dropped/.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

The officers asserted, without probable cause or reasonable suspicion, that the stop was because she "might" have an outstanding warrant and was possibly using an alias, neither of which were true. Officers recognized Jones from the prior Hawthorne Park arrest and engaged in invasive questioning in front of her minor child waiting in her running car.

80.      In June 2021, during a community caravan protest organized in response to Medford's eviction of homeless people during a record heatwave, Medford Police selectively pulled over and issued a citation only to the vehicle driven by Jones for alleged "excessive horn use," despite many participants also engaging in honking expressive conduct.[19]

81.      Over the years, MPD has excluded Stabbin' Wagon from official communications that were sent to other BHRN member service providers ahead of encampment sweeps, denying the organization its right to prepare or serve its clients.

82.      The Medford Police Department has collected and maintained dossiers concerning Plaintiffs' social media activity, affiliations, and speech, none of which pertained to any criminal investigation nor were supported by reasonable suspicion of a crime.

83.      Internal City communications obtained through public records requests reveal that MPD officers, including Defendants Graham and Kirkpatrick, monitored Jones' and Strong's online posts, events, and protest activities. Officers referenced Plaintiffs by name, cataloged their associations with activist groups, and made derogatory characterizations, including calling them "the worst human beings ever."

84.      By 2022, MPD was collecting and storing information about Plaintiffs' online

---

[19] @stabbinwagonmfr, *After #MedfordPolice posted eviction notices…*, INSTAGRAM (June 30, 2021), https://www.instagram.com/p/CQxMXdVtMBT/?hl=en&img_index=1.

LeDuc Montgomery LLC
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

activities, community associations, and political speech, despite the absence of any criminal investigation or reasonable suspicion of a crime. This included monitoring social media accounts, creating fake social media profiles in order to infiltrate and spy on Plaintiff's online activist activities, and documenting Plaintiffs' attendance at protests and other First Amendment expressive events.[20]

85.    Public records show MPD maintains a dossier of Plaintiffs' political activity and affiliations spanning several years. The dossier contains evidence showing MPD has collected, and then maintained, information about Plaintiff's protected political activity (in the absence of any connection to a criminal investigation or reasonable suspicion of a crime), including:

a.    A March 4, 2021 email from MPD's Divya Fisher to D.J. Graham regarding an upcoming protest "scheduled to occur" "in response to the COVID outbreak at the jail." Disturbingly, Fisher somehow knew that "This event is not being advertised on social media (or other public channels) and is being shared solely via direct message." The email specifically identified Plaintiff Jones as a "known protest player[]," stating that she, along with others, "frequently post calls to action and were very vocal about their displeasure about MPD's evolvement [sic] during the

---

[20] *ACLU Sues City of Medford for Illegal Surveillance, Citing Records Obtained by Information for Public Use*, INFORMATION FOR PUBLIC USE (Aug. 23, 2024), https://info4publicuse.org/2024/08/aclu-sues-medford/. Medford Police Department created the fake Facebook profile "Jessica Taylor" and intentionally used the profile to infiltrate social media groups and spy on Plaintiffs' expressive activity, including lawful community organizing and nonviolent activism unrelated to any criminal activity or investigation. *Mass Surveillance and ICE Backdoors in Southern Oregon*, INFORMATION FOR PUBLIC USE, https://info4publicuse.org/2025/06/mass-surveillance-and-ice-backdoors-in-southern-oregon/.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

Hawthorne Park encampment." Fisher confirmed she is monitoring social media including the "local BLM/ protest pages" and "will scan other social media platforms and see if there is any mention of this event[.]" Graham forwarded the email to a sergeant with MPD (hereinafter "the whistleblower sergeant").

b.  Fisher later noted that she went so far as to "check[] a variety of social media platforms" and "contacted the FBI to see if there is something I am missing," but none of these efforts yielded any evidence of criminal activity. Graham noted that MPD also reached out to the Oregon Titan Fusion Center seeking information, but found nothing. He reiterated MPD's belief that Jones was affiliated with Siskiyou Abolition Project.

c.  A May 11, 2021, email by Mayor Randy Sparacino, former MPD Police Chief, to MDP's Scott Clauson, containing the Jefferson Public Radio article "As Encampment Evictions Begin in Medford, Where Are People Supposed to Go?" quoting Plaintiff Jones talking on behalf of Stabbin' Wagon about police raiding homeless camps. Sparacino tells Clauson: "wanted you to be aware of what they're saying."

d.  A June 16, 2022, MPD action plan against a "Rave against Rogue Retreat" event. MPD noted that "Melissa Jones is the organizer of the event," and that, according to MPD Crime Analysts, the "Source of information is on Facebook and Instagram." MPD stated the "event will be monitored by social media." The Whistleblower sergeant was listed as second in command charged with responding to the event, including "Trespassing and/or Disorderly Conduct at the City Hall" "as needed."

PAGE 24 – **COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

e.   A June 24, 2022, email in which MPD admits to monitoring Jones' social media accounts relating to her attendance at a reproductive rights demonstration.

86.     In 2024, ACLU of Oregon filed a lawsuit against the City of Medford on behalf of Rogue Valley Pepper Shakers, Stabbin' Wagon, and Jones, seeking solely injunctive and declaratory relief, arguing that MPD's collection and maintenance of information regarding non-criminal activist activity violates ORS 181A.250.  That case is ongoing in Jackson County Circuit Court, with trial scheduled for 2026. *Rogue Valley Pepper Shakers v. City of Medford*, 24-cv-39962.[21]

**J.     2023: Former Medford Police Officer Blows the Whistle to Jones and Others on Facebook About MPD Monitoring of Activists and Being Biased against Plaintiffs**

87.     On January 8, 2023, Jones was contacted via Facebook messenger by the whistleblower sergeant.

88.     The whistleblower sergeant is a former MPD officer who had been a member of the MPD Livability Team (LVT).

89.     The whistleblower sergeant and Jones were not previously connected on Facebook and had not communicated there previously.

90.     During the January Facebook instant message exchange, the whistleblower sergeant wrote to Jones, "I have a conversation between Kirkpatrick and I you'd be interested in."

91.     The whistleblower sergeant continued, "I'm not claiming to be an innocent party in this, but the 'leader' of the LVT definitely has a bias towards you."

---

[21] *Rogue Valley Pepper Shakers v. City of Medford*, ACLU OF OREGON (2024), https://www.aclu-or.org/en/cases/rogue-valley-pepper-shakers-v-city-medford.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

92.     The whistleblower sergeant further wrote, "since I'm not a police officer any longer and I share in the [']Kirkpatrick is a prick['] movement I wanted to show you what he was circulating."

93.     When Jones asked what Kirkpatrick was circulating, the whistleblower sergeant declined to answer.

94.     The whistleblower sergeant did publicly confirm that MPD monitors social media accounts of activists. In late 2023, apparently disagreeing with MPD's targeting and surveillance of non-violent activists, the whistleblower sergeant commented on a Facebook post in the Jackson County Scanner Group page, "Ryan Mallory What do you think about PD creating fake profiles to 'monitor' the activity? Does that change your view?"

95.     Public records show that by 2023, MPD was paying an analyst to continuously monitor and maintain records about activists' social media and political activity in Jackson County, including about Plaintiffs, despite such organizations and people having no connection to criminal activity nor being connected to any criminal investigation, and without any reasonable suspicion of a crime.

### K.    2023: Intentional Interference with Grant Funding and Business Relationships

96.     In 2023, the Oregon Health Authority awarded Stabbin' Wagon a $1.5 million grant to develop a peer-run respite center in Southern Oregon. The grant was competitively awarded, with Stabbin' Wagon scoring the highest of all applicants. No other service providers in the Jackson County BHRN applied for the grant.

97.     Almost immediately, City of Medford and Medford Police Department leadership, including Defendants Sjothun, Ivens, Arnold, and Kirkpatrick, launched a coordinated effort to undermine and reverse the grant award. Internal emails show officers and city officials

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

disseminated inflammatory, false, and disparaging information about Plaintiffs to other providers, state officials, and community leaders. High-ranking City and MPD officials engaged in a covert campaign to discredit the organization. Communications from Chief Ivens, Deputy Chief Arnold, and others expressed outrage over the award and attempted to mobilize public opposition and influence the OHA to rescind the grant.

98.    The City's effort to interfere in the grant included communications with external parties, including executives of rival service providers who shared the City's animus toward Stabbin' Wagon. The campaign sought to portray Stabbin' Wagon as untrustworthy, unqualified, and politically extreme, an effort intended to deprive Plaintiffs of an essential funding stream and reputational legitimacy.

99.    Defendants began lobbying OHA and coordinating with other nonprofits hostile to Stabbin' Wagon, including OnTrack Rogue Valley and the Addictions Recovery Center, in an effort to halt the grant. Defendants also lobbied their community allies.

100.    Plaintiffs were not aware of these covert efforts at the time they were taking place. Plaintiff only learned of the covert efforts later through public reporting and records disclosures.

101.    On information and belief, one of the community allies contacted as a result of Defendants' outreach against Stabbin' Wagon's OHA grant was Ryan Mallory, the founder and owner of ThiefHunter Labs LLC in Jackson County. Mallory also moderates several social media groups related to ThiefHunter Labs and its "Scanner Group" network. Mallory's family member, Addison Mallory, is employed by Jackson County Sheriff's Department.

102.    Mallory, through ThiefHunter Labs and social media groups and networks, operates a private crime and loss-prevention consulting company. Through its "Scanner Group" network of Facebook groups, podcasts, and consulting services, the company claims to provide criminal

PAGE 27 – **COMPLAINT**

research, locating, and identification, background checks, and crime prevention training for businesses and individuals. Mallory presents the company as a bridge between the public and law enforcement, frequently emphasizing its ability to aid police in locating suspects and prevent crime through community reporting. The company's team prominently features former and current law enforcement officers, underscoring its close alignment with policing culture and methods.

103.    Publicly available information shows a consistent pattern of Mallory and Thiefhunter Labs collaborating with or giving platform to the Medford Police Department. ThiefHunter Labs has featured Medford Police Department personnel as guests on its official podcast who discussed patrol ethics and citizen reporting systems, and the MPD Livability Team featuring Defendant Kirkpatrick and Officer Wulff, who discussed homelessness and policing in a video episode titled "Medford Police Department Livability Team/Homeless | Scanner Group Podcast 008."

104.    ThiefHunter Labs also publicly interviewed Defendant Randy Sparacino, the former Medford Police Chief and Mayor, lending their platform to promote his views in an episode titled "Scanner Group | Podcast 002 | Chief/Mayor Randy Sparacino, Criminal Updates."

105.    ThiefHunter Labs' own materials explicitly describe law enforcement as the "second line of defense," positioning themselves as complementary to police while encouraging the public to support law enforcement efforts.

106.    These practices and statements show that ThiefHunter Labs and Mallory are not neutral observers, but instead operate as active supporters and amplifiers of the Medford Police Department, aligning their business and media activities with police interests.

107.    Consistent with Defendants' outreach to members in its network seeking to undermine Stabbin' Wagon's OHA grant, on September 7, 2023, Ryan Mallory posted a video to

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

social media urging the Jackson County community to oppose Stabbin' Wagon's receipt of the OHA grant and demonizing Stabbin' Wagon's harm reduction work.

108.    Parroting the talking points seen in Defendants' emails to others suggesting Stabbin' Wagon was not a 'legitimate' non-profit, Mallory stated of Stabbin' Wagon, "Nothing about these folks qualifies them to do that [open a peer respite center]. If it was Jackson County Health Authority or one of the many recovery organizations doing this, [I] probably wouldn't say much."

109.    "But the fact of the matter is," continued Mallory in his post, Stabbin' Wagon's employees "protest the police" and "protest authority."

110.    Mallory's post stated in part that "Unqualified people that fill our Parks in greenways with needles, keep people addicted by promoting drug use, and misappropriate grant money by using it for public protest of the police rather than helping people are about to get a massive paycheck. Listen to the video. Please write your opposition in an email to the director of the Oregon health authority at OHA.DirectorsOffice@oha.oregon.gov[.] Ask for an audit of the stabbin wagon organization, ask that The state give that money to a qualified recovery agency or the Jackson county health authority. It's the only way 1.3 mil Will do our community any good. These folks are intending on renting a building to perpetuate drug use with 1.3 million dollars in taxpayer money. Let them know that thier [sic] two leaders, Melissa Jones and her marketing director [Sam Strong] have openly stated that they get grant money and use it to protest police and others."

111.    Following Defendants' campaign to undermine and discredit Stabbin' Wagon among the community, and shortly after Mallory's post to the more than 100,000 members of the Jackson Scanner Group Facebook page, Jones and Strong experienced increased retaliation and

LeDuc Montgomery LLC
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

harassment.

112.    On September 13, 2023, a known pro-police member of the Jackson Scanner Group arrived on site at Stabbin' Wagon's outreach service, approached Stabbin' Wagon staff and began yelling that she was going to call the police to report Stabbin' Wagon employees for violating the exclusion zone by being present in Medford. Her behavior was hostile and aggressive and made Stabbin' Wagon staff fearful.

113.    Plaintiffs continued to experience harassment, discrimination, and retaliation from Medford officials, as well as increased harassment from members of the public and in online forums, well into 2024 and up to the present day.

114.    The Oregon Health Authority in fact delayed the grant execution process in apparent response to Defendants' campaign to undermine Stabbin' Wagon's state grant funding.

115.    In 2023, Information for Public Use published a story that included a public records disclosure showing the collusion by the City of Medford, Medford Police Department, and other community members attempting to revoke Stabbin' Wagon's OHA grant.[22]

116.    The City of Medford public record trove exposed by Information for Public Use gained significant media attention regarding the City's retaliation against Plaintiffs.[23]

---

[22]    *POLICE AND CITY OF MEDFORD COLLUDE TO DEFUND HARM REDUCTION NONPROFIT*, INFORMATION FOR PUBLIC USE (Updated Oct. 29, 2023), https://info4publicuse.org/blog/.

[23]    *See, e.g.,* Eric Bengel, *Stabbin' Wagon's $1.5 Million Grant Raises Questions, Emails Show*, ROGUE VALLEY TIMES (Sept. 13, 2023), https://rv-times.com/2023/09/13/stabbin-wagons-1-5-million-grant-raises-questions-emails-show-2/; Jake Thomas, *Facing Backlash over $1.5 Million State Grant, Stabbin' Wagon Speaks Out*, THE LUND REPORT (Sept. 12, 2023), https://www.thelundreport.org/content/facing-backlash-over-15-million-state-grant-stabbin-wagon-speaks-out.

PAGE 30 – **COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

117.    In January 2024, Plaintiff's work further became the subject of national discourse when an article in the New Yorker was published regarding Measure 110 and drug decriminalization in Oregon and heavily featured Plaintiffs.[24]

118.    Plaintiffs' reputations, mental health, finances, and professional relationships have suffered as a result of Defendants' conduct.

119.    Stabbin' Wagon's operations and partnerships have been undermined by the City's repeated interference.

120.    By 2024, both Strong and Jones had resigned from employment with Stabbin' Wagon County, due to the cumulative negative effects of the harassment, surveillance, doxing, and retaliatory pressure from the City of Medford and allied third parties.

121.    By 2025, Stabbin' Wagon was forced to close its peer respite program in part as a result of municipal and zoning barriers and Defendants' subversion campaign. Stabbin' Wagon staff continue to fear retaliation and harassment from Medford Police and city officials.

### L.  Medford Has a History of Retaliating Against Advocates Who Challenge Police

122.    The City of Medford and Medford Police Department have a history of targeting and retaliating against advocates, activists, and volunteers who oppose or question law enforcement policy perspectives.

123.    In July 2019, John Malaer, a homelessness and disability rights advocate and Jackson County COC Board Member, was scheduled to give a presentation to the Jackson County COC regarding his lived experience with policing in Medford. Mr. Malaer had been a vocal critic

---

[24] E. Tammy Kim, *A Drug-Decriminalization Fight Erupts in Oregon*, THE NEW YORKER (Jan. 15, 2024), https://www.newyorker.com/magazine/2024/01/22/a-new-drug-war-in-oregon.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

of law enforcement abuse against unhoused residents in Medford. Three days before his scheduled presentation, Medford Police Department arrested and falsely designated Mr. Malaer as homeless in the arrest citation, and lodged Mr. Malaer in the Jackson County jail, where he suffered egregious abuse.[25] Mr. Malaer subsequently sent an email to Defendant Medford City Manager Sjothun, then-Chair of the COC Board, detailing the abuse and resigning from the COC Board.

124.    In a separate incident, in December 2022, Medford resident Stephen Douglas was selected to serve on the City of Medford Police Advisory Committee. He was appointed to serve beginning February 1, 2023, with his term expiring January 31, 2026.

125.    Shortly after joining the Committee, during a tour of the Police Department in 2023, Mr. Douglas asked Medford Police Deputy Chief DJ Graham about the Medford Police Department's handcuffing policy and handcuffing arrestees too tightly. Deputy Chief Graham responded he would look into the matter and respond back to Mr. Douglas.

126.    Instead of responding to Mr. Douglas' concern, between March and April 2023, employees of the Medford Police Department, City of Medford, and Medford City Council Member Eric Stark began calling and pressuring Mr. Douglas to resign from the Police Advisory Committee. The City also withheld information and access regarding Police Advisory Committee participation from Mr. Douglas and would not let him participate in the Committee's activities.

127.    On April 20, 2023, members of the Medford Police Department advocated at a City Council Meeting to remove Mr. Douglas from the Police Advisory Committee.[26] The Medford

---

[25] *See Malaer v. Kirkpatrick*, No. 1:20-cv-00049-CL (D. Or.).

[26] *Medford City Council Meeting Recording*, CITY OF MEDFORD (Panopto video at 59:53) (April 20, 2023), https://medford.hosted.panopto.com/Panopto/Pages/Embed.aspx?id=5dea42ba-e35d-4988-939d-af7300121913.

**LeDuc Montgomery LLC**
                    2210 W Main St., Suite 107 #328
                    Battle Ground, Washington 98604
                    704.702.6934

City Attorney Eric Mitton made a presentation, and the City Council voted to remove Mr. Douglas from the Police Advisory Committee on the recommendation of the Medford Police Department.

128.    On April 21, 2023, Mayor Sparacino, former Medford Police Chief, sent Mr. Douglas a written letter confirming his removal from the Police Advisory Committee. The City of Medford, Medford Police Department, Police Chief Trevor Arnold, Deputy Chief DJ Graham, Mayor Randy Sparacino, and the Medford City Council, including but not limited to Eric Stark, participated in or perpetuated this retaliation.

129.    In late 2023, public records exposed by Information for Public Use reveal that Medford Police spied on, monitored, and collected information about non-violent activists and groups, including Plaintiffs, Black Lives Matter, Rogue Valley Pepper Shakers, Siskiyou Rising Tide, and Rise and Resist Southern Oregon, among others, despite no connection to criminal investigations.[27]

130.    Plaintiffs' experiences of being targeted and retaliated against by the City of Medford are not isolated incidents, but part of an ongoing pattern and practice of First Amendment violations by the City, intended to silence and suppress voices critical of the Medford Police Department and its activities.

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 – First Amendment – Retaliation
### *(Against All Individual Defendants)*

131.    Plaintiffs reallege all previous paragraphs.

132.    Defendants, acting under color of state law, took adverse actions against Plaintiffs

---

[27] Natasha Lennard, *Oregon Police Obsessively Spied on Activists for Years, Even After Pipeline Fight Ended*, THE INTERCEPT (Nov. 8, 2023), https://theintercept.com/2023/11/08/oregon-police-surveillance-protests-activists/.

LeDuc Montgomery LLC
                                            2210 W Main St., Suite 107 #328
                                            Battle Ground, Washington 98604
                                            704.702.6934

in retaliation for Plaintiffs' protected expression, using law enforcement powers in an attempt to suppress dissent, including:

    a.  targeted surveillance of protest groups, nonprofit workers, and social media accounts of local activists, including monitoring and documenting the protected speech and associations of Plaintiffs and other activists;

    b.  coordinating with third parties to undermine Plaintiffs' funding and professional relationships;

    c.  harassment;

    d.  patterned exclusion of disfavored service providers from city-sponsored communication channels and funding networks;

    e.  routine coordination between police, code enforcement, and nonprofit partners to marginalize those engaged in advocacy for unhoused and drug-using populations;

    f.  private and public disparagement; and

    g.  pretextual stops, unlawful arrests, targeted citations; exclusion orders, and other enforcement actions.

133.    These retaliatory acts would chill a person of ordinary firmness from continuing to engage in protected expression.

134.    Defendants Jones and Strong eventually resigned from their employment with Stabbin' Wagon, due in large part to the cumulative impacts of Defendants' actions.

135.    Defendants' adverse actions were substantially motivated by Plaintiffs' protected conduct. Statements by MPD officers, City emails, and the pattern of targeted enforcement against Plaintiffs, while others were not similarly treated, provide direct and circumstantial evidence of unconstitutional motive.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

136.     As a result of Defendants' conduct, Plaintiffs have suffered violations of their constitutional rights, as well as physical, emotional, economic, and reputational harm.

137.     Accordingly, Plaintiffs seek economic and noneconomic damages in an amount to be determined at trial.

138.     The acts of the individual Defendants were intentional, willful, and in reckless disregard of Plaintiffs' constitutional rights. Plaintiffs seek punitive damages against them in an amount to be determined by a jury.

139.     Plaintiffs seek an award of their reasonable attorney fees and costs incurred in bringing this action, pursuant to 42 U.S.C. § 1988.

### SECOND CLAIM FOR RELIEF
Violation of 42 U.S.C. § 1983 – First and Fourth Amendment – *Monell* Liability
*(Against Defendant City of Medford)*

140.     Plaintiffs reallege all previous paragraphs.

141.     Under *Monell v. Department of Social Services*, a municipality is liable under § 1983 when a constitutional violation is the result of an official policy or decision by municipal policy makers, widespread custom or practice that is so permanent and well settled it constitutes the force of law, or a failure to train, supervise, or discipline municipal employees, reflecting deliberate indifference to constitutional rights.

142.     The City of Medford, through its official policymakers, departments, and agents, maintained and enforced policies, customs, and practices that caused the above-referenced violations of Plaintiffs' constitutional rights, including rights protected by the First and Fourth Amendments to the United States Constitution.

143.     Defendant City of Medford, through its final policymakers (including but not limited to the City Manager, Chief of Police, and Mayor) approved, directed, or ratified the

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

retaliatory conduct, surveillance, arrests, and interference detailed in this Complaint.

144.    The City adopted formal and informal policies to exclude and discredit service providers that refused to collaborate with law enforcement, including Stabbin' Wagon, and privileged those that embedded police officers on boards or operated under police influence.

145.    Even absent a written policy, the City of Medford maintained a longstanding custom and practice of retaliating against people and organizations that challenged the City's law enforcement priorities or political agenda, in the various ways described *supra*.

146.    These practices were widespread, long-standing, and known to city leadership. They reflect a municipal culture of suppressing dissent, particularly when it emerges from groups advocating harm reduction, drug decriminalization, or housing justice.

147.    The City of Medford also failed to adequately train or supervise its police officers and managerial staff concerning the rights of Plaintiffs and others similarly situated, including:

      a.  First Amendment protections for protestors, nonprofit workers, and public health advocates;

      b.  the limits of lawful surveillance and data retention, including the limitations imposed by ORS 181A.250; and

      c.  the appropriate use of force and law enforcement activity in the context of homelessness and harm reduction outreach.

148.    The City also failed to discipline officers engaged in known retaliatory conduct. Officers with histories of harassment or improper targeting of Plaintiffs were promoted or retained in key leadership positions (e.g., Livability Team supervisors), despite complaints or notice of misconduct.

149.    These actions and omissions caused direct violations of Plaintiffs' constitutional

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

rights, as well as constituting deliberate indifference to the constitutional rights of Plaintiffs and others similarly situated, and were a moving force behind the constitutional injuries alleged herein.

150.    The City's acts and omissions described herein directly caused harm to Plaintiffs, including but not limited to retaliatory arrests and prosecution, suppression of political speech and public health outreach, economic damage through grant interference, emotional distress, reputational harm, increased costs and financial damages, and long-term disruption of Plaintiffs' nonprofit operations and professional standing.

151.    Accordingly, Plaintiffs seek economic and noneconomic damages in an amount to be determined at trial.

152.    Plaintiffs seek an award of their reasonable attorney fees and costs incurred in bringing this action, pursuant to 42 U.S.C. § 1988.

## THIRD CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights
#### *(Against All Individual Defendants)*

153.    Plaintiffs reallege all previous paragraphs.

154.    The elements of a claim for conspiracy to violation civil rights under 42 U.S.C. § 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws or equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) injury to person or property or deprivation of a constitutional right.

155.    Defendants conspired to deprive Plaintiffs of the equal protection of the laws and the equal privileges and immunities under the law by engaging in a coordinated campaign to undermine the rights and protections conferred by Oregon Measure 110, ORS 195.530, and related public health and housing laws and regulations.

PAGE 37 – **COMPLAINT**

156.    The conspiracy was motivated by invidious discriminatory animus based on the class-based legal and political status of Plaintiffs' clients: people who are unhoused and/or drug-using, and whose legal and civil status recently changed under Oregon law.

157.    As the legislative history of § 1985(3) demonstrates, the statute was enacted to protect groups who became the targets of organized hostility due to newly conferred legal rights. Congress intended to shield classes of people, such as Black Republicans, Northern schoolteachers during Reconstruction, and people "from New Jersey," not necessarily because of immutable identity, but because of allegiance to legal and political transformation. *See* Cong. Globe, 42d Cong., 1st Sess. 428-29 (1871).

158.    In Oregon, a similar backlash occurred during all relevant times of 2019 through 2023, and to the present. The legal status of unhoused and drug-using people was transformed by Oregon voters and legislators. Their formerly criminalized conduct (e.g., simple drug possession and camping on public land) was no longer blanketly illegal, and they were legally entitled to access public health services, treatment, and public space without criminal prosecution or with additional protections in place.

159.    In response to this shift, Defendants undertook a conspiracy to suppress these new rights and punish those who supported or embodied them. Through intimidation, surveillance, retaliation, and discriminatory enforcement, Defendants targeted Plaintiffs for their direct support of this legally protected class and for recording and publicly exposing the City's misconduct.

160.    For example, ORS 195.530 declares that people experiencing homelessness may lawfully use public space without discrimination based on housing status. Other Oregon statutes impose limits on enforcement practices, such as time, place, and manner restrictions on sweeps of homeless camps on public land.

PAGE 38 – **COMPLAINT**

161.    These laws demonstrate a legislative intent to protect unhoused people as a vulnerable legal class. Combined with Measure 110's decriminalization provisions and public health access mandates, these statutes create affirmative rights for clients served by Plaintiffs.

162.    Defendants' conduct, including arrests, surveillance, online doxing, funding interference, and reputational attacks, constitutes invidious action aimed at suppressing those rights.

163.    Accordingly, Stabbin' Wagon's clients, as beneficiaries of legislatively conferred rights and targets of retaliatory conduct by public officials, constitute a protected class under § 1985(3). Plaintiffs, in turn, were targeted for supporting that class and vindicating its rights.

164.    In Medford, this group, often rural, medically disabled, and economically marginalized, is treated as a racialized and criminalized "other," illegitimate in public life. MPD's internal language, enforcement disparities, and systematic exclusion efforts underscore this legal and cultural hostility. Defendants have effectively constructed an illegitimate legal identity for these people, treating them not as civilians entitled to rights, but as an unworthy criminal class, precisely the type of group-based suppression § 1985(3) was designed to address. The discriminatory policing and punishment of this class is consistent with historical practices of exclusion and economic punishment that § 1985(3) sought to eliminate.

165.    As Plaintiffs supported, protected, and defended this class, through public health work, activism, recording of police activity, and policy advocacy, they became the focus of Defendants' animus.

166.    Defendants conspired among themselves and with third parties, including hostile nonprofit leaders and politically aligned social media actors, to surveil, harass, discredit, and dismantle Plaintiffs' work.

PAGE 39 – **COMPLAINT**

LeDuc Montgomery LLC
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

167.    Plaintiffs were targeted not only for their political beliefs and speech, but because they were helping the very class that Defendants sought to exclude, punish, and suppress from public life in Medford.

168.    Defendants' overt acts in furtherance of this conspiracy include:

a.    Dissemination of discrediting and false information to third parties about Plaintiffs, their work, and their clients;

b.    Interference with a state-funded $1.5 million grant awarded to Stabbin' Wagon;

c.    Targeted arrests, citations, surveillance, and harassment of Plaintiffs; and

d.    Coordination with anti-activist social media groups that published private information and incited public backlash.

169.    These acts were motivated by invidious animus against Plaintiffs' ideological and associational status, including affiliations with leftist, abolitionist, harm reduction, and LGBTQIA2S+ movements, and by their visible support of politically disfavored groups.

170.    Plaintiffs have been injured in their persons, reputations, livelihoods, and legal interests as a direct and proximate result of this unlawful conspiracy by Defendants.

171.    Defendants' conduct proximately caused damages including deprivation of liberty, emotional distress, reputational harm, and disruption of Plaintiffs' public health work.

172.    Accordingly, Plaintiffs seek economic and noneconomic damages in an amount to be determined at trial.

173.    The acts of the individual Defendants were intentional, willful, and in reckless disregard of Plaintiffs' constitutional rights. Plaintiffs seek punitive damages against them in an amount to be determined by a jury.

174.    Plaintiffs seek an award of their reasonable attorney fees and costs incurred in

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

bringing this action, pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF
### Intentional Interference with Economic Relations
*(Against Defendant City of Medford)*

175.    Plaintiffs reallege all previous paragraphs.

176.    At all times relevant, Plaintiffs had a valid and existing professional and economic relationship with the Oregon Health Authority and other organizations in Jackson County, including but not limited to Behavior Health Resource Network (BHRN) stakeholders, grant partners, community service providers, and prospective funders. Plaintiffs Jones and Strong were employees of Stabbin' Wagon whose livelihoods depended in part on the continued operation of the Stabbin' Wagon organization.

177.    These relationships included a $1.5 million grant awarded by OHA to Plaintiff Stabbin' Wagon to establish and run a peer respite center for people with substance use and housing instability, a grant awarded through a competitive scoring process.

178.    At all times relevant, Defendants, including Defendant City of Medford and individual defendants Sjothun, Ivens, Arnold, and Kirkpatrick, among others, had actual knowledge of Plaintiffs' grant award, the organizational partnerships that supported it, and the professional and financial relationships Plaintiffs relied upon to carry out their work and activities.

179.    The City of Medford is liable for the actions of its employees and officials under the doctrine of *respondeat superior* and Oregon law.

180.    Defendants intentionally interfered with Plaintiffs' professional and economic relationships by, among other things:

    a.  Engaging in backchannel communications with OHA officials and third-party nonprofit leaders urging revocation or reconsideration of the grant;

LeDuc Montgomery LLC
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

b. Disseminating false, misleading, or derogatory statements about Stabbin' Wagon's practices, personnel, and leadership;

c. Coordinating with other BRHN organizations (including Addictions Recovery Center and OnTrack Rogue Valley) to stoke political and public opposition to the grant award;

d. Utilizing official city resources to distribute negative media, incite reputational harm, and disrupt Plaintiffs' standing in the harm reduction and housing services ecosystem; and

e. Interfering with Stabbin' Wagon's communications and reputation within the BHRN network, including exclusion from essential notifications and referral opportunities.

181. Defendants were not parties to the relationships and had no legal justification or privilege to interfere.

182. Defendants' interference was conducted for both improper motive and by improper means. It was done with the purpose of retaliating against Plaintiffs for their constitutionally protected speech and activism, and for their refusal to align with the City's law enforcement-led policy priorities regarding unhoused and drug-using residents of Medford.

183. As a direct and proximate result of Defendants' actions, Plaintiffs suffered reputational harm, disruption to service delivery and client trust, delays and loss of funding, diminished professional standing and opportunities, emotional distress, and harm to their business interests and livelihoods.

184. Accordingly, Plaintiffs seek economic and noneconomic damages in an amount to be determined at trial.

PAGE 42 – **COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

185.    Plaintiffs seek punitive damages in an amount to be determined by a jury.

### FIFTH CLAIM FOR RELIEF
### False Light
### (Against Defendant City of Medford)

186.    Plaintiffs reallege all previous paragraphs.

187.    Defendants, acting under color of law, gave substantial publicity to false and highly objectionable statements and innuendo about Plaintiffs that placed them in a false light before the public.

188.    The City of Medford is liable for the actions of its employees and officials under the doctrine of *respondeat superior* and Oregon law.

189.    Defendants knew, or acted with reckless disregard for the truth, that these statements were false, misleading, or sensationalized, and were likely to be offensive to a reasonable person. These false or misleading statements and publicity include, but are not limited to:

    a.    City officials and police leadership publicly characterized Stabbin' Wagon as a destabilizing influence in the community, warning that a $1.5 million grant to the nonprofit would "cause more destruction." Public emails exchanged among the Chief of Police, Deputy Chief, and City Manager referred to the grant as "unbelievable" and a "disaster waiting to happen."

    b.    Police and City officials presented Plaintiffs as threats to public order, despite MPD having no evidence of criminal wrongdoing or legitimate safety concerns. The misleading framing repeated in press statements allowed the public to draw the false inference that Plaintiffs' harm reduction work enabled or encouraged disorder.

    c.    Suggesting to BHRN members that Stabbin' Wagon is not a "legitimate" non-profit, despite Stabbin' Wagon having a board of Directors, 501(c)(3) IRS status, and

PAGE 43 – **COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

received hundreds of thousands in state-evaluated and monitored grant funding.

d. In response to litigation and public scrutiny, MPD officials defended their surveillance practices by claiming they were merely reviewing "publicly available information" for public safety purposes, explicitly denying that they were monitoring political or social views. These statements were knowingly misleading because internal records and emails demonstrate that MPD maintained information on Plaintiffs' political ideology and associations.

190.    This intentionally misleading publicity placed Plaintiffs in a false and damaging light with respect to their public health mission, professionalism, and political integrity.

191.    The false or misleading statements were broadly disseminated outside of the City of Medford, including to nonprofits like OnTrack and ARC, as well as state lawmakers, OHA, and the community at large, resulting in reputational injuries to Plaintiffs.

192.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered reputational harm, disruption to service delivery and client trust, delays and loss of funding, diminished professional standing and opportunities, emotional distress, and harm to their business interests and livelihoods.

193.    Accordingly, Plaintiffs seek economic and noneconomic damages in an amount to be determined at trial.

194.    Plaintiffs seek punitive damages in an amount to be determined by a jury.

### DEMAND FOR JURY TRIAL

195.    Plaintiffs demand a jury trial on all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests the Court enter judgment in their favor

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

and against all Defendants, and award the following relief:

A. A declaration Defendants violated Plaintiff's rights under the United States Constitution and Oregon law, including but not limited to under the First and Fourth Amendment;

B. An award of economic and non-economic damages in an amount to be proven at trial, for Plaintiff's physical injuries, pain and suffering, emotional distress, trauma, humiliation, and loss of dignity, lost wages, and other out-of-pocket expenses, past and future mental health treatment, and related expenses in an amount to be determined at trial;

C. An award of punitive damages against each individual Defendant whose acts were intentional, malicious, or taken with reckless indifference to Plaintiffs' federally and state-protected rights;

D. An award of Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute or rule;

E. An award of interest on all sums awarded, including prejudgment and post-judgment interest as permitted by law; and

F. Such other and further relief as this Court deems just, equitable, and appropriate.

DATED: September 11, 2025.                     LEDUC MONTGOMERY LLC

By: *s/Alicia LeDuc Montgomery*

**Alicia LeDuc Montgomery, OSB #173963**
alicia@leducmontgomery.com
704.702.6934

**Marianne Dugan, OSB #932563**
mdugan@cldc.org
541.687.9180

Attorneys for Plaintiffs

PAGE 45 – **COMPLAINT**           **LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934