**ALICIA LEDUC MONTGOMERY, OSB # 173963**
Email: alicia@leducmontgomery.com
**LEDUC MONTGOMERY LLC**
2210 W Main Street, Suite 107 #328
Battle Ground, Washington 98604
Telephone: 704.702.6934
www.leducmontgomery.com

**MARIANNE DUGAN, OSB # 932563**
Email: mdugan@cldc.org
**CIVIL LIBERTIES DEFENSE CENTER**
1711 Willamette Street Ste 301 No. 359
Eugene, Oregon 97402
Telephone: 541.687.9180
www.cldc.org

      Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| STABBIN WAGON, an Oregon public benefit corporation; MELISSA JONES, an individual; and SAMANTHA STRONG, an individual, | Case No. 1:25-cv-1632-MTK |
|     Plaintiffs, | **SECOND AMENDED COMPLAINT** |
|       v. | Violations of 42 U.S.C. § 1983 – First Amendment Retaliation, *Monell* Liability; Violations of 42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights |
| CITY OF MEDFORD, a municipal corporation; BRIAN SJOTHUN, an individual; RANDY SPARACINO, an individual; JUSTIN IVENS, an individual; DARRELL GRAHAM, an individual; GEOFF KIRKPATRICK, an individual; TREVOR ARNOLD, an individual; ARTURO VEGA, an individual; RYAN MALLORY, an individual; and JOHN and JANE DOES 1-9, individual employees or agents of the City of Medford, | **DEMAND FOR JURY TRIAL** |
|     Defendants. | |

PAGE 1 – **SECOND AMENDED COMPLAINT**

## INTRODUCTION

1.      The City of Medford has a history of sundown town policy enforcement, anti-vagrancy laws, and intense public policy influence by law enforcement. Beginning in 2019, the City was attempting to remove homeless people from its downtown and greenway as part of an economic development project, and also actively opposed drug decriminalization measures in Oregon.

2.      Plaintiff Stabbin' Wagon was founded in 2020 and primarily serves drug users and homeless people in Medford, Oregon. Plaintiffs Melissa Jones and Samantha Strong were, at all relevant times, employees of Stabbin' Wagon.

3.      Plaintiffs serve people the cops don't like, vocally oppose the City's policy agendas, and, through social media videos and policy advocacy, expose the ways in which the city and its police engage in what Plaintiffs believe is unlawful or morally distasteful behavior against Stabbin' Wagon's clients. Stabbin' Wagon also has a policy of not cooperating with police, while Medford and Jackson County law enforcement sit on the boards of directors of the other non-profit drug treatment and housing service providers in Medford.

4.      By 2023, in the face of drug decriminalization legislation in Oregon, the City of Medford and Stabbin' Wagon were diametrically opposed, with the City publicly calling for recriminalization legislation and enforcing a downtown exclusion zone policy, while Stabbin' Wagon expanded its homelessness outreach and advocacy services, openly critiqued police enforcement against unhoused people, and received a $1.5 million state grant to open a peer respite center in Jackson County.

5.      The City of Medford responded by targeting and surveilling Plaintiffs, harassing

PAGE 2 – **SECOND AMENDED COMPLAINT**

Stabbin' Wagon employees, launching a lobbying campaign to "undo" Plaintiffs' OHA grant, and arresting, jailing, and prosecuting Stabbin' Wagon's employees without probable cause during a public health event in downtown Medford in August 2023.

6.      In August 2024, ACLU of Oregon filed a lawsuit alleging the City of Medford Police Department's collection and monitoring of information regarding Plaintiffs' First Amendment organizing activity violated state law under ORS 181A.250. That lawsuit remains ongoing in state court.

7.      This case seeks redress for a years-long campaign by the City of Medford and its agents and employees to unlawfully target, harass, retaliate against, and suppress the speech, activism, and public health work of Plaintiffs. Plaintiffs are community organizers and health workers whose constitutionally protected outreach and expressive activities, including distribution of overdose prevention materials, participation in public demonstrations, and public health events, have been repeatedly and intentionally targeted by the Medford Police Department and Medford City officials, through unlawful arrests, surveillance, economic interference, and other retaliatory actions. Defendants' conduct has violated Plaintiffs' rights under the First and Fourth Amendments to the United States Constitution and Oregon law.

## JURISDICTION

8.      This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. §§ 1983, 1985, and 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

## VENUE

9.      Venue is proper in the District of Oregon under 28 U.S.C. § 1391(b), because the events giving rise to this claim occurred in this district, and all Defendants reside in this district.

PAGE 3 – **SECOND AMENDED COMPLAINT**

10. Venue is proper in the Medford Division because all events giving rise to Plaintiff's claims in this lawsuit took place in Jackson County, Oregon. 28 U.S.C. § 1391(b)(2).

## PARTIES

### A. Plaintiffs

11. Plaintiff Stabbin' Wagon is an Oregon nonprofit public benefit corporation headquartered in Jackson County, Oregon. It is a 501(c)(3) organization that provides harm reduction, public health outreach, and crisis support services to unhoused and at-risk populations throughout Southern Oregon. Stabbin' Wagon and its staff regularly engage in expressive activities, such as publishing educational content, recording law enforcement interactions, organizing demonstrations, and advocating for systemic reform.

12. Plaintiff Melissa Jones, at all relevant times, was a resident of Jackson County, Oregon, and is the Founder and, at all relevant times, was Executive Director of Plaintiff Stabbin' Wagon. Jones is an activist engaged in advocacy for housing rights, LGBTQIA2S+ rights, reproductive justice, drug decriminalization, and harm reduction. Jones has been subjected to targeted retaliation, arrest, and prosecution by the City of Medford and its employees for her constitutionally protected outreach and expressive activities.

13. Plaintiff Samantha Strong is a resident of Jackson County, Oregon, and at all relevant times was an employee of Stabbin' Wagon. Strong is an activist engaged in advocacy for housing rights, LGBTQIA2S+ rights, reproductive justice, drug decriminalization, and harm reduction. Strong has been subjected to targeted retaliation, arrest, and prosecution by the City of Medford and its employees for their constitutionally protected outreach and expressive activities.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

**B. Defendants**

14.     Defendant City of Medford is a municipal corporation organized under the laws of the State of Oregon and is the legal entity responsible for the operation of the Medford Police Department. The City is liable for the unlawful conduct of its policymakers, agents, and employees.

15.     Defendant Brian Sjothun is the former City Manager of the City of Medford. At all times relevant, he acted under color of state law and within the scope of his employment as City Manager. Defendant Sjothun participated in the retaliatory actions described herein. On information and belief, Defendant is a resident of Jackson County, Oregon.

16.     Defendant Randy Sparacino is the former Mayor and former Chief of Police of the City of Medford. At all times relevant, he acted under color of state law and within the scope of his employment as Mayor. Defendant Sparacino participated in the retaliatory actions described herein. On information and belief, Defendant is a resident of Jackson County, Oregon.

17.     Defendant Justin Ivens is the Chief of Police for the Medford Police Department. At all relevant times, he acted under color of state law and within the scope of his employment. Chief Ivens participated in or ratified the surveillance and retaliatory actions described herein. On information and belief, Defendant is a resident of Jackson County, Oregon.

18.     Defendant Darrell "DJ" Graham is the Deputy Chief of Police and formerly supervised the Medford Police Department's Livability Team, also known as the LVT. At all relevant times, he acted under color of law and participated in the acts of surveillance, targeting, and retaliation. On information and belief, Defendant is a resident of Jackson County, Oregon.

19.     Defendant Geoff Kirkpatrick is a Lieutenant with the Medford Police Department

PAGE 5 – **SECOND AMENDED COMPLAINT**

and supervisor of the Livability Team. At all relevant times, he acted under color of law and was directly involved in coordinating or executing retaliatory enforcement actions against Plaintiffs. On information and belief, Defendant is a resident of Jackson County, Oregon.

20.    Defendant Trevor Arnold is the Deputy Chief of Police for the Medford Police Department. At all relevant times, he acted under color of state law and within the scope of his employment. He participated in or was aware of the policies, practices, or events giving rise to the claims herein. On information and belief, Defendant is a resident of Jackson County, Oregon.

21.    Defendant Arturo Vega is a police officer employed by the Medford Police Department. At all relevant times, he acted under color of state law and within the scope of his employment. Defendant engaged in stops, detentions, and harassment of Plaintiffs. Defendant Vega was also a School Resource Officer at North Medford High School where Plaintiff Jones' son attended school. On information and belief, Defendant is a resident of Jackson County, Oregon.

22.    Defendant Ryan Mallory is a law-enforcement-adjacent figure in Southern Oregon operating under the brand "ThiefHunter Labs LLC." Defendant Mallory operates and moderates the "Jackson County Scanner – Oregon" Facebook group, which has over 100,000 members. He presents himself as a law-enforcement-adjacent "crime fighter" and has repeatedly collaborated with, promoted, and given a platform to Medford Police Department officials, including former Chief of Police and Mayor Randy Sparacino, and members of the Medford Police Livability Team, including Defendant Kirkpatrick. Defendant Mallory maintains close familial and professional ties to law enforcement, including through his relative employed by the Jackson County Sheriff's Department. Acting individually and through his control over ThiefHunter Labs, Mallory joined the conspiracy alleged herein by weaponizing his platform to dox, harass, and intimidate Plaintiffs,

PAGE 6 – **SECOND AMENDED COMPLAINT**

to spread defamatory allegations, and to incite opposition to Stabbin' Wagon's state-funded operations in coordination with the City of Medford Defendants. ThiefHunter Labs LLC is organized and solely controlled by Mallory, and functions as his alter ego. ThiefHunter Labs LLC was administratively dissolved on September 22, 2022. Defendant Mallory nevertheless continues to operate ThiefHunter Labs and Jackson County Scanner - Oregon as his alter ego and uses the names in connection with his activities.

23.    Defendants John and Jane Does 1–9 are unidentified employees or agents of the City of Medford who participated in the events described in this Complaint. Plaintiffs will amend this Complaint to identify the Defendants once their identities are known. On information and belief, Defendants reside in Jackson County, Oregon.

FACTUAL BACKGROUND

**A.  Medford Has a History of Enforcing "Sundown Town" Exclusion Policies**

24.    Medford historically operated as a "sundown town" in which Black people, Chinese laborers, vagrants, and visibly poor persons were prohibited from being present after dark or forcibly removed by police and vigilantes. These exclusionary practices did not meaningfully differentiate between unhoused whites and racial minorities; rather, the line was drawn around public visibility, poverty, and disruption of social order. As one contributor wrote in the Medford Mail Tribune on July 18, 1963:

PAGE 7 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

## "Sundown" No More

Medford has long had a reputation as a "sundown" town. The reputation once was justified. Is it still?

This question was brought up at a recent meeting of the Human Rights Council. It is a good question, and one that needs answering, in these days when so much attention is being given to civil rights and equality of treatment and opportunity for all.

A "sundown" town, of course, is one where people of colored minorities are hustled out of town "by sundown" — either through official action, or by more subtle pressures. It is a town where the human right and need for accommodations and food is denied, out of prejudice and fear.

. . . . .

MEDFORD once was just such a place. Negroes and other racial minorities were definitely not welcome here. In some cases of record, many years ago, police officers were assigned to see that no such individuals were permitted to remain here overnight.

Later, overnight lodging was denied them. They were not welcome in restaurants. And it was rare indeed that any found a way to stay here.

What is the situation today?

Despite some lingering evidences of prejudice, Medford hostelries and eating places by and large accept minority race individuals without any fuss. And increasing numbers of them are staying here, partly as a result of this change, and partly simply because there are more Negroes on the West Coast, and thus more of them are passing through, on business or as tourists.

. . . . .

A MAN in Portland who is close to civil rights matters in the state recalls that at one time colored people coming through Medford would recount to their friends the difficulties they had here. Today, however, the discussion is more apt to be about the kind of accommodations they had and the unemotional and courteous treatment they received.

What has been responsible for this turn toward enlightenment and decency?

Most likely it has been a combination of things. These would include an ever-rising level of education, a new spirit of tolerance and good will, a realization that the money spent by a Negro is just as good as that spent by a white man, an understanding of the Oregon laws which forbid discrimination in places of public accommodation because of race.

. . . . .

WHATEVER the cause, it is good to know that Medford's long-standing reputation is no longer entirely justified, and to hear from people who should know that the "sundown" taint is fading.

As recently as a decade ago, it was a rare thing to see a colored face on Medford streets. Now hardly a week goes by without the sight of a Negro tourist entertainer.

And why not? We're all Americans.

Those who would deny their fellow-citizens the privileges and rights they demand for themselves only betray the ideals on which this nation was founded and has prospered. — E. A.

PAGE 8 – **SECOND AMENDED COMPLAINT**

25.     Today, Medford operates an extensive "exclusion zone"[1] and anti-camping ordinance framework intended to deter unhoused and drug-addicted people from remaining in Medford.[2] Plaintiffs' clients are often denied the protections of the law because they are perceived as out-of-place in public, much like the targets of historical sundown policies.

**B. Medford has a History of Treating Homelessness and Drug Addiction as an Inter-related Issue to be Solved via Enforcement and Jailing**

26.     Prior to 2019, the Medford Police Department had a Neighborhood Livability Team to address homelessness and nuisance property issues.  Part of the Neighborhood Livability Team's role included working with property owners to clean up nuisance properties, and pressured property owners to report suspicious people or activities to the police and to not provide short-term rentals to local residents.

27.     The City of Medford later received a Community Oriented Police Services (COPS) Grant expanding the program to address homelessness issues. The COPS Grant expansion created the present Livability Team and expanded its mission. In June 2019, the City of Medford created the Community Engagement Division with the stated goal of improving livability issues in the City of Medford.  This Division is comprised of one police Lieutenant, one Sergeant, and one Corporal, among others, who oversee the "Livability Team."  The Medford

---

[1] National Homelessness Law Center, *Letter to Medford City Attorney Eric Mitton Re: Medford, Oregon Homeless Exclusion Zones and Jail "Lodging"* ( Aug. 18, 2025), https://homelesslaw.org/wpcontent/uploads/2025/09/2025.8.18_Medford_Exclusion_Zones.pdf.

[2] Damian Mann, *City of Medford Expands Exclusion Zone, Increases Camping Restrictions*, ROGUE VALLEY TIMES (Sept. 30, 2024), https://rv-times.com/2024/09/30/city-of-medford-expands-exclusion-zone-increases-camping-restrictions-2/.

PAGE 9 – **SECOND AMENDED COMPLAINT**

Chief of Police publicly stated that the City of Medford "handpicked each of our livability team members to have that personality and to be able to have compassion and to get to know these folks."[3]

28.     Historically, the City of Medford has sought to develop Medford into a recreation destination, viewing homelessness issues as an impediment to that goal as well as to downtown and greenway development.

29.     Defendant Kirkpatrick was the first Sergeant overseeing the Livability Team, and Wulff was a member of the Livability Team. Wulff had been involved with the Neighborhood Livability Team prior to June 2019. According to Defendant Kirkpatrick and Wulff, the purpose of the Livability Team was for the City to address homelessness as part of the Homeless Action Plan, a specific team of police officers to deal with "drinking in public" and "disorderly things" in the downtown areas in a new way, which included an "outreach piece," as it "was not always enforcement."

30.     According to Wulff, "Kirkpatrick's directive" was "go forth and conquer . . . . Let's find solutions that are creative," because "we realized really quickly 'enforcement always' is never going to solve this issue, there is a human element to it, there is to this illness . . . . We need to address these in a different fashion . . . . We know due to the logistical problems at our jail, if enforcement is the only avenue we are taking, we are solving a problem for maybe a few hours, but if have somebody we can help them – . . . get them in shelter, give them a chance, you

---

[3] *How Medford's new 'livability team' is tackling homelessness on the greenway*, KOBI 5 (Sept. 26, 2019), https://kobi5.com/news/top-stories/how-medfords-new-livability-team-is-tackling-homelessness-on-the-greenway-111680/.

PAGE 10 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

can not only solve a livability issue for the City for a lifetime, you can also change a life in the process and impact people."

31.    According to Defendant Kirkpatrick, "We work with a lot of community organizations, and one in particular, the majority of their staff are all folks Mike [Wulff] and I have chased around for years . . . folks we thought were career lifetime criminals . . . and now they are part of the solution."

32.    According to Defendant Kirkpatrick, the Livability Team is "a group of officers that are selected based on certain characteristics of compassion, hard work, outside the box thinking, and really with aim to address some of the issues, both behaviorally and societally, that we see with a burgeoning homeless population here in Medford. When the team was formed, we looked at 'what are we trying affect' . . . 'how are we trying to work with the homeless and homeless service providers' . . . and what we found was that the most effective way for us to interact int that community is to be that broker of resources, to be the boots on the ground in the camps creating relationships with the homeless, creating relationships with our service providers, and then trying to marry the two."[4]

33.    The Livability Team directly "[w]ork[s] with [the Jackson County] Continuum of Care Coordinator to refer individuals to programs," with the "[t]ypes of crimes the team would help address [including]: drinking in public, disorderly conduct, criminal mischief, occupied RVs, accumulation of junk, stored vehicles in the right-of- way."

34.    The Livability Team is "tasked with providing services and help assisting people

[4]   City of Medford, *Medford Livability Team*, Facebook (July 13, 2022), https://www.facebook.com/CityofMedford/videos/461519978675424/.

PAGE 11 – **SECOND AMENDED COMPLAINT**

in the community that have a lot of calls for service," with the promise that "jail isn't always the answer to every offense . . . . [T]hat is where the Medford Police Department's Livability Team seeks to help . . . . It's a group of officers . . . targeting a lot of their needs around those calls for service to help kind of reduce the future need for the law enforcement realm . . . and providing them the services they need to get off the streets or stop having problems within the community that have risen to the calls for service that Medford has received." The City's public information about this Team states that "Jackson County community justice is involved with a lot of the individuals, and so the Livability team is "kind of partnered with them in the services we offer . . . to provide a wrap around plan of services."

35.     The City of Medford promotes its Livability Team program as a positive human-centric approach to community policing of homeless people in Jackson County.  But, as alleged herein, the City of Medford's policies regulating unhoused people in Medford included violent retaliation against people who speak out against law enforcement in Jackson County.

### C.     City of Medford Opposed Measure 110 and Drug Decriminalization in Oregon

36.     In November 2020, Oregon voters passed referendum Measure 110, the Drug Addiction Treatment and Recovery Act. Measure 110 made Oregon the first state in the U.S. to decriminalize possession of small amounts of all drugs, also greatly expanding addiction services and social supports through redirected marijuana tax revenue and law enforcement savings.[5] According to the Drug Policy Alliance, "Before Measure 110, Oregon arrested people for drug

---

[5] *Oregon's Measure 110: What Really Happened,* DRUG POLICY ALLIANCE, 1 (Feb. 2024), https://drugpolicy.org/wp-content/uploads/2024/02/DPA-WhatReallyHappenedM110.pdf.

PAGE 12 – **SECOND AMENDED COMPLAINT**

possession while ranking nearly last in access to treatment. In response, voters approved Measure 110 as a needed intervention to the challenges Oregon was facing around the harms of arresting and jailing people for drugs and to provide more services and supports for people in need."[6]

37.     Measure 110 restricted law enforcement's authority to stop, detain, arrest, or jail someone solely on the suspicion of drug possession. It reduced penalties for most "possession of a controlled substance" (PCS) offenses from a crime to a new "Class E" violation, punishable with only a $100 maximum fine, effective February 1, 2021. No jail, supervision, or other criminal penalties could be imposed.[7] The majority of Oregon law enforcement agencies vehemently opposed Measure 110.

38.     Following the passage of Measure 110, Senate Bill 755 (2021) established Behavioral Health Resource Networks (BHRNs).[8] House Bill 2513 (2023) further clarified the role of BHRNs. A BHRN is an entity or group of entities working together to provide comprehensive, community-based services and supports to people with substance use disorders or harmful substance use. Each Oregon county has at least one BHRN. Each BHRN must provide trauma-informed, culturally specific, linguistically responsive services. Services include but are not limited to screening for health and social service needs, behavioral health screening and referral for substance use disorder, individualized intervention planning, low-barrier substance use

---

[6] *Id*. at 2.

[7] *Measure 110*, OREGON JUDICIAL DEPARTMENT (Sept. 6, 2024), https://www.courts.oregon.gov/about/Documents/BM110Statistics.pdf.

[8] *Drug Addiction Treatment and Recovery Act (Measure 110),* OREGON HEALTH AUTHORITY, https://www.oregon.gov/oha/hsd/amh/pages/measure110.aspx.

PAGE 13 – **SECOND AMENDED COMPLAINT**

disorder treatment, harm reduction services, peer support services, employment supports, housing supports, and referral to appropriate outside services. "It is the policy of the State of Oregon that screening, health assessment, treatment and recovery services for drug addiction are available to all those who need and want access to those services."[9]

39.    The City of Medford opposed Measure 110 and drug decriminalization policy. By 2023, the City passed a Resolution requesting the Oregon legislature repeal Measure 110 and recriminalize drug possession.[10] The City resolution proposed restoring misdemeanor status for possession of drugs. Medford's then-Mayor Randy Sparacino, who is the former Medford Chief of Police, stated in a press release, "I am pleased to see that our council and city leadership are moving forward with a resolution seeking a repeal of Measure 110 by our state legislators and if that isn't possible, significant and necessary changes to the measure."[11]

40.    Defendant Medford City Manager Sjothun blamed harm reduction programs like Stabbin' Wagon's Syringe Service Program for "livability" issues, stating, "Medford residents have to endure more drug paraphernalia in parks and other public spaces, including needles which are handed out by organizations to drug users."[12] The City had issued 5,540 possession violations, and

---

[9] *Id.*

[10] Agenda Item Commentary Item No.: 70.3 (Council Bill 2023-123), MEDFORD CITY COUNCIL, 11 (Sept. 7, 2023), https://www.oregonlegislature.gov/golden/Documents/Adopted%20Measure%20110%20Resolution%2009072023.pdf.

[11] Ella Hutcherson, *City of Medford Calls for Repeal or Modification of Measure 110*, JEFFERSON PUBLIC RADIO (Sept. 7, 2023), https://www.ijpr.org/politics-government/2023-09-07/city-of-medford-calls-for-repeal-or-modification-of-measure-110.

[12] Damian Mann, *Medford City Council Wants Measure 110 to Be Fixed or Repealed*, ROGUE VALLEY TIMES (Sept. 11, 2023), https://rv-times.com/2023/09/11/medford-city-council-wants-

PAGE 14 – **SECOND AMENDED COMPLAINT**

wanted to re-criminalize drug possession and build a larger jail in Medford.[13]

      **D.**     **Police Exert Extensive Influence on Access to Housing and Addiction Service in Medford**

     41.     Medford city policy has historically, and in present times, been extensively influenced by law enforcement agendas and policy preferences.

     42.     At all times relevant, addiction and homelessness service providers in Medford had active law enforcement officers serving on their boards of directors, embedding law enforcement perspectives directly into organizational leadership.

     43.     At all times relevant, the former Medford Chief of Police Randy Sparacino served as the Mayor of Medford.

     44.     At all times relevant, Jackson County Sheriff Deputy Chad Miller served on the Medford City Council.

     45.     At all times relevant, Medford Police Chief Justin Ivens served on the Board of Directors of Addictions Recovery Center (ARC) in Medford.

     46.     At all times relevant, Medford Deputy Police Chief Trevor Arnold was the President of the Board of Directors of OnTrack Rogue Valley (currently known as Continuum Behavioral Health & Recovery Services), which provides behavioral health treatment and addiction recovery services in Medford.

     47.     At all times relevant, former Medford City Manager Brian Sjothun was the Board

---

measure-110-to-be-fixed-or-repealed/.

[13] *Id*.

PAGE 15 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

Chair of the Jackson County Continuum of Care Board (COC), which oversees homelessness project priorities and federal HUD funds in Jackson County. Defendant Sjothun was an architect of the 2020 Hawthorne Park sweep, which resulted in the Medford Police Department closing down an entire public park, "sweeping" out more than 100 unhoused people living in the park, and arresting and jailing several community volunteers, including Plaintiff Jones, as well as a reporter, for simply remaining in the public park.[14]

48.     At all times relevant, Jackson County Sheriff Nathan Sickler also served on the Jackson County COC Board.

49.     At all times relevant, Medford Police Sergeant Jason Antley, who currently supervises the Livability Team, served on the Board of Directors of ACCESS, an organization that provides food, warmth, and shelter for homeless and vulnerable people in Medford and Jackson County. ACCESS is also the Lead Agency managing the Jackson County COC and federal HUD funding for housing and homelessness projects in Medford and Jackson County.

50.     At all times relevant, Medford Police Cultural Liaison Lilia Caballero also served on the Board of Directors of ACCESS.

51.     Medford Police also controlled access to the Medford Urban Campground, a service funded by City of Medford to permit homeless people to live in tents on City property, operated primarily by the non-profit organization Rogue Retreat. "To get a spot in the camp, residents have to receive a referral from the Medford Police Department's Livability Team. That's

---

[14] *City of Medford v. April Rosemary Fonseca,* ACLU OF OREGON (Aug. 16, 2022), https://www.aclu-or.org/en/cases/city-medford-v-april-rosemary-fonseca.

PAGE 16 – **SECOND AMENDED COMPLAINT**

a group of police officers who do outreach with people experiencing homelessness."[15]

52.    The regional care ecosystem in Medford is significantly shaped by law enforcement priorities, particularly in the areas of addiction recovery, housing, and behavioral health. While some service organizations do not have law enforcement on their boards, they operate in a service environment shaped by coordinated diversion programs, justice partnerships, and funding structures that reflect ongoing collaboration with and influence by police. Many of the organizations in which Medford Police exert influence are members of the Jackson County BHRN.

**E.    Stabbin' Wagon Was Founded in 2020 in Response to Unmet Community Needs for Homelessness and Drug Addiction Services Not Controlled by Police**

53.    Plaintiffs are well-known advocates for public health and housing rights in Medford.

54.    Plaintiffs Jones and Strong have been vocal in supporting unhoused communities and critical of Medford Police Department ("MPD") practices and are well-known locally as activists affiliated with Stabbin' Wagon.

55.    Between 2020 and 2023, Plaintiff Jones, and later Plaintiff Strong, were the primary employees and public face of Stabbin' Wagon. For Plaintiff Jones in particular, their work and reputation became synonymous with that of Stabbin' Wagon.

56.    Plaintiff Jones founded Stabbin' Wagon in 2020 shortly after the Almeda Drive Fire displaced many in Medford, among them unhoused people. Many displaced people temporarily

---

[15] Sydney Dauphinais, *Medford's First Urban Campground Provides a Safe Space for Homeless Campers, but Not for Long*, OREGON PUBLIC BROADCASTING (Aug. 17, 2020), https://www.opb.org/article/2020/08/18/medfords-first-urban-campground-provides-a-safe-space-for-homeless-campers-but-not-for-long/?utm_source=chatgpt.com.

PAGE 17 – **SECOND AMENDED COMPLAINT**

settled in Hawthorne Park, which became a local hub for access to outreach services, meals, services, and resources. Jones engaged in outreach and mutual aid support, providing food and harm reduction supplies from a Radio Flyer wagon to displaced and unhoused residents living in Hawthorne Park. Jones' distribution of safer-use supplies, like clean syringes and naloxone, earned that project the nickname the "stabbin' wagon," which Jones continued.

57.    Today, Stabbin' Wagon is a fully operational 501(c)(3) organization with a small staff. A white cargo van has replaced the original Radio Flyer wagon. Stabbin' Wagon travels throughout the community to meet people where they are, providing harm reduction and public health services to vulnerable populations in Jackson County, including a Syringe Service Program, overdose prevention, HIV testing, and until recently, a peer respite program.



58.    Stabbin' Wagon formed just before Measure 110, the statewide ballot measure which decriminalized drug possession in Oregon.

59.    Stabbin' Wagon's service model is unique compared to other care providers in Southern Oregon, including addiction and recovery organizations in the Jackson County BHRN, in that Stabbin' Wagon provides peer-led, non-clinical harm reduction services with no

PAGE 18 – **SECOND AMENDED COMPLAINT**

requirement for abstinence, respecting autonomy and self-determination rather than pressuring people into treatment.

60.     Stabbin' Wagon also has a controversial policy of not collaborating with police, distinguishing Stabbin' Wagon from other service providers in Jackson County and the BHRN.

61.     Stabbin' Wagon's community-centered harm reduction work is evidence-based and effective. The organization has been awarded millions of dollars in government and private grants since its inception. But these grant awards have drawn the ire of Medford Police Department and police-aligned service providers. It has also made Stabbin' Wagon the focus of national attention, including being featured in New Yorker Magazine and discussed on the Joe Rogan Podcast.

**F.     Plaintiffs Openly Oppose and Expose the City of Medford's Attempts to Criminalize and Punish the Status of Homelessness and Simple Drug Possession**

62.     Plaintiffs' work has challenged entrenched local policies surrounding homelessness, substance use, and policing in Medford. Their public health outreach and advocacy are expressive, often critical of law enforcement, and supported by constitutionally protected speech and association.

63.     Plaintiffs have engaged in public advocacy regarding public housing and health issues, including speaking at Medford City Council meetings and public forums. Often Medford Police Department representatives would be present at these meetings. Plaintiffs would share stories of police abuse of unhoused people, and criticize the City's enforcement activities against unhoused and drug using residents.

64.     Plaintiffs engaged in constitutionally protected activities, including organizing events and protests, speaking at public meetings and public forums, publishing political speech

PAGE 19 – **SECOND AMENDED COMPLAINT**

and commentary, conducting harm reduction outreach, recording on-duty police officers, and advocating for systemic housing and health care reforms in Medford and Jackson County, Oregon.

65.    Plaintiffs also regularly engaged in non-violent political pranksterism and performative protest. For example, Plaintiffs attended a Medford City Council meeting with toy pigs that "oinked" when squeezed. Plaintiffs would "oink" the pigs when Medford Police spoke during the meeting.

66.    A large portion of Stabbin' Wagon's client base are homeless. Stabbin' Wagon staff regularly visit clients on the Bear Creek Greenway and other locations where homeless camps are established. Plaintiffs were often present when police sweeps and arrests in homeless camps were occurring.[16]

67.    Plaintiffs routinely filmed such actions by Medford Police and posted them to Stabbin' Wagon's social media accounts, often with satirical or comedic commentary and editing. The Stabbin' Wagon social media posts often depicted Medford Police as acting in bad faith, incompetent, and laughable.

68.    For example, in December 2022, Stabbin' Wagon posted on social media offering free mini posters depicting a clown wearing a Medford Police badge.

---

[16] *See, e.g.,* @stabbinwagonmf, *Medford's War on the Poor Ep. 2*, Instagram (Feb. 24, 2021), https://www.instagram.com/tv/CLsTF3pBARh/?utm_source=ig_web_copy_link&igsh=MzRlOD BiNWFlZA==.

PAGE 20 – **SECOND AMENDED COMPLAINT**



69.    Unsurprisingly, MPD did not like Plaintiffs publicly exposing video footage of police sweeps of homeless people and negative portrayal of law enforcement in Medford.

70.    MPD's Kirkpatrick openly expressed his irritation of Stabbin' Wagon's First Amendment activities.

71.    As noted above, Defendant Kirkpatrick served as the lead of the MPD Livability Team. While on the that Team, Kirkpatrick was hostile and displayed animosity toward Jones, Stabbin' Wagon, and other housing rights activists who video-recorded Kirkpatrick and MPD officers and then posted the videos with commentary on social media.

72.    In one such video recorded July 29, 2021, Stabbin' Wagon caught Kirkpatrick threatening an activist for recording police during a homeless camp sweep, and then, when the activist stated he was going to call his attorney, Kirkpatrick threatened, "If you're not gone by Thursday morning I'm going to put handcuffs on you." Stabbin' Wagon posted the video to social media, along with non-violent commentary critical of Defendant Kirkpatrick's actions, mocking

PAGE 21 – **SECOND AMENDED COMPLAINT**

MPD, and celebrating community action that prevented some camps from being "swept."[17]

G.    **City of Medford Targeted Plaintiffs Based on their Protected Political Activity**

73.    This case arises from a deliberate, sustained campaign by the City of Medford and its agents to retaliate against Plaintiffs for their constitutionally protected activities, activism, public health outreach, and expressive conduct, and to suppress dissent by weaponizing law enforcement powers.

74.    Defendant City of Medford, through its Police Department and municipal officials and employees, has engaged in a sustained campaign of harassment, intimidation, and retaliation against Plaintiffs, seeking to suppress their public health work and chill their protected First Amendment activity.

75.    Rather than support or remain neutral to these lawful efforts, the City of Medford and its police officials adopted an adversarial and punitive posture, beginning at least in 2020 and escalating in 2023, as Plaintiffs' visibility and funding increased.

76.    Defendants have employed a combination of law enforcement shows of force, selective code enforcement and prosecution, and smear campaigns to obstruct, undermine, and punish Plaintiffs' outreach services, public protests, and policy advocacy.

H.    **2020: Targeting and Arrest During Homeless Sweep in Hawthorne Park**

77.    In September 2020**,** during a mass police action to displace homeless and wildfire-displaced people camping at Hawthorne Park, Plaintiff Jones remained on site to assist residents,

---

[17] @stabbinwagonmfr, *Medford Oregon unhoused residents stand up & fight back!*, INSTAGRAM (July 31, 2021), https://www.instagram.com/tv/CSAE6Y-JK9b/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==.

PAGE 22 – **SECOND AMENDED COMPLAINT**

engaging in peaceful humanitarian support work. Medford Police Department arrested Jones and charged her with criminal trespassing for simply remaining in the public park assisting displaced residents in packing their belongings. Medford Police arrested multiple other non-violent community observers, including an NPR-affiliate journalist, drawing public outcry.

78.     MPD's mass arrest at Hawthorne Park drew national condemnation. More than 50 media organizations objected to the arrests, including the local NPR journalist April Fonseca Erlich, on First Amendment grounds.[18] The City charged Fonseca Erlich, but those charges were dismissed as unconstitutional.

**I.     2021-2023: Retaliatory Stops and Surveillance Following Public Protests**

79.     In January 2021, MPD officers, including Defendants Vega and Barringer, stopped and detained Jones without cause after she completed a shift providing food to unhoused people. The officers asserted, without probable cause or reasonable suspicion, that the stop was because she "might" have an outstanding warrant and was possibly using an alias, neither of which were true. Officers recognized Jones from the prior Hawthorne Park arrest and engaged in invasive questioning in front of her minor child waiting in her running car.

80.     In June 2021, during a community caravan protest organized in response to Medford's eviction of homeless people during a record heatwave, Medford Police selectively pulled over and issued a citation only to the vehicle driven by Jones for alleged "excessive horn use," despite many participants also engaging in honking expressive conduct.[19]

---

[18] *Judge Dismisses Charges Against Oregon Journalist April Fonseca Ehrlich*, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS (Sept. 8, 2022), https://www.rcfp.org/april-ehrlich-charges-dropped/.

[19] @stabbinwagonmfr*, After #MedfordPolice posted eviction notices…*, INSTAGRAM (June 30,

PAGE 23 – **SECOND AMENDED COMPLAINT**

81. Over the years, MPD has excluded Stabbin' Wagon from official communications that were sent to other BHRN member service providers ahead of encampment sweeps, denying the organization its right to prepare or serve its clients.

82. The Medford Police Department has collected and maintained dossiers concerning Plaintiffs' social media activity, affiliations, and speech, none of which pertained to any criminal investigation nor were supported by reasonable suspicion of a crime.

83. Internal City communications obtained through public records requests reveal that MPD officers, including Defendants Graham and Kirkpatrick, monitored Jones' and Strong's online posts, events, and protest activities. Officers referenced Plaintiffs by name, cataloged their associations with activist groups, and made derogatory characterizations, including calling them "the worst human beings ever."

84. By 2022, MPD was collecting and storing information about Plaintiffs' online activities, community associations, and political speech, despite the absence of any criminal investigation or reasonable suspicion of a crime. This included monitoring social media accounts, creating fake social media profiles in order to infiltrate and spy on Plaintiff's online activist activities, and documenting Plaintiffs' attendance at protests and other First Amendment expressive events.[20]

---

2021), https://www.instagram.com/p/CQxMXdVtMBT/?hl=en&img_index=1.

[20] *ACLU Sues City of Medford for Illegal Surveillance, Citing Records Obtained by Information for Public Use*, INFORMATION FOR PUBLIC USE (Aug. 23, 2024), https://info4publicuse.org/2024/08/aclu-sues-medford/. Medford Police Department created the fake Facebook profile "Jessica Taylor" and intentionally used the profile to infiltrate social media groups and spy on Plaintiffs' expressive activity, including lawful community organizing and non-violent activism unrelated to any criminal activity or investigation. *Mass Surveillance and ICE*

PAGE 24 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

85.     Public records show MPD maintains a dossier of Plaintiffs' political activity and affiliations spanning several years. The dossier contains evidence showing MPD has collected, and then maintained, information about Plaintiff's protected political activity (in the absence of any connection to a criminal investigation or reasonable suspicion of a crime), including:

    a.   A March 4, 2021 email from MPD's Divya Fisher to D.J. Graham regarding an upcoming protest "scheduled to occur" "in response to the COVID outbreak at the jail." Disturbingly, Fisher somehow knew that "This event is not being advertised on social media (or other public channels) and is being shared solely via direct message." The email specifically identified Plaintiff Jones as a "known protest player[]," stating that she, along with others, "frequently post calls to action and were very vocal about their displeasure about MPD's evolvement [sic] during the Hawthorne Park encampment." Fisher confirmed she is monitoring social media including the "local BLM/ protest pages" and "will scan other social media platforms and see if there is any mention of this event[.]" Graham forwarded the email to a sergeant with MPD (hereinafter "the whistleblower sergeant").

    b.   Fisher later noted that she went so far as to "check[] a variety of social media platforms" and "contacted the FBI to see if there is something I am missing," but none of these efforts yielded any evidence of criminal activity. Graham noted that MPD also reached out to the Oregon Titan Fusion Center seeking information, but

---

*Backdoors in Southern Oregon*, INFORMATION FOR PUBLIC USE, https://info4publicuse.org/2025/06/mass-surveillance-and-ice-backdoors-in-southern-oregon/.

PAGE 25 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

found nothing. He reiterated MPD's belief that Jones was affiliated with Siskiyou Abolition Project.

c. A May 11, 2021, email by Mayor Randy Sparacino, former MPD Police Chief, to MDP's Scott Clauson, containing the Jefferson Public Radio article "As Encampment Evictions Begin in Medford, Where Are People Supposed to Go?" quoting Plaintiff Jones talking on behalf of Stabbin' Wagon about police raiding homeless camps. Sparacino tells Clauson: "wanted you to be aware of what they're saying."

d. A June 16, 2022, MPD action plan against a "Rave against Rogue Retreat" event. MPD noted that "Melissa Jones is the organizer of the event," and that, according to MPD Crime Analysts, the "Source of information is on Facebook and Instagram." MPD stated the "event will be monitored by social media." The Whistleblower sergeant was listed as second in command charged with responding to the event, including "Trespassing and/or Disorderly Conduct at the City Hall" "as needed."

e. A June 24, 2022, email in which MPD admits to monitoring Jones' social media accounts relating to her attendance at a reproductive rights demonstration.

86.    In 2024, ACLU of Oregon filed a lawsuit against the City of Medford on behalf of Rogue Valley Pepper Shakers, Stabbin' Wagon, and Jones, seeking solely injunctive and declaratory relief, arguing that MPD's collection and maintenance of information regarding non-criminal activist activity violates ORS 181A.250.  That case is ongoing in Jackson County Circuit Court, with trial scheduled for 2026. *Rogue Valley Pepper Shakers v. City of Medford*, 24-cv-

PAGE 26 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

39962.[21]

**J.     2023: Former Medford Police Officer Blows the Whistle to Jones and Others on Facebook About MPD Monitoring of Activists and Being Biased against Plaintiffs**

87.     On January 8, 2023, Jones was contacted via Facebook messenger by the whistleblower sergeant.

88.     The whistleblower sergeant is a former MPD officer who had been a member of the MPD Livability Team (LVT).

89.     The whistleblower sergeant and Jones were not previously connected on Facebook and had not communicated there previously.

90.     During the January Facebook instant message exchange, the whistleblower sergeant wrote to Jones, "I have a conversation between Kirkpatrick and I you'd be interested in."

91.     The whistleblower sergeant continued, "I'm not claiming to be an innocent party in this, but the 'leader' of the LVT definitely has a bias towards you."

92.     The whistleblower sergeant further wrote, "since I'm not a police officer any longer and I share in the [']Kirkpatrick is a prick['] movement I wanted to show you what he was circulating."

93.     When Jones asked what Kirkpatrick was circulating, the whistleblower sergeant declined to answer.

94.     The whistleblower sergeant did publicly confirm that MPD monitors social media accounts of activists. In late 2023, apparently disagreeing with MPD's targeting and surveillance

---

[21] *Rogue Valley Pepper Shakers v. City of Medford*, ACLU OF OREGON (2024), https://www.aclu-or.org/en/cases/rogue-valley-pepper-shakers-v-city-medford.

PAGE 27 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

of non-violent activists, the whistleblower sergeant commented on a Facebook post in the Jackson County Scanner Group page, "Ryan Mallory What do you think about PD creating fake profiles to 'monitor' the activity? Does that change your view?"

95.      Public records show that by 2023, MPD was paying an analyst to continuously monitor and maintain records about activists' social media and political activity in Jackson County, including about Plaintiffs, despite such organizations and people having no connection to criminal activity nor being connected to any criminal investigation, and without any reasonable suspicion of a crime.

### K.      2023: Intentional Interference with Grant Funding and Business Relationships

96.      In 2023, the Oregon Health Authority awarded Stabbin' Wagon a $1.5 million grant to develop a peer-run respite center in Southern Oregon. The grant was competitively awarded, with Stabbin' Wagon scoring the highest of all applicants. No other service providers in the Jackson County BHRN applied for the grant.

97.      Almost immediately, City of Medford and Medford Police Department leadership, including Defendants Sjothun, Ivens, Arnold, and Kirkpatrick, launched a coordinated effort to undermine and reverse the grant award. Internal emails show officers and city officials disseminated inflammatory, false, and disparaging information about Plaintiffs to other providers, state officials, and community leaders. High-ranking City and MPD officials engaged in a covert campaign to discredit the organization. Communications from Chief Ivens, Deputy Chief Arnold, and others expressed outrage over the award and attempted to mobilize public opposition and influence the OHA to rescind the grant.

98.      The City's effort to interfere in the grant included communications with external

PAGE 28 – **SECOND AMENDED COMPLAINT**

parties, including executives of rival service providers who shared the City's animus toward Stabbin' Wagon. The campaign sought to portray Stabbin' Wagon as untrustworthy, unqualified, and politically extreme, an effort intended to deprive Plaintiffs of an essential funding stream and reputational legitimacy.

99.     Defendants began lobbying OHA and coordinating with other nonprofits hostile to Stabbin' Wagon, including OnTrack Rogue Valley and the Addictions Recovery Center, in an effort to halt the grant. Defendants also lobbied their community allies.

100.    Plaintiffs were not aware of these covert efforts at the time they were taking place. Plaintiff only learned of the covert efforts later through public reporting and records disclosures.

**L.  2023 – 2024: Ryan Mallory's Targeting of Plaintiffs**

101.    Defendant Ryan Mallory was aware of the City of Medford's disdain for and undermining of Plaintiffs'' advocacy and Stabbin' Wagon's operations.

102.    In particular, Defendant Mallory was aware of MPD's campaign to undermine the Stabbin' Wagon OHA grant.

103.    Defendant Mallory amplified the same accusations, parroted the City Defendants' same language and calls to action, and timed his conduct to coincide with the City's actions against Plaintiffs.

104.    The City Defendants, in particular the members of the Medford Police Department, were aware of Defendant Mallory's pro-law enforcement social media influence and activity in Jackson County.

105.    Defendant Ryan Mallory is the founder and owner of ThiefHunter Labs LLC in Jackson County.

PAGE 29 – **SECOND AMENDED COMPLAINT**

106.    Defendant Mallory also moderates several social media groups related to ThiefHunter Labs and its "Scanner Group" network. Mallory's family member, Addison Mallory, is employed by Jackson County Sheriff's Department.

107.    Defendant Mallory, through ThiefHunter Labs and social media groups and networks, operates a private crime and loss-prevention consulting company. Through its "Scanner Group" network of Facebook groups, podcasts, and consulting services, the company claims to provide criminal research, locating, and identification, background checks, and crime prevention training for businesses and individuals.

108.    Defendant Mallory presents the company as a bridge between the public and law enforcement, frequently emphasizing its ability to aid police in locating suspects and prevent crime through community reporting. The company's team prominently features former and current law enforcement officers, underscoring its close alignment with policing culture and methods.

109.    Publicly available information shows a consistent pattern of Defendant Mallory collaborating with or giving platform to the Medford Police Department. ThiefHunter Labs has featured Medford Police Department personnel as guests on its official podcast who discussed patrol ethics and citizen reporting systems, and the MPD Livability Team featuring Defendant Kirkpatrick and Officer Wulff, who discussed homelessness and policing in a video episode titled "Medford Police Department Livability Team/Homeless | Scanner Group Podcast 008."

110.    ThiefHunter Labs also publicly interviewed Defendant Randy Sparacino, the former Medford Police Chief and Mayor, lending their platform to promote his views in an episode titled "Scanner Group | Podcast 002 | Chief/Mayor Randy Sparacino, Criminal Updates."

111.    ThiefHunter Labs' own materials explicitly describe law enforcement as the

PAGE 30 – **SECOND AMENDED COMPLAINT**

"second line of defense," positioning themselves as complementary to police while encouraging the public to support law enforcement efforts.

112.    In doing so, ThiefHunter Labs positioned Defendant Mallory's vigilante platform as a private adjunct to official law enforcement.

113.    These practices and statements show that ThiefHunter Labs and Mallory are not neutral observers, but instead operate as active supporters and amplifiers of the Medford Police Department, overtly aligning their business and media activities with police interests.

114.    On August 4, 2023, Defendant Mallory used his platforms to publish Plaintiffs' personal identifying information, including their home addresses and dates of birth, under "Busted" graphics, mimicking booking log releases. These disclosures mirrored law enforcement booking records.

115.    Mallory's publication of Plaintiffs' home addresses and booking-style graphics mirrored official law enforcement arrest disclosures and, on information and belief, were designed to lend the appearance of official sanction to the City's retaliatory narrative.

116.    On Aug. 8, 2023, Defendant Mallory amplified an article about Stabbin' Wagon arrests, captioning: "RV Times Article ON STABBIN WAGON ARRESTS." The Rogue Valley Times articles did not publish Plaintiffs' home addresses or dates of birth.

117.    The malice of Defendant Mallory's conduct was evident by the fact the content of his posts violated the policies he set for the *Jackson County Scanner – Oregon* group, which explicitly prohibit publishing a person's home address, require verified case numbers, and forbid personal digs or civil disputes.

118.    By publishing Plaintiffs' addresses and posting harassing commentary without any

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

case number or legitimate law enforcement purpose, Defendant Mallory weaponized his platform in direct contravention of the Scanner Group's stated rules.

119.    By targeting Plaintiffs and portraying them as criminals, Defendant Mallory escalated furthered the retaliatory objectives of the Medford Police Department.

120.    On September 7, 2023, Consistent with Defendants' outreach to members in its network seeking to undermine Stabbin' Wagon's OHA grant, Mallory posted a video to social media urging the Jackson County community to oppose Stabbin' Wagon's receipt of the OHA grant and demonizing Stabbin' Wagon's harm reduction work.

121.    Parroting the talking points seen in Defendants' emails to others suggesting Stabbin' Wagon was not a 'legitimate' non-profit, Mallory stated of Stabbin' Wagon, "Nothing about these folks qualifies them to do that [open a peer respite center]. If it was Jackson County Health Authority or one of the many recovery organizations doing this, [I] probably wouldn't say much."

122.    "But the fact of the matter is," continued Defendant Mallory in his post, Stabbin' Wagon's employees "protest the police" and "protest authority."

123.    Mallory's post stated in part that,

"Unqualified people that fill our Parks in greenways with needles, keep people addicted by promoting drug use, and misappropriate grant money by using it for public protest of the police rather than helping people are about to get a massive paycheck. Listen to the video. Please write your opposition in an email to the director of the Oregon health authority at OHA.DirectorsOffice@oha.oregon.gov[.] Ask for an audit of the stabbin wagon organization, ask that The state give that money to a qualified recovery agency or the Jackson county health authority. It's the only way 1.3 mil Will do our community any good. These folks are intending on renting a building to perpetuate drug use with 1.3 million dollars in taxpayer money. Let them know that thier [sic] two leaders, Melissa Jones and her marketing director [Sam Strong] have openly stated that they get grant money and use it to protest police and others."

PAGE 32 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

124.     Defendant Mallory's September 7, 2023 post occurred during the height of Defendants' campaign to interfere with the OHA grant and echoed the same claims, requests for audits, and demands for rescission being advanced by City officials through nonpublic channels.

125.     Defendant Mallory was aware, prior to and during his September 7, 2023 post, that Medford officials were engaged in an effort to block or delay Plaintiffs' OHA grant, and published his call-to-action with the understanding and intent that it would amplify and legitimize the City's pressure campaign.

126.     Again, Defendant Mallory's post violated Mallory's own rules for the Scanner Group, which state in part:

> **If you are on the feed to be rude, slander/bash someone or mess with people, skip it and bail . . . .** Scanner Group is not used to handle civil disputes, infractions, . . . or for personal digs at another party over civil issues. We don't care about your neighbor's yard trash . . . Usually things are being handled in civil court because an agreement between two parties allegedly has been breached or as an attempt to recover financial loss. These cases are "he said she said" and to be handled in an appropriate venue. We require case numbers to protect ourselves from claims of defamation. We cover scanner calls and police reports. We also require facts, PC (Probably Cause) to arrest and/or an immediate danger to the community. Our goal is to make life difficult on the criminal element and assist LE in their duties. Not provide a venue to bash another over civil issues and minor infractions.

Emphasis in original.

127.     Defendant Mallory did not act as a neutral commentator or moderator, but as a knowing participant who used his law-enforcement-adjacent platform, access, and selective enforcement of group rules to assist the City Defendants in suppressing Plaintiffs' protected activity.

128.     Defendant Mallory's conduct was not independent, but aligned with and in

PAGE 33 – **SECOND AMENDED COMPLAINT**

furtherance of the conspiracy by City of Medford Defendants to suppress Plaintiffs' protected speech, undermine Stabbin' Wagon's operations, and intimidate supporters of homelessness rights, drug decriminalization, and harm reduction.

129.    Following Defendants' campaign to undermine and discredit Stabbin' Wagon among the community, and shortly after Mallory's September 7, 2023, post to the more than 100,000 members of the Jackson Scanner Group Facebook page, Jones and Strong experienced harassment by Scanner group members, increased public hostility, and delay of their OHA grant execution.

130.    On September 13, 2023, a known pro-police member of the Jackson Scanner Group arrived on site at Stabbin' Wagon's outreach service, approached Stabbin' Wagon staff and began yelling that she was going to call the Medford Police to report Stabbin' Wagon employees for violating the exclusion zone by being present in Medford. Her behavior was hostile and aggressive and made Stabbin' Wagon staff fearful.

131.    Plaintiffs continued to experience harassment, discrimination, and retaliation from Medford officials, as well as increased harassment from members of Defendant Mallory's Jackson Scanner Group and in online forums, well into 2024 and up to the present day.

132.    The Oregon Health Authority in fact delayed the grant execution process in apparent response to Defendants' campaign to undermine Stabbin' Wagon's state grant funding.

133.    In 2023, Information for Public Use published a story that included a public records disclosure showing the collusion by the City of Medford, Medford Police Department, and other

PAGE 34 – **SECOND AMENDED COMPLAINT**

community members attempting to revoke Stabbin' Wagon's OHA grant.[22]

134.   The City of Medford public record trove exposed by Information for Public Use gained significant media attention regarding the City's retaliation against Plaintiffs.[23]

135.   In January 2024, Plaintiff's work further became the subject of national discourse when an article in the New Yorker was published regarding Measure 110 and drug decriminalization in Oregon and heavily featured Plaintiffs.[24]

136.   Defendant Mallory continued to foment animosity and retaliation against Plaintiffs, posting a news article on January 13, 2024 to the Jackson Scanner Group – Oregon with commentary stating, "More about $1,500,000 of your tax money, the Stabbin Wagon, Melissa Jones, the City of Medford and the hot mess ensuing …"

137.   Defendant Mallory's posts in fact fomented animosity and disinformation regarding Plaintiffs and their services, with comments on Defendant Mallory's January 2024 post including:

   a.   "The people running this organization belong in jail";

   b.   "We don't have enough money for the programs already in place, but sure, lets

---

[22]   *POLICE AND CITY OF MEDFORD COLLUDE TO DEFUND HARM REDUCTION NONPROFIT*, INFORMATION FOR PUBLIC USE (Updated Oct. 29, 2023), https://info4publicuse.org/blog/.

[23]   *See, e.g.,* Eric Bengel, *Stabbin Wagon's $1.5 Million Grant Raises Questions, Emails Show*, ROGUE VALLEY TIMES (Sept. 13, 2023), https://rv-times.com/2023/09/13/stabbin-wagons-1-5-million-grant-raises-questions-emails-show-2/; Jake Thomas, *Facing Backlash over $1.5 Million State Grant, Stabbin' Wagon Speaks Out*, THE LUND REPORT (Sept. 12, 2023), https://www.thelundreport.org/content/facing-backlash-over-15-million-state-grant-stabbin-wagon-speaks-out.
[24]   E. Tammy Kim, *A Drug-Decriminalization Fight Erupts in Oregon*, THE NEW YORKER (Jan. 15, 2024), https://www.newyorker.com/magazine/2024/01/22/a-new-drug-war-in-oregon.

PAGE 35 – **SECOND AMENDED COMPLAINT**

throw over a million at this lady with zero experience with respite care and zero rapport with the local community,";

    c.    "Don't pay them but put them in a bank acct so you will have it once they put these two idiots away for being drug dealers. I'd almost guarantee that is what they're doing, on top of supplying everything else"; and

    d.    "I wrote a scathing letter and sent it to Representative Pam Marsh and the OHA."

138.    Defendant Mallory continued to use his social media platforms, including the Scanner Group and Thiefhunter Labs pages, to foment animosity and retaliation against Plaintiffs in line with the conspiracy, including allowing threats of harm to Stabbin' Wagon:



139.    On May 21, 2024, Defendant Mallory posted an article to the Jackson Scanner Group page regarding Defendant Jones' sentencing in municipal court. Mallory commented on his own post that Jones, "Definitely hasn't learned her lesson based on that. Guess we'll see how probation goes" and that Jones' comment to the Times regarding police "did not sit well" with him due to having many friends and family members who are law enforcement.

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934



140.    In March 2025, Defendant Mallory posted a video to the Jackson Scanner Group Facebook page depicting needles on the ground behind a downtown Medford business. He commented on the video that Stabbin' Wagon "shouldn't be in business at all, it worsens the problem" and "They get $1M to sit in the trailer and hand out needles," wrongfully attributing the presence of needles in the video to Stabbin' Wagon.

141.    Plaintiffs' reputations, mental health, finances, and professional relationships have

PAGE 37 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

suffered as a result of Defendants' conduct. The connection between Defendants' conduct in furtherance of concerted efforts to undermine Plaintiffs and the increased harassment from the public and delays in OHA grant funding Plaintiff experienced are inextricable.



142.    Stabbin' Wagon's operations and partnerships have been undermined by the City's and Mallory's repeated interference.

143.    By 2024, both Strong and Jones had resigned from employment with Stabbin' Wagon, due to the cumulative negative effects of the harassment, surveillance, doxing, and retaliatory pressure from the City of Medford and allied third parties.

144.    By 2025, Stabbin' Wagon was forced to close its peer respite program in part as a result of municipal and zoning barriers and Defendants' subversion campaign. Stabbin' Wagon staff continue to fear retaliation and harassment from Medford Police and city officials.

**M. Medford Has a History of Retaliating Against Advocates Who Challenge Police**

145.    The City of Medford and Medford Police Department have a history of targeting and retaliating against advocates, activists, and volunteers who oppose or question law enforcement policy perspectives.

146.    In July 2019, John Malaer, a homelessness and disability rights advocate and Jackson County Continuum of Care (COC) Board Member, was scheduled to give a presentation

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

to the Jackson County COC regarding his lived experience with policing in Medford. Mr. Malaer had been a vocal critic of law enforcement abuse against unhoused residents in Medford. Three days before his scheduled presentation, Medford Police Department arrested and falsely designated Mr. Malaer as homeless in the arrest citation, and lodged Mr. Malaer in the Jackson County jail, where he suffered egregious abuse.[25] Mr. Malaer subsequently sent an email to Defendant Medford City Manager Sjothun, then-Chair of the COC Board, detailing the abuse and resigning from the COC Board.

147.    In a separate incident, in December 2022, Medford resident Stephen Douglas was selected to serve on the City of Medford Police Advisory Committee.  He was appointed to serve beginning February 1, 2023, with his term expiring January 31, 2026.

148.    Shortly after joining the Committee, during a tour of the Police Department in 2023, Mr. Douglas asked Medford Police Deputy Chief DJ Graham about the Medford Police Department's handcuffing policy and handcuffing arrestees too tightly. Deputy Chief Graham responded he would look into the matter and respond back to Mr. Douglas.

149.    Instead of responding to Mr. Douglas' concern, between March and April 2023, employees of the Medford Police Department, City of Medford, and Medford City Council Member Eric Stark began calling and pressuring Mr. Douglas to resign from the Police Advisory Committee. The City also withheld information and access regarding Police Advisory Committee participation from Mr. Douglas and would not let him participate in the Committee's activities.

150.    On April 20, 2023, members of the Medford Police Department advocated at a City

---

[25] *See Malaer v. Kirkpatrick*, No. 1:20-cv-00049-CL (D. Or.).

PAGE 39 – **SECOND AMENDED COMPLAINT**

Council Meeting to remove Mr. Douglas from the Police Advisory Committee.[26] The Medford

City Attorney Eric Mitton made a presentation, and the City Council voted to remove Mr. Douglas

from the Police Advisory Committee on the recommendation of the Medford Police Department.

151.    On April 21, 2023, Mayor Sparacino, former Medford Police Chief, sent Mr.

Douglas a written letter confirming his removal from the Police Advisory Committee. The City of

Medford, Medford Police Department, Police Chief Trevor Arnold, Deputy Chief DJ Graham,

Mayor Randy Sparacino, and the Medford City Council, including but not limited to Eric Stark,

participated in or perpetuated this retaliation.

152.    And in a separate matter in late 2023, public records exposed by Information for

Public Use reveal that Medford Police spied on, monitored, and collected information about non-

violent activists and groups, including Plaintiffs, Black Lives Matter, Rogue Valley Pepper

Shakers, Siskiyou Rising Tide, and Rise and Resist Southern Oregon, among others, despite no

connection to criminal investigations.[27]

153.    Plaintiffs' experiences of being targeted and retaliated against by the City of

Medford are not isolated incidents, but part of an ongoing pattern and practice of First Amendment

violations by the City, intended to silence and suppress voices critical of the Medford Police

Department and its activities.

---

[26] *Medford City Council Meeting Recording*, CITY OF MEDFORD (Panopto video at 59:53) (April 20, 2023), https://medford.hosted.panopto.com/Panopto/Pages/Embed.aspx?id=5dea42ba-e35d-4988-939d-af7300121913.

[27] Natasha Lennard, *Oregon Police Obsessively Spied on Activists for Years, Even After Pipeline Fight Ended*, THE INTERCEPT (Nov. 8, 2023), https://theintercept.com/2023/11/08/oregon-police-surveillance-protests-activists/.

PAGE 40 – **SECOND AMENDED COMPLAINT**

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – First Amendment – Retaliation**
*(Against All Individual City of Medford Defendants)*

154.    Plaintiffs reallege all previous paragraphs.

155.    Defendants, acting under color of state law, took adverse actions against Plaintiffs in retaliation for Plaintiffs' protected expression, using law enforcement powers in an attempt to suppress dissent, including:

    a.    Targeted surveillance of protest groups, nonprofit workers, and social media accounts of local activists, including monitoring and documenting the protected speech and associations of Plaintiffs and other activists;

    b.    Coordinating with third parties to undermine Plaintiffs' funding and professional relationships;

    c.    Harassment;

    d.    Patterned exclusion of disfavored service providers from city-sponsored communication channels and funding networks;

    e.    Routine coordination between police, code enforcement, and nonprofit partners to marginalize those engaged in advocacy for unhoused and drug-using populations;

    f.    Private and public disparagement; and

    g.    Pretextual stops, unlawful arrests, targeted citations; exclusion orders, and other enforcement actions.

156.    These retaliatory acts would chill a person of ordinary firmness from continuing to engage in protected expression.

157.    Defendants Jones and Strong eventually resigned from their employment with

PAGE 41 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

Stabbin' Wagon, due in large part to the cumulative impacts of Defendants' actions.

158.    Defendants' adverse actions were substantially motivated by Plaintiffs' protected conduct. Statements by MPD officers, City emails, and the pattern of targeted enforcement against Plaintiffs, while others were not similarly treated, provide direct and circumstantial evidence of unconstitutional motive.

159.    As a result of Defendants' conduct, Plaintiffs have suffered violations of their constitutional rights, as well as physical, emotional, economic, and reputational harm.

160.    Accordingly, Plaintiffs seek economic and noneconomic damages in an amount to be determined at trial.

161.    The acts of the individual Defendants were intentional, willful, and in reckless disregard of Plaintiffs' constitutional rights. Plaintiffs seek punitive damages against them in an amount to be determined by a jury.

162.    Plaintiffs seek an award of their reasonable attorney fees and costs incurred in bringing this action, pursuant to 42 U.S.C. § 1988.

### SECOND CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 – First and Fourth Amendment – *Monell* Liability
### *(Against Defendant City of Medford)*

163.    Plaintiffs reallege all previous paragraphs.

164.    Under *Monell v. Department of Social Services*, a municipality is liable under 42 U.S.C. § 1983 when a constitutional violation is the result of an official policy or decision by municipal policy makers, widespread custom or practice that is so permanent and well settled it constitutes the force of law, or a failure to train, supervise, or discipline municipal employees, reflecting deliberate indifference to constitutional rights.

PAGE 42 – **SECOND AMENDED COMPLAINT**

165. The City of Medford, through its official policymakers, departments, and agents, maintained and enforced policies, customs, and practices that caused the above-referenced violations of Plaintiffs' constitutional rights, including rights protected by the First and Fourth Amendments to the United States Constitution.

166. Defendant City of Medford, through its final policymakers (including but not limited to the City Manager, Chief of Police, and Mayor) approved, directed, or ratified the retaliatory conduct, surveillance, arrests, and interference detailed in this Complaint.

167. The City adopted formal and informal policies to exclude and discredit service providers that refused to collaborate with law enforcement, including Stabbin' Wagon, and privileged those that embedded police officers on boards or operated under police influence.

168. Even absent a written policy, the City of Medford maintained a longstanding custom and practice of retaliating against people and organizations that challenged the City's law enforcement priorities or political agenda, in the various ways described *supra*.

169. These practices were widespread, long-standing, and known to city leadership. They reflect a municipal culture of suppressing dissent, particularly when it emerges from groups advocating harm reduction, drug decriminalization, or housing justice.

170. The City of Medford also failed to adequately train or supervise its police officers and managerial staff concerning the rights of Plaintiffs and others similarly situated, including:

   a. First Amendment protections for protestors, nonprofit workers, and public health advocates;

   b. The limits of lawful surveillance and data retention, including the limitations imposed by ORS 181A.250; and

PAGE 43 – **SECOND AMENDED COMPLAINT**

c. The appropriate use of force and law enforcement activity in the context of homelessness and harm reduction outreach.

171. The City also failed to discipline officers engaged in known retaliatory conduct. Officers with histories of harassment or improper targeting of Plaintiffs were promoted or retained in key leadership positions (e.g., Livability Team supervisors), despite complaints or notice of misconduct.

172. These actions and omissions caused direct violations of Plaintiffs' constitutional rights, as well as constituting deliberate indifference to the constitutional rights of Plaintiffs and others similarly situated and were a moving force behind the constitutional injuries alleged herein.

173. The City's acts and omissions described herein directly caused harm to Plaintiffs, including but not limited to retaliatory arrests and prosecution, suppression of political speech and public health outreach, economic damage through grant interference, emotional distress, reputational harm, increased costs and financial damages, and long-term disruption of Plaintiffs' nonprofit operations and professional standing.

174. Accordingly, Plaintiffs seek economic and noneconomic damages in an amount to be determined at trial.

175. Plaintiffs seek an award of their reasonable attorney fees and costs incurred in bringing this action, pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights
### *(Against All Individual Defendants)*

176. Plaintiffs reallege all previous paragraphs.

177. The elements of a claim for conspiracy to violation civil rights under 42 U.S.C. §

PAGE 44 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws or equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) injury to person or property or deprivation of a constitutional right.

178.    Plaintiffs advocate for, support, and provide services to people in Southern Oregon, including Medford, who are experiencing drug-related substance use disorder ("SUD") and/or a serious mental illness ("SMI").

179.    At the federal level, Congress passed the Rehabilitation Act, Americans with Disabilities Act, and Affordable Care Act to protect the rights and provide services to persons with disabilities.

180.    Both SUD and SMI are considered a disability under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Section 1557 of the Affordable Care Act.[28]

181.    Congress also passed the McKinney-Vento Homeless Assistance Act, 42 U.S.C. S 11403 *et seq*., to "meet the critically urgent needs of the homeless of the Nation" and provide rental housing assistance to homeless persons with disabilities, "primarily, those persons who are

---

[28] "'[M]ental illness qualifies as a disability under' the ADA." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 117 F.4th 503, 528 (3d Cir. 2024), *cert. denied sub nom. Wetzel v. Williams*, No. 24-1067, 2025 WL 2823715 (U.S. Oct. 6, 2025); "The regulations promulgated pursuant to the ADA include mental illness as an example of an 'impairment' for ADA purposes. *See* 29 C.F.R. § 1630.2(h)(2)." *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 725 (7th Cir. 1998), *overruled by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

seriously mentally ill, have chronic problems with alcohol, drugs, or both, or have acquired immunodeficiency syndrome (AIDS) and related diseases and the families of such persons," including providing resources through the Shelter Plus Care Program.[29]

182.    Disabled people with SUD and SMI, including homeless people with SUD and SMI, are within the suspect classes of persons protected by 42 USC 1985.[30]

183.    In Oregon, voters passed Measure 110[31] in 2020, which stated in part:

**Whereas, Oregonians suffering from substance use disorder also need adequate access to recovery services, peer support and stable housing.**
One in every 11 Oregonians is addicted to drugs. Drug addiction exacerbates many of our state's most pressing problems, such as homelessness and poverty.

**Whereas, Oregon needs to shift its focus to addressing drugs through a humane, cost-effective, health approach.**
People suffering from addiction are more effectively treated with health care services than with criminal punishments. A health care approach includes a health assessment to figure out the needs of people who are suffering from addiction, and it includes connecting them to the services they need.

**Whereas, Oregon still treats addiction as a criminal problem.**
Law enforcement should spend more time on community safety, but Oregon law enforcement officers in 2017 arrested more than 8,000 people in cases where simple

---

[29] *City & Cnty. of San Francisco v. Trump*, No. 25-CV-01350-WHO, 2025 WL 1738675, at *4 (N.D. Cal. June 23, 2025).

[30] "The disabled are included within the 'class' protected by § 1985(3)." *Taggart v. Moody's Invs. Serv., Inc.*, No. 06 CIV. 3388 (PKC), 2007 WL 2076980, at *5 (S.D.N.Y. July 17, 2007); *see also People by Abrams v. 11 Cornwell Co.*, 695 F.2d 33, 42 (2d Cir.1982), *modified on other grounds,* 718 F.2d 22 (2d Cir.1983) (en banc) ("Cases since *Griffin v. Breckenridge* have been generous in applying section 1985(3) to nonracial classifications, even though some of the classifications would not receive strict scrutiny under the equal protection clause."); *Larson by Larson v. Miller*, 55 F.3d 1343 (8th Cir.1995).

[31]    The    Drug    Addiction    Treatment    and    Recovery    Act    (Aug.    15,    2019), https://sos.oregon.gov/admin/Documents/irr/2020/044text.pdf.

PAGE 46 – **SECOND AMENDED COMPLAINT**

drug possession was the most serious offense. In many instances, the same people were arrested for drug possession, again and again, because they are unable to get treatment.

184.    Measure 110 implemented the Drug Addiction Treatment and Recovery Act. The Act in part required the creation of an Oversight and Accountability Council, which was required to contain at least one "person specializing in housing services for people with substance use disorder or a diagnosed mental health condition," and also required some funds to be used solely for purposes for which moneys in the statewide Mental Health Alcoholism and Drug Services Account under ORS 430.380 may be used.

185.    These provisions recognize the interconnection between SUD, SMI, and homelessness, including in Southern Oregon.

186.    In June 2021, the Oregon legislature passed HB 2980 into law, which:

Requires Oregon Health Authority to provide funding to peer-run organizations in Portland metropolitan area, southern Oregon region, Oregon coast and eastern and central Oregon region to operate peer respite centers to provide peer respite services to individuals with mental illness or trauma response symptoms who experience acute distress, anxiety or emotional pain that may lead to need for higher level of care.[32]

187.    The peer respite center Plaintiffs sought to implement through the OHA grant was designed in part to serve clients with SUD and/or SMI, including such clients who were homeless while experiencing mental health crisis, by providing them a residential home in which to live for up to two weeks in a non-clinical setting run by compassionate peers.

188.    Similarly, ORS 195.530 declares that people experiencing homelessness may

---

[32] Oregon Legislative Information, *HB 2980 Enrolled: Overview*, Oregon State Legislature (2021), https://olis.oregonlegislature.gov/liz/2021R1/Measures/Overview/HB2980.

PAGE 47 – **SECOND AMENDED COMPLAINT**

lawfully use public space subject to reasonable time, place, and manner restrictions, without discrimination based on housing status.

189.    These laws demonstrate a legislative intent to protect unhoused people as a vulnerable legal class. Combined with Measure 110's decriminalization provisions and public health access mandates, these statutes create affirmative rights for clients served by Plaintiffs.

190.    Plaintiffs thus advocate for, support, and provide services to a class of people for whom a governmental determination that its members require and warrant special federal assistance in protecting their rights has been made by Congress, and reinforced by Oregon statewide voters and the Oregon Legislature at times relevant to this action.

191.    Plaintiffs may thus bring a § 1985(3) claim as advocates, supporters, and service providers for people experiencing SUD and/or SMI disability, including homeless persons with SUD and/or SMI.[33]

---

[33] The United States Supreme Court stated that, "The predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes *and their supporters.* The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott,* 463 U.S. 825, 836, 103 S. Ct. 3352, 3360 (1983) (emphasis added); *see also Waller v. Butkovich*, 584 F. Supp. 909, 937 (M.D.N.C. 1984) (interpreting the same language to conclude that "animus against advocates of equal rights for black people is within the scope of activity against which § 1985(3) is directed"); *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1266, 1267, 1273-73 (10th Cir. 1989) (plaintiffs who are supporters or advocates for the poor and for minorities may allege legitimate § 1985(3) claims, regardless of their race); *Farber v. City of Paterson*, 440 F.3d 131, 141 (3d Cir. 2006) ("a § 1985(3) plaintiff need not be a member of the class against which a conspiracy directs its invidiously discriminatory animus"); *Lesley v. Bennett*, 778 F. Supp. 3d 1201, 1215–16 (D. Wyo. 2025) ("We next consider whether relief under Section 1985(3) is limited exclusively to supporters of race-based groups. We find that it is not.").

PAGE 48 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

192.    As the legislative history of § 1985(3) demonstrates, the statute was enacted to protect groups who became the targets of organized hostility due to newly conferred legal rights. Congressman Shellabarger introduced § 1985(3) and made it clear that the statute was intended to protect all persons, without distinction of race, color, or class, from conspiracies by local majorities. *See Cong. Globe*, 42d Cong., 1st Sess. 428-29 (1871); Devin S. Schindler, *The Class-Based Animus Requirement of 42 U.S.C. § 1985(3): A Limiting Strategy Gone Awry,* 84 MICH. L. REV. 88 (1985). Rep. Lowe said the bill was meant to apply to "all classes in all States; to persons of every complexion and of whatever politics." *Cong. Globe*, 42d Cong., 1st Sess., App. 376 (1871).

193.    In Oregon, a similar backlash occurred during all relevant times of 2019 through 2023, and to the present. The legal status of unhoused people experiencing SUD and SMI was transformed by Oregon voters and legislators. Their formerly criminalized conduct (e.g., simple drug possession and camping on public land) was no longer blanketly illegal, and they were legally entitled to access public health services, treatment, and public space without criminal prosecution or with additional protections in place.

194.    In response to this shift, Defendants undertook a conspiracy to suppress these new rights and punish those who supported or embodied them. Through intimidation, surveillance, retaliation, and discriminatory enforcement, Defendants targeted Plaintiffs for their direct support of this legally protected class and for recording and publicly exposing the City's misconduct.

195.    Defendants' conduct, including arrests, surveillance, online doxing, funding interference, and reputational attacks, constitutes invidious action aimed at suppressing those rights.

PAGE 49 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

196.    Although Defendants did not necessarily communicate directly at every stage, they reached a tacit understanding that Defendant Mallory would use his platform to amplify, legitimize, and escalate the City Defendants' retaliatory actions, while City officials would benefit from, rely on, and not repudiate Mallory's actions. Each Defendant acted with knowledge of the others' roles and with the intent to further their shared objective.

197.    Defendant Mallory's role was not that of an independent journalist, but of a private actor knowingly assisting state officials in accomplishing objectives they could not lawfully pursue directly.

198.    Accordingly, Stabbin' Wagon's clients, as beneficiaries of legislatively conferred rights and targets of retaliatory conduct by public officials, constitute a protected class under § 1985(3). Plaintiffs, in turn, were targeted for supporting that class and vindicating its rights.

199.    In Medford, this group, often rural, medically disabled, and economically marginalized, is treated as a racialized and criminalized "other," illegitimate in public life. MPD's internal language, enforcement disparities, and systematic exclusion efforts underscore this legal and cultural hostility. Defendants have effectively constructed an illegitimate legal identity for this class of people, treating them not as civilians entitled to rights, but as an unworthy criminal class, precisely the type of group-based suppression § 1985(3) was designed to address. The discriminatory policing and punishment of this class is consistent with historical practices of exclusion and economic punishment that § 1985(3) sought to eliminate.

200.    As Plaintiffs supported, protected, and defended this class, through public health work, activism, recording of police activity, and policy advocacy, they became the focus of Defendants' animus.

PAGE 50 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

201.    Defendants conspired among themselves and with third parties, including hostile nonprofit leaders and politically aligned social media actors, to surveil, harass, discredit, and dismantle Plaintiffs' work.

202.    Plaintiffs were targeted not only for their political beliefs and speech, but because they were helping the very class that Defendants sought to exclude, punish, and suppress from public life in Medford.

203.    Defendants' overt acts in furtherance of this conspiracy include:

a.    Dissemination of defamatory, discrediting, and false information to third parties about Plaintiffs, their work, and their clients;

b.    Interference with a state-funded $1.5 million grant awarded to Stabbin' Wagon;

c.    Targeted arrests, citations, surveillance, and harassment of Plaintiffs;

d.    Coordination with anti-activist social media groups that published private information and incited public backlash; and

e.    Disseminating Plaintiffs' private identifying information, obtained through law enforcement channels, to more than 100,000 followers in order to incite harassment and vigilantism against Plaintiffs.

204.    These acts, undertaken jointly with Medford Police, City officials, and Defendant Mallory, were intended to deprive Plaintiffs and the vulnerable class they served of unhoused and drug-using individuals newly protected rights by Measure 110 and related laws of equal protection of the laws.

205.    These acts of the Defendants were motivated by invidious animus against Plaintiffs' ideological and associational status, including affiliations with leftist, abolitionist, harm

PAGE 51 – **SECOND AMENDED COMPLAINT**

reduction, and LGBTQIA2S+ movements, and by their visible support of politically disfavored groups including homeless and transient residents, and people living with SUD and/or SMI, which is a qualifying disability under the Americans with Disabilities Act.

206.    Plaintiffs have been injured in their persons, reputations, livelihoods, and legal interests as a direct and proximate result of this unlawful conspiracy by Defendants.

207.    Defendants' conduct proximately caused damages including deprivation of liberty, emotional distress, reputational harm, and disruption of Plaintiffs' public health work.

208.    Accordingly, Plaintiffs seek economic and noneconomic damages in an amount to be determined at trial.

209.    The acts of the individual Defendants were intentional, willful, and in reckless disregard of Plaintiffs' constitutional rights. Plaintiffs seek punitive damages against them in an amount to be determined by a jury.

210.    Plaintiffs seek an award of their reasonable attorney fees and costs incurred in bringing this action, pursuant to 42 U.S.C. § 1988.

## DEMAND FOR JURY TRIAL

211.    Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests the Court enter judgment in their favor and against all Defendants, and award the following relief:

A.  A declaration Defendants violated Plaintiff's rights under the United States Constitution and Oregon law, including but not limited to under the First and Fourth Amendment;

B.  An award of economic and non-economic damages in an amount to be proven at trial, for

PAGE 52 – **SECOND AMENDED COMPLAINT**

**LeDuc Montgomery LLC**
2210 W Main St., Suite 107 #328
Battle Ground, Washington 98604
704.702.6934

Plaintiff's physical injuries, pain and suffering, emotional distress, trauma, humiliation, and loss of dignity, lost wages, and other out-of-pocket expenses, past and future mental health treatment, and related expenses in an amount to be determined at trial;

C.  An award of punitive damages against each individual Defendant whose acts were intentional, malicious, or taken with reckless indifference to Plaintiffs' federally and state-protected rights;

D.  An award of Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute or rule;

E.  A prevailing party fee as permitted by law;

F.  An award of interest on all sums awarded, including prejudgment and post-judgment interest as permitted by law; and

G.  Such other and further relief as this Court deems just, equitable, and appropriate.


DATED:  February 11, 2026.                    LEDUC MONTGOMERY LLC

                                              By: *s/Alicia LeDuc Montgomery*
                                              **Alicia LeDuc Montgomery, OSB # 173963**
                                              alicia@leducmontgomery.com
                                              704.702.6934

                                              **Marianne Dugan, OSB # 932563**
                                              CIVIL LIBERTIES DEFENSE CENTER
                                              mdugan@cldc.org
                                              541.687.9180

                                              Attorneys for Plaintiffs


PAGE 53 – **SECOND AMENDED COMPLAINT**