IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


JOHN LEE MALAER,                                    Case No. 1:20-cv-00049-CL

                    Plaintiff,                       **OPINION AND ORDER**

        v.

SGT. GEOFFREY KIRKPATRICK, et al,

                    Defendants.

_____

CLARKE, Magistrate Judge.

        This is a civil rights case arising out of Plaintiff's encounter with law enforcement on

July 11, 2019.  Full consent to magistrate jurisdiction was entered on August 16, 2021 (#56).

Plaintiff's case against the City defendants was severed from the case against the County

defendants on July 14, 2021 (#52).  The case comes before the Court on the City Defendants'

motion for summary judgment (#220). Oral argument was heard on August 16, 2023, and

supplemental briefs were filed on August 22 and August 23, 2023. For the reasons below, the

motion for summary judgment (#220) is DENIED in part and GRANTED in part.

**EXHIBIT 2**
**PAGE 1 of 19**

**STANDARD**

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

**BACKGROUND**

The procedural history of this case has been well documented and thoroughly discussed in prior opinions.

Factually, this case arises out Plaintiff's arrest on July 11, 2019, by Medford Police Officers, after they were dispatched to Lumpy's bar located at 801 S. Riverside Ave. in Medford,

**EXHIBIT 2**
**PAGE 2 of 19**

Oregon. Def. MSJ Ex. 1 – CAD Report; Ex. 2 – Kirkpatrick Depo. Pg. 60.  Sergeant Wulff, Corporal Esqueda and Officer McFall responded and the officers' interactions with Plaintiff leading to his arrest were captured on body camera and fleet camera in the police vehicle used to transport Plaintiff to jail. Ex. 3 – Esqueda Body Cam; Ex. 4 – McFall Body Cam; Ex. 5 – Wulff Body Cam and Ex. 6 – Fleet Cam. The complaining employee from Lumpy's bar called 9-1-1 for police assistance for Plaintiff's alleged disorderly conduct; dispatch information included that a man in a wheelchair was in the parking lot throwing rocks at the windows and threatening the complainant. Def. MSJ Ex. 1.

Plaintiff John Malaer is a paraplegic and is bound to a wheelchair. Plaintiff asserts that, at the time of the incident outside of Lumpy's, his electric wheelchair was dying, rendering the wheelchair useless, causing him to shout and throw pebbles at the Lumpy's building to try to get someone's attention so they could assist him in moving towards the bus stop and getting on to the bus.  Corporal Esqueda was the first officer on the scene after the Lumpy's employee, Kelly Cole, called police. As Esqueda approached, Malaer was in his electric wheelchair on the sidewalk trying to board the bus. The caller, Cole, was in the doorway of Lumpy's.  Esqueda asked her, "Did he damage anything?" Cole confirmed, "No." Ex. 4 (0:03-06); Esqueda Video, 2:40:44-2:40:51 (#84).

The parties' perspectives on the subsequent events and actions by Plaintiff and by officers on the scene are quite different.  As the non-movant, Plaintiff is entitled to all inferences in his favor, unless submitted evidence demonstrates that his version of the facts is impossible. According to the Plaintiff, the bus ramp was down, and Plaintiff was negotiating with the bus driver to get help loading his wheelchair onto the bus. Plaintiff asserts that Corporal Esqueda interrupted this negotiation in a hostile manner. First, Esqueda said, "Hey! Do you have a bus

**EXHIBIT 2**
**PAGE 3 of 19**

pass? Do you have a bus pass? Then get on the bus." Ex. 4 (00:14-38); Esqueda Video (#84).

Esqueda also called Plaintiff an "asshole" multiple times, telling him to "Go away." *Id.* Even

though Esqueda was telling Plaintiff to leave, Plaintiff claims this interaction delayed him and

prevented him from boarding the bus, causing the bus to leave without him. A review of the

video footage from Esqueda's bodycam shows that this claim is not supportable. The video

shows that while Esqueda was approaching, prior to any interaction between Esqueda and

Plaintiff, the bus ramp was lifting up and the bus was beginning to pull away. As Plaintiff turned

around and Esqueda got his attention, Plaintiff can be heard saying to the bus driver, "I will not

forgive you!" *Id.* at (00:14-17). The clear implication being that Plaintiff will not forgive the

driver for refusing to let him board the bus. No reasonable juror could find that Esqueda's

approach prevented Plaintiff from boarding the bus.

Immediately after making contact, Plaintiff began to shout at Esqueda, refusing to talk to

him or give his name. First Plaintiff tried to brush him off saying, "Who even are you?" over

and over, and, "Why do I need to talk to you?" Esqueda eventually interjects, "Because you're

being an asshole." *Id.* at (00:14-38). Plaintiff then continued shouting and cursing at Esqueda.

Esqueda continued attempting to speak with Plaintiff but struggled to get a word in. Finally,

Esqueda said, "You think just because you're in a wheelchair you can't go to jail?" Ex. 4 (00:41-

46); (Esqueda Video, 2:41:20) (#84).

While Plaintiff continued shouting and ranting, Esqueda interviewed Kelly Cole, the

Lumpy's employee who called MPD to report Plaintiff's behavior. Cole told Esqueda she did

not know Plaintiff. She said that Plaintiff "got himself stuck in a hole. Couple of guys helped

him out. As soon as they left, he turned his motor back on made them think it was a dead battery.

Put himself back in the hole. Two other people helped him out. When I came out here, he started

**EXHIBIT 2**
**PAGE 4 of 19**

this. And calling me names, threaten my life." Ex. 4 (01:02-01:38).  Esqueda put his gloves on,

stating to Cole, "I'd rather not beat up a guy in a wheelchair, if possible." *Id.* at (1:22-1:30).

Plaintiff can be heard in the background of this portion of the video, continuing to shout and

swear and rant. Esqueda commented to Cole, "It is hard to get upset at a guy who's pissed about

his wheelchair." *Id.* at (1:30-1:56). He also suggested that she and the other employees

essentially just leave him alone and let him go.  Esqueda testified at his deposition that Plaintiff

was free to leave after the Cole interview. Ex. 3 (53:9-18).  "[B]ased on [my] initial interviews

with Mr. Malaer, he was free to go." *Id.* (45:10-17).

Esqueda re-approached Plaintiff and told him he was not going to arrest him. However,

they continued interacting. Plaintiff asked Esqueda: "Are you going to help me?" Esqueda

answered: "No, I'm not going to help you." Ex. 3 (41:1-4); Ex. 4 (02:35- 03:02). Then he asked,

"Do you need help?" And Plaintiff said, "No, I don't need help." *Id.*  Plaintiff used a variety of

racist epithets, calling Esqueda an "illegal Mexican."  Esqueda responded "you're just a sad,

pathetic man who needs to go away." Ex. 4 (02:08-02:28); Esqueda Video, 2:43:00-12 (#84).

Esqueda also called Plaintiff "an idiot." *Id.*

At 7:43 PM, Officers Wulff and McFall arrived. Ex. 7 (88:9-90:22); Ex. 8 (18:12-22).

Wulff saw Esqueda talking with a man sitting in a wheelchair. Ex. 7 (95:22-96:2). They

approached and had the following exchange:

> Officer McFall (03:49): What's going on?
> Malaer (03:50): Trying to get home, dog.
> Officer McFall (03:52): Trying to get home?
> Officer McFall (03:55): What's your name?
> Malaer (03:57): It doesn't matter what my name is.
> Officer McFall (03:59): It does matter.
> Malaer (03:59): No it doesn't. No it doesn't.
> Malaer (04:01): What you gonna arrest me cuz I don't give you my
> name? Is that what you're gonna do?
> Officer McFall (04:05): Well, I got called here for a reason, so.

**EXHIBIT 2**
**PAGE 5 of 19**

Malaer (04:07): Doesn't matter what you got called for. It doesn't matter what all these idiots have fucking said. Are you gonna arrest me? Because I fucking want to go home? Is that what you're gonna arrest me for? Then, you do that.

Officer McFall (04:20): What's going on?

Malaer (04:21): You're an idiot. That's what's going on. He's an idiot. You're an idiot. You guys need to leave me the fuck alone. That's what is going on.

Officer McFall (04:29): Do you, do you mind standing by with him so I can get a…

Malaer (04:32): Step off bitch. Step off mother fucker. That's what they're asking you. Step off. Mother fucker. Fuck all you mother fuckers. What you guys gonna do? Arrest me?

Officer McFall (4:42): Yeah.

Officer Wulff (4:42): Probably.

Malaer (4:44): You gonna throw me on the ground and put me in jail? For what?

Officer McFall (04:45): We're not going to throw you on the ground. But we'll put you in.

Malaer (04:46): What you gonna put me in jail for?

Officer Wulff (04:49): On its nose right now, I'd say disorderly conduct.

Malaer (04:49): Because these idiots right here. Fuck you. Fuck you. Then you do that. Arrest me. That's what you do. That's your next fucking job.

Officer Wulff (04:58): We're assuming you're okay. <laugh>.

Officer Esqueda (5:01): <laugh> Yeah.

Ex. 4; Esqueda Video (# 84).

The officers continued to attempt to talk to Plaintiff. Plaintiff continued to rant and shout, cursing and cussing, telling them to go away. Esqueda asked him multiple times, "Do you need our assistance?" Plaintiff answered, "No," and continued to rant and shout, telling them to arrest him if that is what they wanted to do, and then asking what they could possibly arrest him for. The officers tried to explain what disorderly conduct means, and Plaintiff argued with them and continued shouting. Eventually a police vehicle pulled up near where Plaintiff was on the sidewalk, and he asked what was happening, and they told him, "You're under arrest, for

EXHIBIT 2
PAGE 6 of 19

disorderly conduct, like we have been telling you." They proceeded to read him his Miranda rights and place him under arrest.

Plaintiff experiences medical incontinence. He had not evacuated his bladder for several hours, and he urinated on himself towards the end of the encounter with police. Ex. 6 (79:23-80:5). Esqueda noted out loud that Plaintiff "pissed in his wheelchair." Ex. 4 (01:49-01:52); Esqueda Video (2:42:37) (#84). Plaintiff asserts that Esqueda was mocking him for this, but there is no evidence of that on the video, merely a comment as if to alert the officers who were planning to physically remove Plaintiff from his wheelchair to make the arrest.

During the arrest, Officer McFall handcuffed Plaintiff and told him to "Stand up!" Wulff responded "I don't think he can, so we're going to have to move him." Ex. 4 (15:11-15:17:01). The officers pulled Plaintiff out of his wheelchair, bent him forward handcuffing him behind his back. Officers dragged Plaintiff by his elbows, dropped his body down toward the ground, then pulled him up again. They slowly dragged Plaintiff in sideways across the back seat of the SUV. Officers belted Plaintiff into the back seat with his arms still handcuffed behind his back, without any support. Plaintiff exclaimed "you guys don't even know how to do this." Ex. 25. Plaintiff claims that he tried to stabilize himself to remain upright with his hands, but he claims the officers thought he was trying to resist. Plaintiff continued to shout and rant while he was being arrested.

Sergeant Kirkpatrick was the officer in charge of MPD Team 7. Ex. 10 (33:10-19). Kirkpatrick gave instruction to Wulff by phone regarding Plaintiff's arrest and transport. Ex. 7 (151:20-152:13). He arrived with a community resource truck, loaded the wheelchair in, and transported it to the jail. Ex. 10 (102:7-23). Plaintiff claims he was transported in a police SUV which was not ADA equipped for a paraplegic arrestee. Ex. 7 (152:9-22).

**EXHIBIT 2**
**PAGE 7 of 19**

McFall interviewed Cole after Plaintiff was arrested for disorderly conduct. Cole said, "He didn't scare me, he just pissed me off when he put [the wheelchair] back in the hole the second time." Ex. 28 (17:53-18:26). Cole claimed Plaintiff got "stuck in the hole purposely," and was making people "believe" he had a dead battery. She repeatedly told officers, "The motor's good, if you guys have to load him up, the [wheelchair] motor's good." *Id.* (2:56-3:01). However, McFall tried to move the wheelchair after arrest and said the battery "is dead." *Id.* (26:27-27:00).

## DISCUSSION

### I.   The City Defendants' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

Plaintiff alleges two claims against City Defendants: (1) a section 1983 Civil Rights Act claim brought against the individual Defendants, for Fourth Amendment violations including unreasonable seizure and arrest, and (2) an ADA/RA claim against the City for violations occurring during Plaintiff's arrest and transport to the Jackson County jail. Probable cause at the time of arrest entitles the Defendants to summary judgment as to the 1983 claim. Issues of fact preclude summary judgment as to three of the ADA claims, but three other ADA claims fail as a matter of law.

#### 1.   The Defendants are entitled to summary judgment as to Plaintiff's Fourth Amendment claims for unreasonable seizure and arrest.

The Civil Rights Act, 42 U.S.C. § 1983, does not create rights but provides the vehicle by which federal rights can be enforced. This section is used to enforce rights given under any federal statute or the federal constitution.[1] *Monroe v. Pape*, 365 U.S. 167 (1961*); Monell v.*

---

[1] Despite this clear limitation to federal statute or the federal constitution, Plaintiff argues that the Court should utilize section 1983 to enforce rights under the Oregon constitution and should use Oregon's subjective standard for evaluating probable cause. No law or precedent is cited for this unique argument, and the Court declines to entertain it here.

**EXHIBIT 2**
**PAGE 8 of 19**

*Department of Social Service*, 436 U.S. 658 (1978); *Maine v. Thiboutot*, 448 U.S. 1 (1980). A claim under § 1983 must show (1) a deprivation (2) of some protected federal right (3) under color of state law. *Parrott v. Taylor*, 451 U.S. 527, 536-37 (1981); *Monroe*, 365 U.S. 167.

The Fourth Amendment protects personal privacy and dignity against unwarranted intrusion by the State. *Schmerber v. California*, 384 U.S. 757, 770 (1966). A constitutionally valid seizure must have probable cause to believe a crime has been committed; the officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrants that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Probable cause exists when "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the person being arrested] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986); *Carroll v. United States*, 267 U.S. 132 (1925); *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949); *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Libby v. City of Medford*, 2017 WL 2219995 (D. Or. Mar. 17, 2017) (assessment of "all the information" possessed) (citing *State v. Stevens*, 311 Or. 119, 129 (1991)).

### a. Defendants had probable cause to arrest Plaintiff for Disorderly Conduct.

Plaintiff was cited with Disorderly Conduct and Menacing under the Medford Municipal Code ("MMC").[2] Ex. 17. Disorderly Conduct under MMC 5.120 is defined as follows: "A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person engages in fighting or

---

[2] While Plaintiff was awaiting trial, Ms. Cole passed away, and the charges against Plaintiff were dismissed.

EXHIBIT 2
PAGE 9 of 19

violent, tumultuous or threatening behavior; makes unreasonable noise; obstructs vehicular or pedestrian traffic on a public way...." Ex. 18, Ex. 7 – Esqueda Depo, Pg. 86, Ln. 1-14. The crime of Menacing under MMC 5.1102 states: "No person shall intentionally attempt, by words or conduct, to place another person in fear of imminent physical injury."

The officers at the scene had probable cause to arrest Plaintiff for disorderly conduct. Plaintiff's words and demeanor were angry and aggressive. He was captured on video ranting, yelling, cussing, and creating a scene on the sidewalk for a significant amount of time, even when officers were not directly engaged with him. Plaintiff claims his only intent was to be able to get home safely, but his loud, persistent shouting, yelling, and ranting recklessly created obvious public inconvenience, annoyance and alarm, as evidenced by the Lumpy's employees interviewed by Corporal Esqueda. Plaintiff engaged in incessant "tumultuous or threatening behavior," before and after Esqueda arrived on scene. He made unreasonable noise by shouting and screaming at officers, and obstructed pedestrian traffic on the sidewalk outside of Lumpy's – a "public way."

Plaintiff points out that Corporal Esqueda told him that he should leave, indicating that he was free to go, after speaking to Kelly Cole. Plaintiff argues that, by telling him to leave, Esqueda was indicating that Plaintiff had done nothing wrong up to that point, or that probable cause did not exist for an arrest. This is incorrect. Esqueda's attempt to resolve the situation without an arrest, by telling Plaintiff to leave and go home, did not eliminate the probable cause that existed at that moment in time. Regardless, Plaintiff did not leave, and he continued engaging in the same conduct that allowed officers to form probable cause for the arrest.[3]   In

---

[3] Plaintiff also argues that because his wheelchair battery was dead or dying, he was physically unable to leave – meaning that the only reason he was ultimately arrested was because his disability prevented him from leaving when told to go. The Court will address this argument more specifically as it relates to

other words, officers had probable cause to arrest Plaintiff for disorderly conduct both before and after Esqueda told Plaintiff he was free to go.

At this stage, the Court must construe all facts, to the extent that there is any dispute, in Plaintiff's favor. However, Plaintiff cannot raise a dispute of material fact if the allegation is affirmatively disproved by the evidence in the record. Here, a jury and the community at large could absolutely find that officers were not a model of sensitivity or compassion in their treatment of Mr. Malaer. Certain comments made about his disabilities were inappropriate and uncalled for, and it is possible that calling for mental health or crisis intervention services to help Plaintiff could have avoided the arrest in this case. However, there is no indication that Plaintiff would have been open to receiving such help, and officers acted reasonably under the circumstances. Ultimately, there is no genuine dispute that Plaintiff engaged in loud, disruptive shouting for a significant amount of time, causing an undeniable public disturbance. The officers had probable cause that Plaintiff committed the crime of disorderly conduct at the time of his arrest. The City Defendants are entitled to summary judgment.

### b. The individual City Defendants are entitled to qualified immunity.

Even if officers mistook Plaintiff's disability symptoms for disorderly conduct, they are entitled to qualified immunity. Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam). As discussed

---

Plaintiff's ADA claim below. For purposes of the probable cause analysis, it is irrelevant because probable cause existed before and after Esqueda told him to leave.

**EXHIBIT 2**
**PAGE 11 of 19**

above, the officers had probable cause to arrest Plaintiff for disorderly conduct. However, Plaintiff also alleges that his disability symptoms were mistaken for disorderly conduct, resulting in his wrongful arrest. There is no indication or evidence in the record that the officers knew or should have known that Plaintiff's belligerent shouting and ranting could be a symptom of his PTSD, as opposed to an intoxicated response to the frustrating situation with his dying wheelchair battery. The officers acted reasonably with the information available to them at the time. For this reason, Wulff, Esqueda, and McFall are entitled to qualified immunity.

### 2. The City is entitled to summary judgment as to some, but not all, of Plaintiff's ADA claims.

Defendants move for summary judgment against Plaintiff's ADA/RA claims against the City for violations occurring during Plaintiff's arrest and transport to the Jackson County jail.[4] Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 608-10 (2015). Plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001).

### a. Plaintiff is a "qualified individual with a disability," and the ADA applies to the encounter between Plaintiff and City officers.

---

[4] There is no significant difference in the analysis of rights and obligations under the ADA and the RA, and they may be interpreted and applied together. *McGary v. City of Portland*, 386 F.3d 1259, 1265 n. 7 (9th Cir. 2004); *Duvall*, 260 F.3d at 1136.

**EXHIBIT 2**
**PAGE 12 of 19**

The City agrees that, as a paraplegic who is permanently paralyzed and confined to a wheelchair, Plaintiff is a "qualified individual with a disability" for the purpose of Plaintiff's ADA Claim. However, the City does not concede that Plaintiff is a qualified individual for ADA purposes as to his "chronic PTSD issues." While Plaintiff gave some deposition testimony around having "PTSD issues around large groups of people," Plaintiff has not submitted any evidence that he has ever been diagnosed with PTSD nor treated for such a condition. He never told officers that he had a disability related to PTSD, nor did he ask for any accommodation related to such a condition. However, the bar is extremely low for determining whether an individual has a qualifying disability for ADA purposes. *See, e.g., Quinones v. Potter*, 661 F. Supp. 2d 1105, 1120 (D. Ariz. 2009) (at the summary judgment stage, 'precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity.... Rather, ... a plaintiff's testimony may suffice to establish a genuine issue of material fact.'") (internal citations omitted). The Court will assume for purposes of this motion that Plaintiff does suffer from ADA-qualifying chronic PTSD.

The City of Medford is a "public entity," and its agents are subject to the ADA and RA. *See Smith v. City of Medford,* No. 1:17-CV-00931-CL, 2020 WL 8910898, at *1 (D. Or. 2020). The Supreme Court has never decided whether the ADA applies to arrests made by police officers, however. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 610 (2015) (declining to decide the issue and dismissing certiorari as improvidently granted). The rule in the Ninth Circuit stands as follows: a city may be liable for two types of Title II claims:

> (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of

investigation or arrest, causing the person to suffer greater injury or
indignity in that process than other arrestees.

*Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part,
cert. dismissed in part*, 575 U.S. 600 (2015). A defendant may also raise as an affirmative

defense that the requested accommodation of the plaintiff's disability would constitute an undue

burden, requiring "a fundamental alteration in the nature of a service, program, or activity or in

undue financial or administrative burdens." *See* 28 C.F.R. § 35.150(a)(3).

Here, to the extent that Plaintiff raises claims and issues of fact that properly fall into one

of the above ADA arrest categories, as discussed below, the ADA applied to the encounter

between Plaintiff and the City officers.

### b. The City is entitled to summary judgment on three of Plaintiff's ADA claims.

Plaintiff alleges that the City, via its officers, violated his ADA rights in six different

ways. Three of Plaintiff's claims fail to raise a sufficient question of fact as to the officers'

treatment of him during the encounter, and they fail to appropriate fall into one of the two

allowed categories of claims – wrongful arrest or reasonable accommodation.

First, Plaintiff alleges that Corporal Esqueda failed to allow or assist Plaintiff in boarding

a public bus. This action does not fall into either the wrongful arrest or reasonable

accommodation categories, and Plaintiff fails to show that this was a violation of the ADA.

Moreover, Esqueda had reasonable suspicion to stop Plaintiff and prevent him from boarding the

bus. "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which,

when considered with objective and reasonable inferences, form a basis for particularized

suspicion.'"*United States v. Evans*, 786 F.3d 779, 788 (9th Cir.2015) (quoting *United States v.

Montero–Carmargo*, 208 F.3d 1122, 1129 (9th Cir.2000) (en banc)). Officer Esqueda arrived at

the scene of a complaint, which reported that Plaintiff was shouting and throwing rocks and

endangering citizens; this report gave Esqueda reasonable suspicion to make a stop and interview the Plaintiff. Finally, a review of Esqueda's bodycam footage shows that he approached Plaintiff while the bus driver was already refusing to allow or help Plaintiff to board the bus. Thus, even without reasonable suspicion, the evidence refutes Plaintiff's claim on the merits as well.

Second, Plaintiff's claim of "verbal assault," also does not fall into either ADA arrest category. Rude or derogatory comments cannot form the basis of an ADA claim as a matter of law. *See Anaya v. Marin County Sheriff*, 2014 WL 7273544, *5 (N.D.Ca. 2014); *Casper v. Gunite Corp.*, 221 F.3d 1338 (7th Cir. 2000) (rudeness, impatience, and personality conflicts do not constitute an ADA violation.); *Camarillo v. Carrols Corp.*, 518 F.3d 153, 157 (2d Cir.2008) ("legislation such as the ADA cannot regulate individuals' conduct so as to ensure that they will never be rude or insensitive to persons with disabilities."). This claim fails as a matter of law.

Third, Plaintiff's allegations that officers failed to offer him "community caretaking services," fail to state a claim under either wrongful arrest or reasonable accommodation.[5] The fact that law enforcement officers frequently engage in community caretaking services does not create a duty that requires them to offer such services to all members of the public at all times – and Plaintiff cites to no law or precedent otherwise. In particular, Plaintiff has not shown that such services were not offered to him because of his disabilities or for other discriminatory reasons. The City is entitled to summary judgment on these three claims.

### c. The City is not entitled to summary judgment on three of Plaintiff's ADA claims, as well as his claim for compensatory damages.

Plaintiff raises a question of fact on three claims that properly fall into the ADA arrest categories. First, Plaintiff raises a question of fact as to a claim for wrongful arrest. A jury could

---

[5] A "community caretaking exception" to the Fourth Amendment's warrant requirement does exist, but it is not applicable here. The exception allows police officers to impound vehicles that jeopardize public safety and the efficient movement of traffic.

**EXHIBIT 2**
**PAGE 15 of 19**

find that the only reason Plaintiff was arrested was because, as a paraplegic with a non-functioning wheelchair, he was physically unable to leave the scene when Corporal Esqueda told him he was free to go. Moreover, all of the officers at the scene assumed that Plaintiff was extremely intoxicated such that he had no control over his angry ranting and his incontinence, but Plaintiff has raised a question of fact as to whether his demeanor and incontinence were actually caused by his PTSD, combined with the officers' insensitive and inciting language, as well as Plaintiff's inability to leave the scene when told he could go. A reasonable jury could find that officers mistook Plaintiff's disability symptoms for criminal activity under the ADA.[6]

Second, Plaintiff has raised a question of fact as to whether the City failed to reasonably accommodate his paraplegia during his arrest and transport to the Jackson County Jail. Other courts have found that the ADA is applicable to transportation of arrestees. *See, e.g., Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998). Here, during the arrest, Officer McFall handcuffed Plaintiff and told him to "Stand up!" Wulff responded "I don't think he can, so we're going to have to move him." Ex. 4 (15:11-15:17:01). As seen on the video evidence, officers pulled Plaintiff out of his wheelchair, and bent him forward, handcuffing him behind his back. Officers dragged Plaintiff by his elbows, dropped his body down toward the ground, then pulled him up again. They dragged Plaintiff in sideways across the back seat of the SUV. Officers belted Plaintiff into the back seat with his arms still handcuffed behind his back. Plaintiff claims that he was left trying to sit up without any support. Plaintiff exclaimed "you guys don't even know how to do this!" Ex. 25. Plaintiff claims that he tried to stabilize himself to remain upright with his hands, but that officers thought that this was an attempt to resist or fight back. Plaintiff claims he

---

[6] The Court notes once again that even if officers mistook his symptoms for disorderly conduct, they did so reasonably, and therefore they did not violate Plaintiff's civil rights even if they violated his rights under the ADA.

**EXHIBIT 2**
**PAGE 16 of 19**

was transported in a police SUV which was not ADA equipped for a paraplegic arrestee. Ex. 7 (152:9-22).

The City claims that there is no evidence that Plaintiff was significantly injured due to this method of transport, but that is not the correct standard to evaluate this claim. A municipality is liable "where the treatment or lack of accommodation caus[es] the person to suffer greater injury or indignity . . . than other arrestees." *Sheehan*, 743 F.3d at 1232. Plaintiff claims he was subject to physical pain, degradation, and the indignity of being unable to support himself in the seat.

Plaintiff claims that the City had an available alternative, and the officers could have called an ADA accessible taxi for transport. The City argues that such an accommodation would not be reasonable, as ADA-equipped vehicles are likely very expensive. Whether or not this was a feasible alternative is a factual question for a jury. Plaintiff has raised a sufficient question of fact as to whether this transport was medically unsafe and failed to reasonably accommodate his disability, and the Court cannot rule on this claim as a matter of law.

Third, Plaintiff alleges that the City failed to ensure that his backpack with necessary medical devices such as his catheter and medications were available to him after arrest and at the jail. Plaintiff claims that the officers separated him from his wheelchair and then sent the backpack to the police station instead of leaving it with the wheelchair so that he could access it in jail. He claims that without this access, he experienced "nearly 20 hours of non-stop leg spasms, bladder spasms, level 8 pain, medical incontinence, and increased sepsis." The City attempts to pass responsibility for this on to the jail and the County, but Plaintiff raises a question as to whether the City officers failed to accommodate his obvious disability by not ensuring that

**EXHIBIT 2**
**PAGE 17 of 19**

his disability-related medical devices were properly transferred from the City officers to the County jail such that they had the potential to be accessed by Plaintiff while he was in custody.

Finally, Plaintiff claims that the City damaged his wheelchair by transporting it to the jail improperly, and he seeks compensatory damages for this and the claims above. Compensatory damages are not available under Title II of the ADA absent a showing of discriminatory intent. *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998). The Ninth Circuit applies the deliberate indifference standard:

> Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act on the likelihood. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1988*); see also id.* at 395, 109 S.Ct. 1197 (O'Connor, J., concurring) (deliberate indifference require both 'some form of notice… and the opportunity to conform to [statutory] dictates).

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138-39 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001). When a plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test. *Id.* at 1139. Here, Plaintiff has raised a question of fact as to whether his paraplegia was sufficiently obvious that the City was on notice that an accommodation was required during arrest and transport to ensure that Plaintiff was physically safe and unharmed.

In order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent and involves an element of deliberateness. *Id.* Here, Plaintiff has raised a question of fact as to the deliberateness of the officers' actions.

**EXHIBIT 2**
**PAGE 18 of 19**

In particular with regard to his medical needs during transport and the failure to ensure that he had access to his catheter and medications, separating him from his backpack raises a question of an element of deliberateness. Plaintiff also claims that proper care was not taken with his wheelchair, and it was damaged as a result.

Plaintiff has raised a question of fact as to whether the City and its agents deliberately failed to accommodate his paraplegia during arrest and transport, as well as transport of his wheelchair. A jury must decide these questions of fact.

## ORDER

For the reasons above, the City defendants' motion for summary judgment is GRANTED in part and DENIED in part. Summary judgment is granted as to Plaintiff's 1983 claim under the Fourth Amendment and as to three out of six ADA claims. The three remaining ADA claims and the compensatory damages claim identified in this opinion shall proceed to trial.

IT IS SO ORDERED and DATED this ___9___ day of November, 2023.

MARK D. CLARKE
United States Magistrate Judge

**EXHIBIT 2**
**PAGE 19 of 19**