**ALICIA LEDUC MONTGOMERY, OSB # 173963**
Email: alicia@leducmontgomery.com
**LEDUC MONTGOMERY LLC**
2210 W Main Street, Suite 107 #328
Battle Ground, Washington 98604
Telephone: 704.702.6934
www.leducmontgomery.com

**MARIANNE DUGAN, OSB # 932563**
Email: mdugan@cldc.org
**CIVIL LIBERTIES DEFENSE CENTER**
1711 Willamette Street Ste 301 No. 359
Eugene, Oregon 97402
Telephone: 541.687.9180
www.cldc.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| STABBIN WAGON, an Oregon public benefit corporation; MELISSA JONES, an individual; and SAMANTHA STRONG, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF MEDFORD, a municipal corporation; BRIAN SJOTHUN, an individual; RANDY SPARACINO, an individual; JUSTIN IVENS, an individual; DARRELL GRAHAM, an individual; GEOFF KIRKPATRICK, an individual; TREVOR ARNOLD, an individual; ARTURO VEGA, an individual; RYAN MALLORY, an individual; and JOHN and JANE DOES 1-9, individual employees or agents of the City of Medford, <br><br> Defendants. | Case No. 1:25-cv-1632-MTK <br><br> **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS** <br><br> ORAL ARGUMENT REQUESTED |

PAGE i -- **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................iii

INTRODUCTION ................................................................................................................1

STANDARD OF REVIEW ..................................................................................................2

ARGUMENT........................................................................................................................4

I.    DEFENDANTS IMPERMISSIBLY INTRODUCE FACTUAL EVIDENCE
      BEYOND THE COMPLAINT........................................................................................4

II.   PLAINTIFFS HAVE PLAUSIBLY ALLEGED A FIRST AMENDMENT
      RETALIATION CLAIM..................................................................................................5

      A.    Plaintiffs Allege Quintessential Protected Speech, Association, and
            Expressive Activity ............................................................................................6

      B.    The SAC Plausibly Alleges Materially Adverse Action ..................................6

      C.    The Surveillance Allegations Go Beyond an Abstract "Chilling"
            Theory ...............................................................................................................8

      D.    The Grant-Sabotage Allegations Are Actionable Retaliation, Not Mere
            Government "Counter-Speech" .........................................................................9

      E.    The SAC Plausibly Alleges Retaliatory Motive and Causation.......................9

      F.    The SAC Adequately Identifies the Roles of Each Individual
            Defendants ......................................................................................................10

      G.    The First Amendment Claim Is Timely; Older Events Are Properly Pled
            Because They Are Relevant for Context...........................................................10

III.  THE SAC PLAUSIBLY STATES A MONELL CLAIM AGAINST THE CITY......12

      A.    *Monell* Liability Can Be Based on a Variety of Theories.............................12

      B.    *Monell* Liability is Sufficiently Alleged at this Pleading Stage ....................14

      C.    The SAC Properly Alleges Policymaker Involvement and Ratification ........14

      D.    The SAC Plausibly Alleges Formal and Informal Policies and Customs ......15

      E.    The SAC Plausibly Alleges Failure to Train, Supervise, and Discipline .......15

      F.    Defendants' Attack on the Fourth Amendment Claim Does not Warrant
            Dismissal of the Monell Claim as a Whole ....................................................16

IV.   THE SAC PLAUSIBLY STATES A § 1985(3) CLAIM.............................................16

      A.    The SAC Alleges Sufficient Facts Implying a Conspiracy ...........................16

      B.    The SAC Plausibly Alleges a Class Based on Disability ..............................21

            1.    SMI and SUD are recognized disabilities under federal law.............22

            2.    Congress made a governmental determination that disabled people
                  require special federal assistance in protecting their rights ..............23

      C.    Plaintiffs Properly Allege a 1985(3) Claim as Supporters of the Class ........26

      D.    The SAC's State Law References Show Parallels with 1985(3)'s Core
            Purpose...........................................................................................................32

V.    THE DOE DEFENDANTS SHOULD NOT BE DISMISSED WITH
      PREJUDICE ................................................................................................................34

VI.   LEAVE TO AMEND SHOULD BE GRANTED TO CURE ANY
      DEFICIENCIES............................................................................................................34

CONCLUSION....................................................................................................................34

**TABLE OF AUTHORITIES**

**CASES**

Abadi v. Am. Airlines, Inc., No. 23-cv-4033 (LJL), 2024 U.S. Dist. LEXIS 59889 (S.D.N.Y. Mar. 29, 2024) ................................................................................................................................25

AE v. Cnty. of Tulare, 666 F.3d 631 (9th Cir. 2012)........................................................14

Alarm Detection Sys., Inc. v. Vill. of Schaumburg, Corp., 930 F.3d 812 (7th Cir. 2019) .....3

Anderson v. Reno, 190 F.3d 930 (9th Cir. 1999) ...............................................................10-11

Ashcroft v. Iqbal, 556 U.S. 662 (2009)................................................................................2, 3, 10

B.D.S. v. Southold Union Free Sch. Dist., 2009 U.S. Dist. LEXIS 55981, 2009 WL 1875942 (E.D.N.Y. June 24, 2009) ......................................................................................................25

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ...............................................................2, 3

Blair v. Bethel School District, 608 F.3d 543 (9th Cir.  2010)...........................................5

Black Unity v. City of Springfield, No. 6:21-cv-00346-AA, 2026 WL 183363, 2026 LX 19034 (D. Or. Jan. 23, 2026).........................................................................................................17, 28

Bray v. Alexandria Women's Health Clinic, 506 U.S. 263(1993)......................................30, 32

Canlis v. San Joaquin Sheriff's Posse Comitatus, 641 F.2d 711 (9th Cir. 1981)................29-31

Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197 (1989).....................................................12

Chew v. Gates, 27 F.3d 1432 (9th Cir 1994).......................................................................12

Christie v. Iopa, 176 F.3d 1231 (9th Cir. 1999) ..................................................................13

City of St. Louis v. Praprotnik, 485 U.S. 112 (1988)..........................................................12-13

Conn v. City of Reno, 572 F.3d 1047 (9th Cir. 2009)..........................................................12

Collings v. Longview Fibre Co., 63 F.3d 828 (9th Cir. 1995) .............................................23

Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957).................................................2

Doe v. Yorkville Plaza Assocs., 1994 U.S. Dist. LEXIS 13234, 1994 WL 509903 (S.D.N.Y. Sept. 19, 1994) ....................................................................................................................25

Fielder v. United Airlines Corp., 218 F.3d 973 (9th Cir. 2000) ..........................................10

Fonda v. Gray, 707 F.2d 435 (9th Cir. 1983) ......................................................................16

Ford v. City of Yakima, 706 F.3d 1188 (9th Cir. 2013) .......................................................7-8

Gillespie v. Civiletti, 629 F.2d 637 (9th Cir. 1980)..............................................................2

Gini v. Las Vegas Metro. Police Dep't, 40 F.3d 1041 (9th Cir. 1994) .................................7

Gravelet-Blondin v. Shelton, 728 F.3d 1086 (9th Cir. 2013) ...............................................13

Griffin v. Breckenridge, 403 U.S. 88 (1971) ...........................................21-22, 28, 29, 31

Hernandez v. Hughes Missile Sys. Co., 298 F.3d 1030 (9th Cir. 2002) ...............................23

Hunter v. County of Sacramento, 652 F.3d 1225 (9th Cir. 2011) ........................................13-14

Karim-Panahi v. Los Angeles Police Dept, 839 F.2d 621 (9th Cir. 1988) ...........................14

Keating v. Carey, 706 F.2d 377 (2d Cir. 1983) ...................................................................27, 32

Keniston v. Roberts, 717 F.2d 1295 (9th Cir. 1983) ............................................................4

Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988 (9th Cir. 2018).....................................4

Klamut v. Cal. Highway Patrol, No. 15-cv-02132-MEJ (N.D. Cal. Dec. 16, 2015) .............23

L.A. Lakers, Inc. v. Fed. Ins. Co., 869 F.3d 795 (9th Cir. 2017) .........................................2

Laird v. Tatum, 408 U.S. 1 (1972) ......................................................................................8

Lake v. Arnold, 112 F.3d 682 (3d Cir. 1997) .....................................................................24, 26

Lalonde v. City of Ogdensburg, 662 F. Supp. 3d 289, 2023 WL 2537626 (N.D.N.Y. 2023) 25

Larez v. City of Los Angeles, 946 F.2d 630 (9th Cir. 1991).................................................13

Larson by Larson v. Miller, 55 F.3d 1343 (8th Cir.) ..............................................25
Leatherman v. Tarrant County Narcotics Intelligence and Coord. Unit, 507 U.S. 163
        (1993)................................................................................................................14
Lee v. City of Los Angeles, 250 F.3d 668 (9th Cir. 2001) .....................................4
Lesley v. Bennett, 778 F. Supp. 3d 1201 (D. Wyo. 2025)................................28-29
Long v. Cty. of L.A., 442 F.3d 1178 (9th Cir. 2006)................................................12
Matrixx Initiatives, Inc., et al. v. Siracusano, 563 U.S. 27, 131 S. Ct. 1309 (2011)..............2-3
Mendocino Envtl. Ctr. v. Mendocino Cty., 192 F.3d 1283 (9th Cir. 1999)............................16-18
Monell v. Department of Social Services, 436 U.S. 658 (1978)..............................12-14
Moss v. U.S. Secret Service, 572 F.3d 962 (9th Cir. 2009) ....................................34
Navarro v. Block, 250 F.3d 729 (9th Cir. 2001)........................................................4
Newcal Indus. v. Ikon Office Solution, 513 F.3d 1038 (9th Cir. 2008) ...................2
Nieves v. Bartlett, 587 U.S. 391 (2019).....................................................................7
O'Brien v. Welty, 818 F.3d 920 (9th Cir. 2016) ....................................................7-8
Oviatt v. Pearce, 954 F.2d 1470 (9th Cir. 1992)..................................................12-13
Payton v. Cox, No. 2:20-cv-4838 (S.D. Ohio Dec. 1, 2020) ..................................25
People by Abrams v. 11 Cornwell Co., 695 F.2d 34 (2d Cir. 1982)........................25
People v. Equifax Info. Serv. LLC, 615 F.3d 1217 (9th Cir. 2010) ........................4
Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262 (10th Cir. 1989)........................28
Sever v. Alaska Pulp Corp., 978 F.2d 1529 (9th Cir. 1992)..............................22, 26
Shah v. County of Los Angeles, 797 F.2d 743 (9th Cir. 1986) ...............................14
Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035 (9th Cir. 2010) ...................2
Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080 (9th Cir. 2001) .................23
Sosa v. Hiraoka, 920 F.2d 1451 (9th Cir. 1990)..................................................10-11
Thompson v. Davis, 295 F.3d 890 (9th Cir. 2002).................................................23
Trautz v. Weisman, 819 F. Supp. 282 (S.D.N.Y. 1993)..........................................25
Tyus v. Ohio Department of Youth Services, 606 F. Supp. 239 (S.D. Ohio 1985)................25
United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott, 463 U.S. 825
        (1983)............................................................................................27, 30, 32
United States v. Hougham, 364 U.S. 310, 81 S. Ct. 13 (1960).................................2
United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539 (9th Cir. 1989)............16-17
Waller v. Butkovich, 584 F. Supp. 909 (M.D.N.C. 1984).......................................28
Weaving v. City of Hillsboro, No. 10-CV-1432-HZ (D. Or. Feb. 16, 2012) .........23
Whitaker v. Garcetti, 486 F.3d 572 (9th Cir. 2007) ...............................................14
Wilson v. Hewlett-Packard Co., 668 F.3d 1136 (9th Cir. 2012) .............................2
Wilson v. Mount Diablo Unified Sch. Dist./Special Educ. Local Plan Area, No.
        19-cv-03441-MMC, 2020 U.S. Dist. LEXIS 33788 (N.D. Cal. Feb. 27, 2020)...........26

**STATUTES**

20 U.S.C. § 1400(c) (Individuals with Disabilities Education Act)......................................24
29 U.S.C. § 701(a) (Rehabilitation Act of 1973)......................................................23, 24
42 U.S.C. § 290dd-2 ..................................................................................................23
42 U.S.C. § 1983....................................................................................................*passim*
42 U.S.C. § 1985....................................................................................................*passim*
42 U.S.C. § 3604(f) (Fair Housing Act).....................................................................24

PAGE iv – PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS

42 U.S.C. § 10801(a) (Protection and Advocacy for Individuals with Mental Illness Act) ..23, 24
42 U.S.C. § 12101 (Americans with Disabilities Act/ADA) ................................................24
42 U.S.C. § 12102 (Americans with Disabilities Act/ADA) ...........................................22, 23
42 U.S.C. § 12114 ..............................................................................................................23
42 U.S.C. § 15001(a) (Developmental Disabilities Assistance and Bill of Rights Act) ........24

**RULES**

Fed. R. Civ. Proc. 8 .....................................................................................................2, 3, 14
Fed. R. Civ. Proc. 12(b)(6).........................................................................................*passim*
Fed. R. Civ. Proc. 15 ..........................................................................................................4

**REGULATIONS**

29 C.F.R. § 1630.2 ......................................................................................................22-23

**CONSTITUTIONAL PROVISIONS**

First Amendment.......................................................................................................*passim*

**INTRODUCTION**

The Medford Defendants' motion asks the Court to do what Fed. R. Civ. P. 12(b)(6) forbids: disaggregate a detailed pleading into isolated fragments, draw inferences against Plaintiffs, accept Defendants' counter-explanations for coordinated conduct, and resolve factual disputes at the pleading stage. The Second Amended Complaint (Dkt 32, hereinafter "SAC") plausibly alleges a years-long retaliation campaign against Stabbin Wagon, Melissa Jones, and Samantha Strong because they publicly criticized Medford policing, advocated for unhoused and drug-using residents, recorded police conduct, refused to collaborate with law enforcement, and secured state funding outside Medford's police-aligned service network. SAC at 2, 19, 28.

The SAC does not rely on allegations of random disagreements or incidental friction. It alleges that the City and senior police officials surveilled Plaintiffs' political activity, excluded Stabbin Wagon from official channels, selectively enforced laws against Jones, coordinated a covert effort to discredit and derail Stabbin Wagon's Oregon Health Authority ("OHA") grant, and worked within a municipal and quasi-municipal ecosystem shaped by law enforcement priorities to marginalize a politically disfavored provider. SAC at 24, 26, 28, 43.

It further alleges that Ryan Mallory, operating a law-enforcement-adjacent platform, amplified and escalated that campaign by publishing Plaintiffs' personal identifying information, parroting the City's anti-Stabbin Wagon talking points, and inciting opposition to Plaintiffs' operations and funding. SAC at 31, 33, 34.

The motion to dismiss should be denied. Plaintiffs have plausibly alleged First Amendment retaliation and municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as well as a conspiracy claim under 42 U.S.C. section 1985. If the Court

PAGE 1 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

concludes any part of the SAC requires more specificity, Plaintiffs respectfully request leave to amend.

## STANDARD OF REVIEW

On a motion to dismiss, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008).

Under the liberal Federal notice pleading approach, a motion to dismiss for failure to state a claim may be granted only if " it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957) – that is, if there is no cognizable legal theory to support the claim, or the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017); *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

Courts should construe pleadings liberally so as to do "substantial justice." Fed. R. Civ. Proc. 8(f). The Federal Rules "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *United States v. Hougham*, 364 U.S. 310, 317, 81 S. Ct. 13 (1960). "In evaluating a complaint, any doubts should be construed in favor of the pleader." *Gillespie v. Civiletti*, 629 F.2d 637, 640 (9th Cir. 1980).

Even after the 2011 *Iqbal* and *Twombly* opinions, a federal complaint withstands a motion to dismiss where allegations "suffice to 'raise a reasonable expectation that discovery will

PAGE 2 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

reveal evidence' satisfying the materiality requirement, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and to 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' *Ashcroft v. Iqbal*, 556 U.S. 662." *Matrixx Initiatives, Inc., et al. v. Siracusano*, 563 U.S. 27, 46, 131 S. Ct. 1309 (2011). Although only "a short and plain statement of the claim showing that the pleader is entitled to relief" is required, Fed. R. Civ. Proc. 8(a)), there is nothing in the rules that prohibits providing additional information for context, especially in an allegation of ongoing animus.

Indeed, *Iqbal* and *Twombly* have predictably led to lengthier, more detailed complaints, to meet the "plausibility" requirement. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

In interpreting *Twombly*, the appellate courts have made clear that even allegations of circumstantial evidence are sufficient to create a "plausible" claim. *See, e.g.*, *Alarm Detection Sys., Inc. v. Vill. of Schaumburg, Corp.*, 930 F.3d 812, 827 (7th Cir. 2019). Indeed, *Twombly* itself suggests this, first discussing circumstantial evidence as supporting one element, but then going on to find that there was insufficient evidence (circumstantial or otherwise) supporting another element. 550 U.S. at 553, 571.

In the instant case, the allegations of the complaint "raise a reasonable expectation that discovery will reveal" circumstantial evidence. *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955. The *Twombly* Court stated: "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the violation." 550 U.S. at 556.

PAGE 3 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

If the court finds that Plaintiffs have insufficiently pled their claims, Plaintiffs request leave to amend their complaint, pursuant to Fed. R. Civ. Proc. 15(a). That rule requires that leave to amend should be "freely given" in the absence of reasons such as bad faith, undue delay, dilative motive by moving party, and undue prejudice. *People v. Equifax Info. Serv. LLC*, 615 F.3d 1217, 1232 (9th Cir. 2010). It is an abuse of discretion to deny leave to amend in the absence of any of the above reasons. *Keniston v. Roberts*, 717 F.2d 1295 (9th Cir. 1983).

## ARGUMENT

## I.      DEFENDANTS IMPERMISSIBLY INTRODUCE FACTUAL EVIDENCE BEYOND THE COMPLAINT

Because a motion to dismiss must be determined taking the allegations of the complaint as true, it is not a vehicle for resolving factual disputes, choosing among competing inferences, or accepting a defendant's preferred characterization of the facts. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018); *Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). Defendants repeatedly ask the Court to infer they had benign motives based on documents outside the complaint. Those are merits arguments, not pleading objections.

For example, Defendants rely on the declaration of Stephanie Kucera to attach a state-court complaint and a prior federal opinion involving John Malaer. Dkt 36 at 2. Arguably, it may be appropriate for the Court to take notice of the existence of those filings, but not of any disputed factual assertions within them for their truth against Plaintiffs on a motion to dismiss. *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001) (taking judicial notice of the fact that certain filings were made in another litigation; holding that: "[W]hen a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.") Defendants attempt to use the state-court pleading to establish as a matter of *fact*

PAGE 4 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

when Jones and Stabbin Wagon knew of MPD's surveillance, and the *Malaer* decision to diminish Plaintiffs' broader allegations of a municipal custom of retaliating against police critics. Neither use is proper at this stage.

The Ninth Circuit has cautioned against the improper use of judicial notice or incorporation-by-reference to resolve factual disputes at the pleading stage. In *Khoja*, the court noted that assuming the truth of incorporated documents to dispute facts in a well-pleaded complaint undermines the plaintiff's ability to present a plausible claim for relief. 899 F.3d at 1014. The *Khoja* court reiterated that Fed. R. Civ. Proc. 12(b)(6) tests legal sufficiency and does not allow the court to resolve factual disputes or to adopt a defendant's competing narrative.

While Plaintiffs do not dispute that Jones may have become aware of certain facts beyond the limitations period, the SAC plausibly alleges that Plaintiffs learned of the extent of the City's further covert efforts to undermine the OHA grant only later, through public reporting and records disclosures. SAC at 29. It also plausibly alleges that activist monitoring was ongoing "by 2023," included the paid maintenance of records on activists, and that it has never been disavowed or conceded unlawful by Medford. *Id.* at 22.

Defendants cannot use documents outside of the Complaint to short-circuit those pleaded allegations.

## II.    PLAINTIFFS HAVE PLAUSIBLY ALLEGED A FIRST AMENDMENT RETALIATION CLAIM

Plaintiffs state a First Amendment retaliation claim when they plausibly allege protected activity, adverse action that would chill a person of ordinary firmness, and a causal connection between the protected activity and the adverse action. *Blair v. Bethel School District*, 608 F.3d 543 (9th Cir. 2010). The SAC easily meets that standard.

PAGE 5 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

### A.    Plaintiffs Allege Quintessential Protected Speech, Association, and Expressive Activity

The SAC clearly and plausibly alleges that Plaintiffs engaged in advocacy regarding housing rights, LGBTQIA2S+ rights, reproductive justice, drug decriminalization, and harm reduction; spoke at Medford City Council meetings and public forums; organized protests and demonstrations; recorded police activity; published political commentary and satire; and advocated for systemic reforms in Medford and Jackson County. SAC at 19, 20, 21. The SAC further alleges that Stabbin Wagon's public-facing work included posting videos of police sweeps with commentary critical of MPD and publicly mocking Medford policing through satire and protest performance. *Id.* at 20. These are core First Amendment activities.[1]

### B.    The SAC Plausibly Alleges Materially Adverse Action

Defendants' brief isolates each factual allegation, arguing that, standing *alone*, each allegation alone does not suffice. But the SAC alleges a long history of a coordinated retaliatory campaign by defendants, and the adverse action inquiry must be understood in that context.

The SAC alleges, among other things, that Medford, in its *long-running pattern of discrimination*: arrested Plaintiff Jones during the Hawthorne Park sweep while she was assisting displaced residents (SAC at 22); stopped and detained Jones in January 2021 without cause after a food-distribution shift, in front of her child (*id.* at 23); selectively cited Jones during a protest caravan for "excessive horn use" (*id.* at 23); excluded Plaintiff Stabbin Wagon from official communications that other BHRN providers received ahead of encampment sweeps (*id.* at 24); collected and maintained dossiers on all Plaintiffs' social media, protest activity, and

---

[1] Defendants argue that Plaintiffs have no standing to make claims for the rights of others. Plaintiffs are making no such claims; rather, Plaintiffs present historic facts that help provide the context for the claims that are specific to the Plaintiffs themselves.

PAGE 6 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

associations, without any criminal nexus (*id.* at 24, 25); paid an analyst to monitor Plaintiffs'

political activity (*id.* at 28); and launched a covert campaign to discredit Plaintiff Stabbin Wagon

and reverse or derail its $1.5 million OHA grant (*id*. at 28, 29).

The SAC further plausibly alleges that those City efforts were amplified through

coordinated or knowing alignment with Ryan Mallory's platform, including publication of

Plaintiffs' home addresses and dates of birth, calls for public opposition to the OHA grant, and

continued public attacks that increased hostility toward Plaintiffs and contributed to delay in

grant execution, staff resignations, and operational harm. *Id.* at 31, 32, 34, 38.

These allegations easily clear the "ordinary firmness" threshold.

Defendants cite *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041 (9th Cir. 1994), for

the proposition that a public official's statements -- even when defamatory -- made in retaliation

for protected speech -- are not actionable under the First Amendment. But that was a case about

damage to reputation, which is governed by very specific legal precedent. As the *Gini* Court

noted – the general rule that "damage to reputation is not actionable under § 1983 unless it is

accompanied by 'some more tangible interests,'" cannot be avoided by alleging that defamation

by a public official occurred in retaliation for the exercise of a First Amendment right." 40 F.3d

at 1045. The current lawsuit is not a "damage to reputation" case, but rather a non-employment

First Amendment retaliation case.

More on point are *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016), and *Ford v. City

of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013) (abrogated on other grounds by *Nieves v.

Bartlett*, 587 U.S. 391 (2019)). In *O'Brien*, the Ninth Circuit denied qualified immunity to

university administrators for retaliation against a student's speech when they restricted his access

to a university building, holding: "The constitutional right to be free from retaliation was 'clearly

PAGE 7 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

established at the time of defendants' actions,'" and "Retaliation for engaging in protected speech has long been prohibited by the First Amendment." 818 F.3d at 936.

Similarly, in *Ford*, the Ninth Circuit declined to grant qualified immunity to police officers who arrested, booked, and jailed the plaintiff for engaging in speech critical of the police. 706 F.3d at 1195-96. In that case, the court held, "Police officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech." *Id*. at 1195.

In both cases, the right to be free from retaliation was at the center of the qualified immunity analysis, and in both cases, the court held that the right was clearly established. Those cases provide the legal precedent Plaintiffs rely on.

C.       The Surveillance Allegations Go Beyond an Abstract "Chilling" Theory

Defendants' reliance on *Laird v. Tatum*, 408 U.S. 1 (1972), fails, because Plaintiffs allege far more than generalized awareness that the government is observing public-facing activity. The SAC alleges that MPD used fake social-media profiles to infiltrate and spy on Plaintiffs' *non-public* online activist activity; monitored protest planning, including an event "being shared solely via direct message"; collected and maintained political dossiers spanning years; and paid an analyst to continuously monitor activists with no criminal connection. SAC at 24, 25, 28. The SAC also alleges concrete consequences to Plaintiffs from this campaign: harassment, operational disruption, delayed grant execution, fear of retaliation, and the resignation of Jones and Strong from Stabbin Wagon. *Id.* at 34, 38. This case therefore does not present the type of abstract or purely subjective "chilling" at issue in *Laird*. It alleges targeted monitoring integrated into broader retaliatory action and accompanied by concrete injury.

PAGE 8 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

**D.    The Grant-Sabotage Allegations Are Actionable Retaliation, Not Mere Government "Counter-Speech"**

Defendants argue that the City's campaign against Stabbin Wagon's OHA grant was protected speech by public officials. That misstates the SAC. Plaintiffs do not merely allege that officials voiced disagreement with harm reduction or Measure 110. They allege that senior City and MPD officials went much further -- "launched a coordinated effort to undermine and reverse the grant award"; disseminated "inflammatory, false, and disparaging information" to providers, officials, and community leaders; and attempted to mobilize opposition so as to "deprive Plaintiffs of an essential funding stream and reputational legitimacy." SAC at 28. They allege that OHA in fact delayed execution of the grant in apparent response to that campaign. *Id*. at 34.

At the pleading stage, that is more than enough to allege retaliatory interference with government benefits and economic opportunity. Whether the City's actions were merely protected "speech" or constituted misuse of municipal influence and official position to punish disfavored speakers is a fact-bound question not resolvable under Fed. R. Civ. Proc. 12(b)(6).

**E.    The SAC Plausibly Alleges Retaliatory Motive and Causation**

The SAC alleges both direct and circumstantial evidence of retaliatory intent. As alleged, Plaintiffs were "well-known advocates" whose work and public criticism targeted Medford's treatment of unhoused and drug-using residents. SAC at 17, 19. The Complaint alleges that MPD officers expressed irritation with Stabbin Wagon's filming and public ridicule of police conduct, and Kirkpatrick in particular is alleged to have displayed hostility toward Jones and Stabbin Wagon for recording police and posting commentary online. SAC at 21. Internal communications identified Jones as a "known protest player[]" and reflected systematic monitoring of "local BLM/ protest pages." SAC at 25. The whistleblower sergeant told Jones that the "leader" of the Livability Team "definitely has a bias towards you" and that he wanted to

PAGE 9 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

show her what Kirkpatrick was "circulating." *Id.* at 27. The SAC then alleges escalation in 2023 as Plaintiffs' profile and funding increased. *Id.* at 22. Those allegations plausibly support causation and unconstitutional motive.

### F.    The SAC Adequately Identifies the Roles of Each Individual Defendants

Defendants label the SAC a "shotgun" pleading, but the SAC names each City Defendant, describes each Defendant's municipal role, and ties specific Defendants to particular categories of misconduct. The SAC alleges that Vega participated in Jones's stop and harassment. SAC at 6, 23. Graham and Kirkpatrick are specifically tied to activist monitoring and dossier-related communications. *Id.* at 24, 25. Sjothun, Ivens, Arnold, and Kirkpatrick are specifically identified as participants in the coordinated effort to undermine the OHA grant. *Id. at 28.* Sparacino is alleged to have participated in retaliatory conduct as former mayor and former police chief, including a surveillance-related communication about Jones's statements to the media. *Id.* at 5, 26. This is sufficient notice pleading. *Iqbal* requires plausible allegations of each official's own conduct; it does not require plaintiffs to prove each defendant's full evidentiary trail before discovery. The SAC gives fair notice of who did what and why.

### G.    The First Amendment Claim Is Timely; Older Events Are Properly Pled Because They Are Relevant for Context

Where a plaintiff demonstrates that earlier incidents are part of a pattern of discrimination that continued into the relevant statute of limitations period, the earlier events are admissible for that purpose. *Sosa v. Hiraoka*, 920 F.2d 1451, 1455-56 (9th Cir. 1990); *Fielder v. United Airlines Corp.*, 218 F.3d 973, 987-88 (9th Cir. 2000)). Under this theory, the continuing violation doctrine allows courts to consider conduct that would ordinarily be time-barred. *Anderson v. Reno*, 190 F.3d 930, 936 (9th Cir. 1999). A plaintiff may use earlier incidents to " demonstrate that the untimely incidents are part of a pattern of discrimination and that the [defendant]

PAGE 10 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

continued this pattern into the relevant limitations period." *Id*. A plaintiff can make the requisite showing "by presenting evidence that [the defendant] engaged in a 'systematic policy of discrimination' or by presenting evidence of a series of related discriminatory acts directed at her by [the defendant's] personnel." *Id*. (quoting *Sosa*, 920 F.2d at 1455-56)).

Defendants overemphasize the allegations regarding 2020-21 incidents to argue that Plaintiffs' claims are outside of the statute of limitations. Plaintiffs include that earlier conduct to demonstrate a pattern of discriminatory animus. But the SAC's central allegations include conduct that occurred between 2023 and 2025 conduct: the coordinated grant-sabotage campaign, public doxxing and incitement through Mallory's platform, delay in grant execution, continuing activist monitoring, and ongoing operational injury. SAC at 28, 31, 34, 38. Those allegations are timely on the face of the SAC.

Moreover, the SAC alleges ongoing surveillance that Medford has never conceded ended. It alleges that by 2023 MPD was paying an analyst to continuously monitor and maintain records about activists' political activity, including Plaintiffs, despite no connection to criminal activity or investigations. SAC at 28. That is not a single completed act fixed in the past; it is an ongoing course of retaliatory surveillance.

Defendants' accrual argument depends on using a state-court pleading to establish that Plaintiffs fully knew the scope of the alleged surveillance more than two years before suit. Even putting aside the impropriety of resolving that *factual* dispute on a motion to dismiss, the SAC separately alleges later-discovered covert conduct relating to the grant-undermining campaign and continuing monitoring. And even if some older incidents are ultimately deemed time-barred as standalone claims for damages, they remain relevant as background evidence of retaliatory motive, municipal custom, and the integrated nature of the campaign.

PAGE 11 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

**III.    THE SAC PLAUSIBLY STATES A MONELL CLAIM AGAINST THE CITY**

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality is liable when constitutional injury results from official policy, widespread custom, actions of final policymakers, ratification, or deliberate indifference in training and supervision. The SAC plausibly alleges each of those pathways.

**A.    *Monell* Liability Can Be Based on a Variety of Theories**

*Monell* liability is not limited to a municipal policy, or an ongoing pattern of misconduct.

First, the delegation of authority to municipal employees also properly states a *Monell* claim. "A city cannot escape liability for the consequences of established and ongoing departmental policy . . . simply by permitting such basic policy decisions to be made by lower level officials who are not ordinarily considered policymakers." *Chew v. Gates*, 27 F.3d 1432, 1445 (9th Cir 1994). *Chew* involved the failure of the L.A.P.D. to establish policies for use of canines, leading to injuries of civilians. The *Chew* court set forth two alternative theories for *Monell* claim:

> 1)  "[I]f the city in fact permitted departmental policy regarding the use of canine force . . . " etc. – a "custom or usage" approach - citing *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988);
>
> 2)  "[A] failure to adopt a departmental policy governing [the] use [of dogs], or to implement rules or regulations . . . "  -- a "deliberate indifference" approach; a "failure to engage in any oversight whatsoever." Citing *Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197 (1989).

*See also Conn v. City of Reno*, 572 F.3d 1047, 1064 (9th Cir. 2009) (absence of a policy on reporting suicide threats could constitute municipal deliberate indifference); *Long v. County of Los Angeles*, 442 F.3d 1178, 1189-90 (9th Cir. 2006) (lack of adequate policies for transfer of patients who become medically unstable and for notification of a doctor when a patient falls or refuses essential medical treatment could support municipal liability); *Oviatt v. Pearce*, 954 F.2d

PAGE 12 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

1470, 1477 (9th Cir. 1992) ("There is no question . . . that the decision not to take any action to alleviate the problem of detecting missed arraignments constitutes a policy for purposes of section 1983 municipal liability.").

Another form of *Monell* liability is based on *ratification* of subordinate officers' actions. *City of St. Louis*, 485 U.S. at 127 ("If [ ] authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). Ratification can be premised on a single constitutional violation; it does not require — or even rely on — a longstanding pattern, practice, or custom. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) ("The Blondins' excessive force claim against the City is based on both the City's policy regarding tasers generally, and its ratification of Sgt. Shelton's use of a taser in this case."); *Christie v. Iopa*, 176 F.3d 1231, 1238-39 (9th Cir. 1999) That is because an act of ratification by a final policymaker is considered a "policy" "chargeable to the municipality" within the meaning of the *Monell* doctrine.

Thus, in *Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991), the Ninth Circuit held that the jury could find Chief Gates "condoned, ratified, and encouraged the excessive use of force" because Gates approved his department's internal investigation of plaintiff's complaint that found no wrongdoing by officers. The *Larez* court held that the jury could properly infer a policy or custom condoning the use of excessive force because Chief Gates failed to take remedial steps after officers used excessive force making clear to officers "they could get away with anything." *Id*. at 647. *See also Hunter v. County of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011) ("evidence of inaction -- specifically, failure to investigate and discipline employees in the face of widespread constitutional violations -- can support an inference that an unconstitutional custom or practice has been unofficially adopted by a

PAGE 13 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

municipality.")

### B.  *Monell* Liability is Sufficiently Alleged at this Pleading Stage

As the Ninth Circuit has noted:

> Our circuit precedent, articulated first in *Shah v. County of Los Angeles*, 797 F.2d 743, 747 (9th Cir. 1986), and most recently in *Whitaker* [*v. Garcetti*], 486 F.3d [572,] 581 [(9th Cir. 2007)], requires plaintiffs in civil rights actions against local governments to set forth no more than a bare allegation that government officials' conduct conformed to some unidentified government policy or custom.

*AE v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012). In general, "a claim of municipal liability under section 1983 is sufficient to withstand a motion to dismiss 'even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice." *Karim-Panahi v. Los Angeles Police Dept*, 839 F.2d 621, 624 (9th Cir. 1988) (citation and quotation marks omitted). *See also Leatherman v. Tarrant County Narcotics Intelligence and Coord. Unit*, 507 U.S. 163, 165 (1993) (rejecting Fifth Circuit's heightened pleading standard in Section 1983 municipal liability cases as inconsistent with the notice pleading requirements of Fed. R. Civ. Proc. 8).

It is by nature virtually impossible at this phase of the proceedings for plaintiff to have sufficient information to fully prove a *Monell* violation, but it is reasonable to infer that the individual officers were acting pursuant to official policy, delegation of authority, lack of policy, and/or ratification. There is sufficient information alleged to allow the *Monell* claims to proceed to discovery.

### C.  The SAC Properly Alleges Policymaker Involvement and Ratification

The SAC expressly alleges that the City, through final policymakers including the City Manager, Mayor, and Chief of Police, approved, directed, or ratified the retaliatory conduct, surveillance, arrests, and interference described in the complaint. SAC at 43. It also alleges direct

PAGE 14 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

involvement by senior officials in the OHA grant campaign, including Sjothun, Ivens, Arnold, and Kirkpatrick. *Id*. at 28. Those are not rank-and-file officer allegations alone; they are allegations of top-level municipal action.

### D.    The SAC Plausibly Alleges Formal and Informal Policies and Customs

The SAC alleges that Medford adopted "formal and informal policies" to exclude and discredit service providers that refused to collaborate with law enforcement, including Stabbin Wagon, while privileging those embedded within police-influenced networks. SAC at 43. That allegation is supported by extensive factual matter: the SAC details the unusually deep integration of law enforcement into Medford's addiction, homelessness, and service-provider governance landscape, including police and sheriff personnel serving on boards of major providers and city-aligned organizations that shape access to services and resources. SAC at 15, 16. It also alleges that Stabbin Wagon was distinct precisely because it refused to collaborate with police. *Id.* at 19.

The SAC further alleges a longstanding custom of retaliating against critics of Medford policing, supported not only by Plaintiffs' experiences but by allegations involving John Malaer, Stephen Douglas, and broader exposure of MPD surveillance of nonviolent activists and groups. SAC at 38, 40. At the pleading stage, that is enough to plausibly allege a custom "so permanent and well settled" as to have the force of law.

### E.    The SAC Plausibly Alleges Failure to Train, Supervise, and Discipline

The SAC alleges that the City failed to train and supervise officers and managerial staff regarding First Amendment protections for protestors and nonprofit advocates, the limits of surveillance and data retention, and the appropriate use of law-enforcement powers in homelessness and outreach contexts. SAC at 43, 44. It also alleges the City failed to discipline

PAGE 15 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

officers engaged in known retaliatory conduct and instead retained or promoted them in leadership positions. *Id.* at 44. Those allegations are sufficient to plead deliberate indifference at this stage.

### F.       Defendants' Attack on the Fourth Amendment Claim Does not Warrant Dismissal of the Monell Claim as a Whole

Defendants devote substantial briefing to arguing that the SAC inadequately alleges a timely Fourth Amendment theory. Even if the Court were to require more precision on that component, the *Monell* claim independently survives because the SAC plausibly alleges a municipal policy and custom causing First Amendment retaliation. At most, any perceived deficiency in the Fourth Amendment aspect would justify leave to amend, not wholesale dismissal of municipal liability.

## IV.      THE SAC PLAUSIBLY STATES A § 1985(3) CLAIM

### A.       The SAC Alleges Sufficient Facts Implying a Conspiracy

At this stage, Plaintiffs need only allege sufficient facts to plausibly support a meeting of the minds, and conspiracy may be alleged through circumstantial facts and reasonable inferences from coordinated conduct. The SAC does so here.

A conspiracy may be pleaded through circumstantial factual allegations showing a meeting of the minds or tacit understanding; direct evidence of an express agreement is not required at the pleading stage. To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the existence of "'an agreement or 'meeting of the minds' to violate constitutional rights.'" *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989) (*en banc*) (quoting *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983)); *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each

PAGE 16 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

participant must at least share the common objective of the conspiracy." *United Steelworkers*, 865 F.2d at 1541 (9th Cir. 1989). The defendants must have, "by some concerted action, intended to accomplish some unlawful objective for the purpose of harming another which results in damage." *Mendocino Envtl. Ctr*, 192 F.3d at 1301 (citations omitted). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.* "For example, a showing that the alleged conspirators have committed acts that "are unlikely to have been undertaken without an agreement" may allow a jury to infer the existence of a conspiracy." *Id*. "Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." *Id. at* 1302.

> As Judge Aiken recently noted:

> Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives. The conspiracy must have as its conscious objective the impairment of the plaintiff's right. And the plaintiff must state specific facts to support the existence of the claimed conspiracy.

*Black Unity v. City of Springfield*, No. 6:21-cv-00346-AA, 2026 WL 183363 at *40, 2026 LX 19034, at *116-17 (D. Or. Jan. 23, 2026) (internal quotations and citations omitted).

*Mendocino* makes clear that plaintiffs may demonstrate a First Amendment retaliation conspiracy claim through circumstantial evidence showing a shared objective to suppress protected activity. There, the court indicated that ability and opportunity to conspire can serve as circumstantial evidence of participation, that direct evidence of improper motive or agreement is rarely available, and that inference from circumstantial facts or coordinated action is therefore

PAGE 17 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

generally how such claims are established. The court held that a combination of facts, including officers' reliance on questionable evidence despite firsthand knowledge; their inclusion of misinformation and omissions in warrant materials; their public dissemination of a narrative portraying activists as dangerous; and their close coordination with other actors engaged in the same effort, permitted a reasonable inference of an agreement to interfere with plaintiffs' political expression. Critically, the Ninth Circuit emphasized that such evidence need not be the most compelling or exclusive explanation; it need only support a "reasonable" inference of conspiratorial intent, and competing inferences are for the jury, not the court, to resolve. Applying that framework, the court concluded that coordinated investigative actions, shared misinformation, and conduct consistent with an intent to discredit and suppress a political group created a triable issue as to both retaliatory motive and conspiratorial agreement.

As in *Mendocino*, Plaintiffs here have alleged facts suggesting coordinated conduct, dissemination of false or misleading narratives, and actions consistent with a shared goal of chilling protected advocacy, more than sufficient to preclude dismissal at this stage. Plaintiffs allege a sustained retaliatory campaign by the City of Medford and its officials against Plaintiffs because of Plaintiffs' advocacy, speech, public-health outreach, and criticism of law enforcement. SAC ¶¶ 73-76. They also alleges that Mallory was aware of the City's hostility toward Plaintiffs and of the City's effort to undermine Stabbin' Wagon's advocacy and operations. *Id.* ¶¶ 101-104. Critically, the SAC does not stop at alleging shared viewpoints. It alleges that Mallory "amplified the same accusations, parroted the City Defendants' same language and calls to action, and timed his conduct to coincide with the City's actions against Plaintiffs." *Id.* ¶ 103. That is a direct allegation of coordinated action.

The SAC also pleads that in 2023, City officials and MPD leadership, including Sjothun,

Ivens, Arnold, and Kirkpatrick, undertook a coordinated effort to undermine and reverse Stabbin' Wagon's $1.5 million OHA grant. *Id.* ¶¶ 96-100. City and MPD leadership disseminated "inflammatory, false, and disparaging information" about Plaintiffs, sought to mobilize public opposition, and attempted to influence OHA to rescind the award. *Id.* ¶ 97. The SAC then alleges that Mallory joined in that same campaign, and on September 7, 2023, he posted a video urging the community to oppose the grant, demonizing Stabbin' Wagon's work, repeating the same verbiage and themes advanced by City officials, and calling on the public to contact OHA and demand an audit and rescission of the grant. *Id.* ¶¶ 120-125. The SAC expressly alleges that Mallory's post occurred "during the height of Defendants' campaign to interfere with the OHA grant," "echoed the same claims, requests for audits, and demands for rescission being advanced by City officials through nonpublic channels," and was made with knowledge that Medford officials were trying to block or delay the grant. *Id*. ¶¶ 124-125.

Those allegations are more than sufficient to plead a plausible meeting of the minds. Plaintiffs allege a common objective -- undermining Plaintiffs' funding, discrediting Plaintiffs publicly, and suppressing Plaintiffs' protected activity -- and coordinated acts in furtherance of that objective by both the City Defendants and Mallory. *Id.* ¶¶ 97-99, 120-128, 196-204. The SAC expressly alleges that Mallory did not act as a neutral commentator, but rather as a "knowing participant" who used his "law-enforcement-adjacent platform, access, and selective enforcement of group rules to assist the City Defendants in suppressing Plaintiffs' protected activity," and that his conduct was "not independent, but aligned with and in furtherance of the conspiracy by City of Medford Defendants." *Id.* ¶¶ 127-128. Most directly, the SAC alleges that although Defendants did not necessarily communicate directly at every stage, "they reached a tacit understanding that Defendant Mallory would use his platform to amplify, legitimize, and

PAGE 19 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

escalate the City Defendants' retaliatory actions, while City officials would benefit from, rely on, and not repudiate Mallory's actions," and that "[e]ach Defendant acted with knowledge of the others' roles and with the intent to further their shared objective." *Id.* ¶ 196.

That allegation of a tacit understanding is supported by detailed factual allegations elsewhere in the SAC. Mallory allegedly published Plaintiffs' personal identifying information, including home addresses and dates of birth, under "Busted" graphics that mimicked booking-log releases and mirrored official arrest disclosures, just one day after Plaintiffs' arrest, and before any such personally identifying information would be available via a public records request. *Id.* ¶¶ 114-115. The SAC alleges those disclosures were designed to lend the appearance of official sanction to the City's retaliatory narrative. *Id*. The SAC further alleges that Mallory's conduct escalated and furthered MPD's retaliatory objectives by portraying Plaintiffs as criminals, *id*. ¶ 119, consistent with MPD officer comments on the phone during Plaintiffs' arrest and private messages sent to Plaintiff Jones that Kirkpatrick had a bias against her; and that Mallory's posts caused harassment, increased public hostility, and delays in OHA grant execution. *Id*. ¶¶ 129-133. Those allegations permit the inference that Mallory's public attacks were not random or merely ideological, but functioned as part of the same retaliatory enterprise alleged against the City Defendants.

The SAC also alleges a broader framework making that inference plausible. Mallory is alleged to operate a law-enforcement-adjacent platform, to present himself and ThiefHunter Labs as aligned with and supporting policing interests, and to have repeatedly collaborated with or provided a platform to MPD officials, including Sparacino, Kirkpatrick, and Wulff. *Id.* ¶¶ 107-113.  The SAC further alleges that the City Defendants, especially MPD members, were aware of Mallory's pro-law enforcement social media influence and activity in Jackson County. *Id.* ¶

PAGE 20 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

104.  Those allegations make plausible the SAC's allegation that Mallory served as a private adjunct who amplified and escalated the City Defendants' retaliation using a platform the City knew of and could benefit from. *Id*., ¶¶ 112-113, 127-128, 196-197.

Defendants seek a level of specificity that would effectively require Plaintiffs to plead evidence before discovery. But, as discussed *supra*, civil rights conspiracies are routinely established through circumstantial evidence, patterns of coordinated conduct, and reasonable inferences from concerted action. The SAC alleges that City officials undertook a covert campaign to discredit Plaintiffs and interfere with their grant; that Mallory echoed those same themes and calls to action at the same time; he used booking-style disclosures and doxxing to reinforce the City's retaliatory narrative; he did so with awareness of the City's efforts; and that Defendants acted with a tacit understanding and shared objective. *Id*. ¶¶ 97-100, 103-104, 114-125, 127-128, 196-204. That is enough to plausibly allege a meeting of the minds under section 1985(3).

**B.       The SAC Plausibly Alleges a Class Based on Disability**

Defendants argue that Plaintiffs have not alleged a protected class for purposes of 42 U.S.C. § 1985(3). But the SAC alleges a coordinated campaign directed at Plaintiffs because they are publicly identified with, support and advocate for, and provide services to populations the City of Medford and Medford Police have historically targeted for exclusion and punishment -- in particular, individuals with Substance Use Disorder ("SUD") and/or Serious Mental Illness ("SMI"), including unhoused persons with these disabilities. SAC ¶¶ 178, 180, 182.

In determining whether disabled individuals with SUD and/or SMI constitute a protected class under 1985(3), the governing standard begins with *Griffin v. Breckenridge*, which requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the

PAGE 21 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

conspirators' action." 403 U.S. 88, 102 (1971). The Ninth Circuit then "require[s] either that the courts have designated the class in question a suspect or quasi-suspect classification requiring more exacting scrutiny *or that Congress has indicated through legislation that the class required special protection.*" *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (emphasis added, internal citations omitted).

Plaintiffs do not dispute that disability has generally been subject to rational basis review, and has not been considered a suspect or quasi-suspect class in the Ninth Circuit for equal protection purposes. But equal protection doctrine does not control 1985(3) class litigation; it merely informs one prong of the Ninth Circuit's approach to section 1985 claims. Courts have applied § 1985(3) to classes that are not suspect classes. *See generally* Joseph D. Burdine, Note, *Post v. Trinity Health-Michigan: Does 42 U.S.C. § 1985(3) Offer Protection from Disability Discrimination?,* 47 SEATTLE U. L. REV. SUPRA 17 (2024). The cases Defendants cite regarding the Ninth Circuit's treatment of unhoused, disabled, or addicted classes for *equal protection* purposes are not dispositive of Plaintiff's section 1985(3) claim, because, as Defendants recognize, Plaintiffs' class theory relies on the "Governmental determination" prong of the Ninth Circuit's approach to section 1985(3) class determinations.

### 1.    SMI and SUD are recognized disabilities under federal law

Both SMI and SUD fall within the definition of "disability" under the Americans with Disabilities Act ("ADA") and related federal law. 42 U.S.C. § 12102(1), (4)(A). Federal regulations implementing the ADA confirm that "mental impairment" includes "emotional or mental illness," and identify conditions such as major depressive disorder, bipolar disorder, and schizophrenia -- paradigmatic forms of SMI -- as impairments that will, in virtually all cases, substantially limit major life activities such as thinking, concentrating, and brain function. 29

PAGE 22 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

C.F.R. §§ 1630.2(h)(2), 1630.2(j)(3)(iii).

Similarly, SUD is recognized as a covered impairment, subject only to the ADA's narrow exclusion, in the employment and applicant context, for individuals "currently engaging in the illegal use of drugs." 42 U.S.C. § 12114(a). Congress expressly preserved protection for people with a history of substance use disorder who are in recovery, participating in treatment, or regarded as having such an impairment. *Id.* § 12114(b); *see also* 29 U.S.C. § 705(20)(B) (Rehabilitation Act); 42 U.S.C. § 10801(a) (finding individuals with mental illness are particularly vulnerable to abuse and unable to protect their own interests); 42 U.S.C. § 290dd-2 (treating SUD as medical condition warranting confidentiality and treatment protections).

The Ninth Circuit recognizes drug addiction as a disability under the ADA. *Thompson v. Davis*, 295 F.3d 890 (9th Cir. 2002); *Hernandez v. Hughes Missile Sys. Co.*, 298 F.3d 1030 (9th Cir. 2002); *Collings v. Longview Fibre Co.*, 63 F.3d 828 (9th Cir. 1995). It also recognizes SMI as an impairment under the ADA. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080 (9th Cir. 2001); *see also Klamut v. Cal. Highway Patrol*, No. 15-cv-02132-MEJ (N.D. Cal. Dec. 16, 2015; *Weaving v. City of Hillsboro*, No. 10-CV-1432-HZ (D. Or. Feb. 16, 2012). Thus both SUD and SMI are recognized disabilities under federal law.

### 2. Congress made a governmental determination that disabled people require special federal assistance in protecting their rights

In enacting the ADA in 1990, Congress made the requisite governmental determination, through legislation, that disabled people face significant discrimination as a class and require special assistance in protecting their civil rights, finding:

> Individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability

PAGE 23 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

of such individuals to participate in, and contribute to, society.

42 U.S.C. § 12101(a)(7).[2] The Ninth Circuit has not ruled on whether Congress's passage of the

ADA qualifies disabled persons as a protected class under § 1985(3), and the issue before this

Court is therefore an open question.

Multiple federal appellate circuits recognize disability as a § 1985(3) class. For example,

in *Lake v. Arnold*, the Third Circuit determined that disabled people are within the scope of those

protected by § 1985(3), with particular emphasis on the governmental determination evidenced

by passage of the ADA. 112 F.3d 682 (3d Cir. 1997). In so finding, the court stated:

> In reaching this conclusion we are influenced by a number of factors which lie outside
> our own conjecture or analysis. We begin with the explicit statement of Congress itself. . .
> . When the language and intent of section 1985(3) are examined in light of the relatively
> recent recognition of current and historic prejudice directed toward the handicapped, it is
> clear that much of our discussion of gender discrimination in [prior cases] applies with
> equal force . . . . To ensure that private conspirators do not strip other citizens of the equal
> protection of the laws, we must be particularly concerned with those discrete and insular
> minorities who have traditionally borne the brunt of prejudice in our society.

---

[2] In addition to the ADA, Congress has repeatedly recognized individuals with disabilities as a group are subjected to discrimination, exclusion, segregation, and unequal treatment, reinforcing that disability-based animus is the kind of class-based discrimination contemplated by 42 U.S.C. § 1985(3). *See, e.g.,* Rehabilitation Act of 1973, 29 U.S.C. § 701(a) (finding that individuals with disabilities are among the most disadvantaged in society and continue to face discrimination in employment, housing, education, transportation, and other areas of public life); Individuals with Disabilities Education Act, 20 U.S.C. § 1400(c) (documenting the historical exclusion of children with disabilities from public education and framing federal policy around equal opportunity, full participation, and independent living); Fair Housing Act, 42 U.S.C. § 3604(f) (prohibiting discrimination because of handicap in housing and requiring reasonable accommodations); Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15001(a) (finding that individuals with developmental disabilities are especially vulnerable to discrimination, abuse, neglect, and deprivation of rights and require services and supports to achieve inclusion in community life); and Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801(a) (finding that individuals with mental illness are vulnerable to abuse, neglect, and injury and often unable to protect their own interests). Collectively, these enactments reflect a consistent congressional determination that individuals with disabilities are a distinct group that has been subject to systemic discrimination and therefore warrants special legal protection, satisfying the "class-based, invidiously discriminatory animus" requirement of § 1985(3).

PAGE 24 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

112 F.3d at 687-88 (citations omitted). *See also People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 42 (2d Cir. 1982), *vacated on other grounds sub nom. People of State of N.Y. by Abrams v. 11 Cornwell Co.*, 718 F.2d 22 (2d Cir. 1983) (claim that the "mentally retarded" were a class protected by section 1985(3) was "colorable")[3]; *Larson by Larson v. Miller*, 55 F.3d 1343, 1352 (8th Cir.), *reh'g granted, judgment vacated sub nom. Larson v. Miller*, 67 F.3d 148 (8th Cir. 1995), *on reh'g*, 76 F.3d 1446 (8th Cir. 1996) ("§ 1985(3)'s protection extends to the handicapped as a class as well as to females"). Many district courts have followed suit, recognizing 1985(3) classes premised on disability status.[4]

Although the Ninth Circuit has yet to address the issue, the Third Circuit's reasoning and recognition of disability as a class, grounded in Congressional determinations to protect a recognized minority class of individuals with characteristics beyond their control from historical unequal treatment, is highly persuasive. This is especially true in view of the Ninth Circuit's

---

[3] A number of district courts in the Second Circuit subsequently held that disabled people are a class falling within the protection of Section 1985(3). *See Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 2023 WL 2537626, at *16 (N.D.N.Y. 2023); *Doe v. Yorkville Plaza Assocs.*, 1994 U.S. Dist. LEXIS 13234, 1994 WL 509903, at *9 (S.D.N.Y. Sept. 19, 1994); *Trautz v. Weisman*, 819 F. Supp. 282, 290 (S.D.N.Y. 1993); *cf. B.D.S. v. Southold Union Free Sch. Dist.*, 2009 U.S. Dist. LEXIS 55981, 2009 WL 1875942, at *20 n.8 (E.D.N.Y. June 24, 2009) (stating in dicta that "the Second Circuit has recognized mental disability as a class protected by Section 1985, and, thus, it logically follows that persons with other types of disabilities, *i.e.*, learning and developmental disabilities, would also be part of a class protected by Section 1985")." *Abadi v. Am. Airlines, Inc.*, No. 23-cv-4033 (LJL), 2024 U.S. Dist. LEXIS 59889, at *67 (S.D.N.Y. Mar. 29, 2024) (internal citations omitted).

[4] *See, e.g., Payton v. Cox*, No. 2:20-cv-4838 (S.D. Ohio Dec. 1, 2020) (disability-based discrimination can satisfy § 1985(3)'s class-based animus requirement and plaintiffs alleging conspirators acted out of hostility toward persons with disabilities was within statute's protection); *Trautz v. Weisman*, 819 F. Supp. 282 (S.D.N.Y. 1993) (persons with learning disabilities sufficiently alleged a cognizable class under § 1985(3)); *Trautz v. Weisman*, 846 F. Supp. 1160 (S.D.N.Y. 1994) (later opinion expressly stating individuals with disabilities may form a protected class; *Tyus v. Ohio Department of Youth Services*, 606 F. Supp. 239 (S.D. Ohio 1985) (mentally disabled individuals are a protected class within the scope of § 1985(3), denying dismissal of § 1985(3) claim).

approach to section 1985(3) claims, which expressly allows a class where "Congress has indicated through legislation that the class required special protection." *Sever*, 978 F.2d at 1536. District courts in the Ninth Circuit have left the door open to disability forming the basis of a section 1985(3) class. *See, e.g., Wilson v. Mount Diablo Unified Sch. Dist./Special Educ. Local Plan Area*, No. 19-cv-03441-MMC, 2020 U.S. Dist. LEXIS 33788, at *12-13 (N.D. Cal. Feb. 27, 2020) ("assum[ing] a 1985 claim can be based on disability," stating in a footnote, "Courts of Appeals that have considered the question have reached differing conclusions as to whether a § 1985 claim may be based on animus toward the disabled. *See Lake v. Arnold*, 112 F.3d at 686 (citing conflicting authorities). To date, the Ninth Circuit has not addressed the issue in a published opinion.").

Plaintiffs acknowledge a circuit split exists among those that have addressed the issue. But courts like the Third Circuit in *Lake* and the district courts cited *supra* have acknowledged that split while reasonably ruling that disabled people fall within the scope of those to be protected by section 1985(3).

Applying the *Sever* framework, Plaintiffs have pled sufficient facts to support a cognizable theory that persons with SUD and/or SMI are disabled under the ADA and that Congress's passage of the ADA reflects a governmental determination that disabled persons require special federal assistance in protecting their rights, such that the proposed class of disabled persons with SUD and/or SMI falls within the scope of section 1985(3) protection.

### C.    Plaintiffs Properly Allege a 1985(3) Claim as Supporters of the Class

Defendants contend that Plaintiffs fail to allege their own membership in a cognizable class for purposes of § 1985(3). That argument rests on an overly narrow reading of both the statute and the SAC and ignores well-established principles permitting claims based on

PAGE 26 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

discrimination against protected classes *and* those who advocate for or associate with them.

Section 1985(3) is not textually limited to plaintiffs who themselves belong to the class that is the object of the conspirators' animus. Directly on point, the Supreme Court has held that "[t]he predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes *and their supporters*. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 836, 103 S. Ct. 3352, 3360 (1983) (emph. added).

The legislative history of 42 U.S.C. § 1985, as detailed in *Farber v. City of Paterson*, 440 F.3d 131 (3d Cir. 2006), underscores that the statute was intended to protect people who are harmed by conspiracies motivated by discriminatory animus, even if they are not members of the targeted class. As the court noted: "[T]he legislative history underscores the view that a § 1985(3) plaintiff need not be a member of the class against which a conspiracy directs its invidiously discriminatory animus, even if in practice this is most often the case." 440 F.3d at 141. *See also Keating v. Carey*, 706 F.2d 377, 388 (2d Cir. 1983) (providing a detailed review of the legislative history and intent of the statute in relation to retaliation against supporters of changed law and social policy during the reconstruction era). This interpretation aligns with the statute's broad remedial purpose.

The statute authorizes suit by "the party so injured" when conspirators act "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws," and an overt act in furtherance of the conspiracy injures "another." 42 U.S.C. § 1985. Thus, where a plaintiff alleges personal injury inflicted because of the plaintiff's association with, support for, or advocacy on behalf of the targeted class, the plaintiff may

PAGE 27 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

proceed so long as the complaint plausibly ties the injury to a conspiracy animated by the requisite class-based discriminatory purpose, even if the plaintiff is not a member of that class. 42 U.S.C. § 1985.

Consistent with the statute's text and legislative history, the Supreme Court has construed § 1985(3) to require that the conspiracy be driven by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus," *Griffin*, 403 U.S. at 102. The harm may be accomplished "directly or indirectly." 42 U.S.C. 1985(3).

Section 1985(3) envisioned the reality that conspirators may target a protected class directly, or indirectly through harm to proxies or supporters of the class, and the statute allows for such supporters to bring a section 1985(3) claim where they are in fact harmed by the class-based, invidiously discriminatory animus of the conspiracy.

This court recently allowed a section 1985(3) claim to proceed, for plaintiffs who were not a member of the asserted protected class. *See Black Unity v. City of Springfield*, No. 6:21-cv-00346-AA, 2026 WL 183363 at *44, 2026 LX 19034, at *125 (D. Or. Jan. 23, 2026) (denying summary judgment on section 1985(3) claim where Plaintiffs "allege that they are a protected class of Black people *and their supporters*, who were targets of a racially motivated conspiracy, including 'racial violence' perpetrated by an 'Anti-BLM mob[]' that was 'facilitated' by Defendants.") (emphasis added). *See also Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1272 (10th Cir. 1989) (plaintiff, who was a supporter or advocate for the poor and minorities, adequately alleged a section 1985(3) claim showing "discriminatory animus against blacks *and those who help blacks*") (emphasis added); *Waller v. Butkovich*, 584 F. Supp. 909, 937 (M.D.N.C. 1984); *Lesley v. Bennett*, 778 F. Supp. 3d 1201, 1216 (D. Wyo. 2025) (""relief under Section 1985(3) . . . extends to supporters and advocates of protected groups, including non-race-based

classes . . . . [N]either Defendants nor this Court has found any textual support nor caselaw that would require an arbitrary line to be drawn between advocates of racial groups and advocates of other protected classes").

Defendants' argument to the contrary conflicts with § 1985(3)'s express "directly or indirectly" language and its focus on whether "another" was injured by an act in furtherance of a class-animated conspiracy, and case law allowing 1985(3) claims by supporters or advocates of the class. Defendants' reliance on *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711 (9th Cir. 1981), is not on point. In *Canlis*, the Ninth Circuit affirmed dismissal of a § 1985(3) claim arising out of a violent confrontation between private citizen Posse Comitatus members and law enforcement during a labor dispute involving United Farm Workers ("UFW") attempting to access private agricultural property to organize farm workers.[5] Following a shootout between the Posse and deputies at a farm, the sheriff and deputies sued under section 1985, alleging that the Posse and agricultural land owners who hired them conspired to interfere with the Sheriff's duties and deprive deputies of equal protection. The court, applying *Griffin v. Breckenridge*, recognized that § 1985(3) reaches purely private conspiracies, but that a viable claim requires, among other elements, a conspiracy motivated by "class-based, invidiously discriminatory animus." The Ninth Circuit held that the plaintiffs had failed to satisfy this requirement because neither "anti-police bias" nor hostility toward law enforcement officers constitutes a protected class under § 1985(3); and plaintiffs could not rely on alleged discrimination against United Farm Workers, because they were not members of that class. Accordingly, the § 1985(3) claim was dismissed for failure to allege a cognizable class and class-based discrimination – to the

---

[5] For background on the troubled and often violently racist history of the Posse Comitatus movement in Oregon, see the complaint in *Hill v. Lane County Sheriff's Mounted Posse et al,* 6:25-cv-01290-MC, pending in the Eugene Division.

PAGE 29 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

contrary, the officers were attacked because they were officers engaging in unwanted law enforcement conduct on private property, not because they were proxies for United Farm Workers organizing.

*Canlis* is meaningfully distinguishable, both doctrinally and factually, from cases recognizing § 1985(3) claims by non-member advocates and supporters of a protected class. First, it was decided prior to the Supreme Court rulings in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 113 S. Ct. 753 (1993), and *United Bhd. of Carpenters*, and its holding must be applied in light of those rulings, which acknowledge claims based on indirect harm and a legislative intent to protect supporters of the protected class who experience harm as a result. These higher court rulings curtail a strict reading of *Canlis* that would foreclose claims by advocates or proxies for a protected class which result from discriminatory animus against the class.

Second, the facts in *Canlis* make clear that its holding is best read as reflecting the straightforward application of § 1985(3)'s requirement that the plaintiff's injury be tied to invidiously discriminatory animus aimed at the class alleged. It rejected the plaintiffs' claim because no qualifying class was adequately alleged, and because the plaintiffs themselves lacked membership in the purported UFW class; were not alleged to be advocates for or proxies of the UFW; nor were they targeted for their affiliation with the UFW. The deputies were assaulted while entering private property to effectuate an arrest of a Posse member on an outstanding warrant; they were harmed in their capacity as law enforcement officers, not as a result of class-based animus toward UFW members. In this context, the court rejected "anti-police bias" as a cognizable class and found no basis to tie the alleged conspiracy against the Sheriff's office to class-based animus against UFW. That factual posture stands in sharp contrast to cases in which

PAGE 30 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

plaintiffs are targeted precisely because of their advocacy on behalf of a protected class, where they function as proxies and are harmed in furtherance of suppressing the class's rights.

Third, *Canlis* does not address whether supporters of a class can bring a section 1985(3) claim. It disposed of the UFW class theory with a mere two sentences of analysis. 641 F.2d at 721. The court's conclusory statement that a "plaintiff must be a member of the class discriminated against to claim the benefits of § 1985(3)" cited just two cases, neither of which concern whether advocates of a class could bring a claim. In the first, *Briley v. California*, 564 F.2d 849, 852 (9th Cir. 1977), the court affirmed dismissal of a section 1985(3) claim because the plaintiff failed to allege that the harm he suffered was motivated by racial or any other invidiously discriminatory animus. It contained no allegations regarding harm to an advocate or supporter of an alleged protected class.

The second case, *Lopez v. Arrowhead Ranches*, 523 F.2d 924 (9th Cir. 1975), similarly found that the plaintiffs' class theories -- inability to secure employment and inequality of protection afforded farm workers -- did not allege the type of class-based invidious, discriminatory animus required post-*Griffin*. *Id.* at 927. *Lopez* did not concern proxy plaintiffs alleging harm as a result of animus against a protected class.

*Canlis* simply stands for the basic requirement that the plaintiff's injury must be tied to invidiously discriminatory animus aimed at the class. Contrary to Defendants' reading of *Canlis*, there is no clear rule in the Ninth Circuit about whether a "supporter" of an affected class can bring a 1985(3) claim.

In light of the text, legislative history, and case precedent, Plaintiffs have plausibly alleged a valid section 1985(3) theory based on targeting of Plaintiffs as supporters of people with SUD and/or SMI disabilities.

PAGE 31 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

**D.      The SAC's State Law References Show Parallels with 1985(3)'s Core Purpose**

Plaintiffs' references to state law, including Measure 110, are relevant to the court's section 1985(3) analysis, but not in the way framed by Defendants. The historical circumstances that gave rise to 42 U.S.C. § 1985(3) were not limited to violence against Black citizens in isolation. As the Reconstruction-era legislative history and later federal decisions explain, Congress enacted the Ku Klux Klan Act to address organized local backlash against newly conferred legal rights, carried out not only against the directly protected class, but also against the people who supported, defended, organized with, and politically advocated for that class. The concern was that where law and policy had shifted to recognize a marginalized group's civil status and rights, entrenched local power structures would respond through coordinated intimidation, surveillance, coercion, and economic and political retaliation. That is why the Supreme Court has recognized that the "predominate purpose" of § 1985(3) was to combat animus against Black people and "their supporters," especially in the Reconstruction South where the Klan functioned as both a terroristic and political force. *See United Bhd. of Carpenters*, 463 U.S. at 836; *Bray*, 506 U.S. at 274-78; *Farber*, 440 F.3d at 138-41; *Keating*, 706 F.2d at 388; Lee Pinzow, *Is It Really All About Race?: Section 1985(3) Political Conspiracies in the Second Circuit and Beyond*, 83 Fordham L. Rev. 1031, 1036-46 (2014) (providing historical background of *the Ku Klux Klan Act* being enacted to protect both Blacks and their supporters and advocates, including Republicans).

Plaintiffs allege a modern analogue to that history, albeit with a scope limited to Medford and a smaller scale of overt violence. The SAC alleges that Oregon materially changed the legal status and rights of people with SUD, SMI, and related vulnerable populations through Measure 110, the creation of BHRNs, and state support for peer respite services, while also recognizing

PAGE 32 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

protections for homeless persons under Oregon law. SAC ¶¶ 36-40, 183-189. The SAC further alleges that Plaintiffs serve precisely the populations affected by those changes, including people with SUD and/or SMI, and that Plaintiffs openly advocated for those groups while refusing to participate in Medford's police-aligned service model. *Id.* ¶¶ 11-13, 53-64, 178-191. The SAC frames that same point by describing a years-long retaliation campaign against Plaintiffs because they publicly criticized Medford policing, advocated for unhoused and drug-using residents, recorded police conduct, refused to collaborate with law enforcement, and secured state funding outside Medford's police-aligned service network. It alleges that Medford opposed Measure 110 and sought recriminalization, blamed harm-reduction efforts for local "livability" issues, and operated a service-provider ecosystem heavily shaped by law enforcement influence. *Id.* ¶¶ 39-52. It further alleges that, once Plaintiffs became visible advocates for those disfavored populations, including obtaining a $1.5 million state grant, City officials and police leadership responded with monitoring of activist activity, dossiers, selective enforcement, exclusion from service networks, a covert campaign to undermine the OHA grant, and coordination of or knowing amplification of Defendant Mallory's doxxing and incitement campaign. *Id.* ¶¶ 73-153.

Plaintiffs allege a coordinated effort, as in the Reconstruction era, to marginalize supporters of the newly protected class, locally targeted and disfavored within a municipal ecosystem shaped by law enforcement priorities in the wake of major state law and policy change – a similar structural circumstance as the one that animated Congress's enactment of § 1985(3).[6] The state law allegations in the SAC are significant in providing critical context

---

[6] *See, e.g.,* John Christopher Anderson, *Three Generations Later and Still No Class: Protecting Americans with Disabilities under 42 U.S.C. § 1985(3), the Ku Klux Klan Act*, 47 DRAKE L. REV. 537 (1999) (esp. V(B)(2), *ADA Recognizes the Similarities Between the Klan Victims and the Disabled,* detailing the many ways people with disabilities have been subjected to similar historical discrimination and structural limitations as Black people).

PAGE 33 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**

showing that Plaintiffs' § 1985(3) theory fits within the historical core of the statute's purpose.

## V.      THE DOE DEFENDANTS SHOULD NOT BE DISMISSED WITH PREJUDICE

The SAC alleges that John and Jane Does 1-9 are unidentified employees or agents of the City of Medford who participated in the events described and whose identities will be added once known. SAC at 7. In a municipal retaliation case involving surveillance, internal communications, and police conduct, the identities of some participants are uniquely within Defendants' control before discovery. If the Court concludes the Doe allegations require greater specificity, the proper remedy is dismissal without prejudice and with leave to amend after targeted discovery, not dismissal with prejudice.

## VI.     LEAVE TO AMEND SHOULD BE GRANTED TO CURE ANY DEFICIENCIES

If the Court concludes more precision is needed in the articulation of the retaliation or conspiracy theory, Plaintiffs request leave to amend rather than dismissal with prejudice. *See Moss v. U.S. Secret Service*, 572 F.3d 962, 972 (9th Cir. 2009) ("[R]equests for leave [to amend] should be granted with extreme liberality").

### CONCLUSION

The SAC plausibly alleges that the Medford Defendants retaliated against Plaintiffs for protected speech and advocacy; that the retaliation was carried out through municipal policy, custom, and policymaker action; and that portions of the campaign were coordinated or knowingly amplified through a law-enforcement-adjacent private actor. Defendants' motion depends on factual disputes and defense-side inferences that cannot be resolved on the pleadings. The motion to dismiss should be denied in full. In the alternative, if the Court identifies any pleading deficiency, Plaintiffs respectfully request leave to amend.

Respectfully submitted March 30, 2026.

CIVIL LIBERTIES DEFENSE CENTER

By:    *s/Marianne Dugan*

**Marianne Dugan, OSB # 932563**
mdugan@cldc.org
541.687.9180

**Alicia LeDuc Montgomery, OSB # 173963**
**LEDUC MONTGOMERY LLC**
alicia@leducmontgomery.com
704.702.6934

*Attorneys for Plaintiffs*

PAGE 35 – **PLAINTIFFS' RESPONSE TO CITY DEFENDANTS' MOTION TO DISMISS**