that these need to be read as a little more than what they -- how they were put together at this point.

THE COURT:  Okay.

MR. MURDOCK:  Okay.  Umm --

THE COURT:  So the other argument that you have is that your client Mallory is just an independent individual and shouldn't be roped into all of this.

MR. MURDOCK:  Yeah, yes.  It's political speech by a private individual on his platforms.  It's -- these are political issues.  I mean, the opening facts section of plaintiffs' response brief says:

> "[There's] a years-long retaliation by City officials and their allies against Plaintiffs because Plaintiffs publicly opposed Medford's treatment of unhoused people, drug users, and harm-reduction advocates, and because Plaintiffs criticized police practices and City policy."

That's their opening sentence of the facts.  There's nothing to do with disabled people here.  They don't allege that Mallory or the City discriminates against disabled individuals in any context other than when these plaintiffs supposedly represent them.  There's no evidence he takes any actions outside of disagreeing with plaintiffs' business

platform.

He simply disagrees with their model.  That's all the evidence shows here.  And they openly admit --

THE COURT:  If anything, if the plaintiffs want to pursue a defamation claim against your client, they can do that.

MR. MURDOCK:  Yeah.  They originally had that, and they withdrew the claim; so --

THE COURT:  Do you know why they withdrew the claim?

MR. MURDOCK:  We were discussing an anti-SLAPP motion.

THE COURT:   Okay.

MR. MURDOCK:  So yes.  As you noted, there's no concrete evidence of an agreement or a conspiracy.  For these conspiracy claims, the facts must be specifically pled. There's no overt act other than speech.  And this is just classic First Amendment political issues that Mr. Mallory is disagreeing with their business model.

THE COURT:   Okay.  Let me hear from the plaintiffs. I'll certainly give you both an opportunity to come back and fill in any other information you want me to know.

Counsel.

MS. LeDUC MONTGOMERY:  Thank you, Your Honor.

I'll pick up right where we left of regarding Mr. Mallory and the allegations against him.  First, I would

say we recognize, you know, under *Twombly* if it's just parallel speech conduct, then generally that's not sufficient for conspiracy.

But what plaintiffs posit we have here is parallel plus. So we have the parallel conduct plus evidence of a prior existing close relationship with the police, evidence of Mr. Mallory intentionally platforming and supporting police, evidence --

THE COURT: Intentionally platforming supporting but how is that conspiratorial?

MS. LeDUC MONTGOMERY: In and of itself, it's not conspiratorial but it together builds support for the inference that, when Mr. Mallory at the same time the City is actively trying to revoke the OHA grant that was awarded to Stabbin Wagon --

THE COURT: They didn't have authority to revoke it; right?

MS. LeDUC MONTGOMERY: They don't have authority to -- there were emails obtained from online public records disclosures. Plaintiff did not send a public records request -- another entity did -- and then published them online, and we read them.

THE COURT: So City employees or political officials for the City were trying to convince Oregon Health Authority to revoke the grant.

MS. LeDUC MONTGOMERY:  Yes.

THE COURT:   Okay.

MS. LeDUC MONTGOMERY:  I think their quote language was to "undo the grant."  They hired a lobbyist to undo the grant.

THE COURT:  With respect to Mr. Mallory as a defendant, why do you think his conduct is implicated under 1985?

MS. LeDUC MONTGOMERY:  Sure.  So during this exact same time period when there's the email saying we're hiring a lobbyist, undo the grant, multiple members of the City leadership -- including the city manager, including the heads of the Medford Police Department, Defendant Kirkpatrick who is a named defendant -- were emailing the heads of different nonprofit groups that various MPD members served on the boards of saying can't believe Stabbin Wagon got this grant.  This is, you know, ridiculous.  This is awful.  People should be outraged.

Basically the City employees and their -- in their capacity as employees from their City emails are outreaching to nonprofits saying be outraged that this member of the berm that they're all part of, Stabbin Wagon, got this grant.  And they were using -- you know, there's different quotes from these emails.

That same exact language was then used in

Mr. Mallory's online post that he made.  He published a video of himself talking about how people need to contact OHA.  We need to undo this grant.  Some of his exact language was nearly identical to the various different emails that the City employees were sending out to folks.

Now, the public records request that was submitted or where these documents came from, to my knowledge, didn't necessarily say find all the Ryan Mallory communications, what have you.  So there may very well be an email to Ryan Mallory from the police saying these things.  But what it is is it's almost verbatim speech being sent out by police and the City employees, and then Ryan Mallory is reiterating it.

And so then in tandem with that verbatim speech, Ryan Mallory is also publishing online just a month prior to that when the plaintiffs were arrested during a public health event they were hosting.  What happened was they were hosting an HIV testing event.  A youth came and was in the middle of getting an HIV test.  It was a runaway youth -- or the person was a runaway youth.  Police came and just apprehended the youth sort of without explanation.

So Stabbin Wagon employees, including the plaintiffs, were, like, you know, get out of here; you're not welcome here; what are you doing taking this person? and then get arrested for interference or disorderly conduct.

The next day Ryan Mallory posts to his forums an

42

image that almost looked like the booking photo and then had, like, details of the arrest and their home address and saying "Busted," like these criminals are busted.

And part of what we're staying is, again, he's trying to lend this, like, appearance of official booking kind of arrest information. And there's also a question of how did he get this information so quickly when it wasn't publicly available?

And, again, we're not in discovery. We don't have --

THE COURT: Information about what? the personal addresses or phone numbers?

MS. LeDUC MONTGOMERY: Or their arrest or any -- because, I mean, that wouldn't be publicly posted at the time. I don't think they were even allowed to have booking photos and things like that, and so --

THE COURT: Is it a booking photo or something that was doctored up to look like one?

MS. LeDUC MONTGOMERY: I think it was doctored up. I mean, I suspect. We don't know yet. But my point is he all of a sudden -- he very quickly had information about the arrest, about the individuals, about their locations; and then he's publishing it in a format that's intended, I think, to look official, kind of like city aligned.

And so whether or not he got that information --

THE COURT:  I know you've described this as sort of parallel plus, but I think I might need more than one plus for it to be criminal conspiracy under 1985.  And so, I mean, what you're describing is a situation in which, you know, every troll out there in the world is now subject to a 1985 claim.

MS. LeDUC MONTGOMERY:  I recognize that there's certainly First Amendment concerns at issue and that it's a closer call for Mr. Mallory on the conspiracy claim than for the City actors.

And to be clear, even if the Court were to find it's not sufficient for Mr. Mallory, we don't believe that defeats the conspiracy claim as to the City because they were outreaching to other folks as well.  But as to Mr. Mallory, I can appreciate Counsel and the Court's concerns about First Amendment.  We're not, you know, having too broad of a view of things when it comes to conspiracy.

But I think here it's that he had the preestablished close working relationship with law enforcement; sort of positing himself as a second responder, if you will, where it's law enforcement adjacent, we're supporting law enforcement and what they're doing; animosity against drug users and folks that would fall within the SUD/SMI category, just generally speaking, leading up to this.

And then he violates his own written rules for the forums that he maintains in order to post this video about the

plaintiffs in a civil matter.  And so it's kind of exceptional that he does that.  And it's, like, why the exceptional conduct?

One plausible inference is because he was in coordination or had reached a tacit agreement with the City actors to assist them in this -- what we're calling a campaign to revoke the grant and block the establishment of a peer respite that would serve members with SUD/SMI in Medford which also kind of goes to the points earlier about, well, is there some sort of, you know, detrimental impact to the class members themselves?  Yes.  The grant was for a peer respite that would specifically serve members with SUD and SMI.

Further, I think the Mendocino case which we do rely heavily on in the briefing, you know, it talks about there's rarely a smoking gun of here's their direct agreement or their -- you know, here's our contract that we're going to enter into this conspiracy together.  But having the ability and opportunity to conspire is one of the elements or a factor the Court can look to to draw that plausible inference of a conspiracy.

THE COURT:  So perhaps, in any event, a motion to dismiss should be denied, but it can be taken up again under summary judgment.

MS. LeDUC MONTGOMERY:  Correct, Your Honor.  And I do think some of this goes to, like, a merits argument or

45

sufficiency of evidence to prove a claim rather than have we, you know, plausibly alleged conspiracy -- you know, a plausible inference of conspiracy here.

THE COURT:  So the plus that you're talking about -- I mean, I'm operating on the understanding that these are allegations in your complaint -- is what appears or can be interpreted to be some kind of coordinated effort or sharing of the information that the general public wouldn't have been able to access that Mr. Mallory ended up publishing on his website or blog.

MS. LeDUC MONTGOMERY:  That's one piece of it where we just don't know where he obtained this information.

THE COURT:  But wouldn't you have to at least allege that it came from the police and not just you don't know?

MS. LeDUC MONTGOMERY:  Correct.

THE COURT:  And do you allege that it came from the City of Medford or the police department?

MS. LeDUC MONTGOMERY:  I don't recall specifically if the complaint says he only got this information from the City of Medford.

THE COURT:  And if you make that allegation, are you able to make that in good faith?

MS. LeDUC MONTGOMERY:  Yes.

THE COURT:  That he did -- on information or belief that it came from the police department or the City of

Medford?

MS. LeDUC MONTGOMERY:  Yes.

THE COURT:  And why?  What information is there that you have or what limited minimal amount of information do you have that suggests that it comes from the police or the City of Medford?

MS. LeDUC MONTGOMERY:  Well, I guess, just generally speaking, if there's been an arrest and information is being published about that in some sort of public capacity -- like, let's say booking reports or something -- then that information would be originating from police.

THE COURT:  Was the booking report published?  Did Mr. Mallory publish something like a booking report or -- I don't know -- an arrest report?

MS. LeDUC MONTGOMERY:  He did not -- I don't believe he published an actual booking report.  He sort of made his own with graphics and then additional information that would have never been conveyed in a booking report like a person's home address.  So we don't know where he obtained the information.

One explanation could be, because he works closely with MPD and shares information, they sent it to him right away.  For example, during that arrest the body cam video -- or the dash cam video of one of the arresting officers, he's having a phone call with someone immediately after; and he

47

says something to the effect of, like, oh, these plaintiffs are just, like, the most horrible people.

THE COURT:  Who says that?

MS. LeDUC MONTGOMERY:  One of the arresting MPD officers.

THE COURT:  How does that connect Mr. Mallory?

MS. LeDUC MONTGOMERY:  My point being that -- again, going to this idea of a tacit understanding or a tacit agreement.  If MPD -- we know at least some of them were harboring what they called a bias.  There was a whistle-blower former MPD employee who reached out to Plaintiff Jones stating point blank Defendant Kirkpatrick --

THE COURT:  Is that Sergeant Venables?

MS. LeDUC MONTGOMERY:  Yes.

THE COURT:  Well, before we move on to that, I want to make sure I understand the connection with Mr. Mallory regarding that body cam footage or the audio.  I mean, was that -- was that officer in any way talking about Mallory or talking to Mallory on that phone call?

MS. LeDUC MONTGOMERY:  I don't know.

THE COURT:  So how do you connect that to anything Mr. Mallory was doing?

MS. LeDUC MONTGOMERY:  I'm saying, if we know MPD is willing to communicate to other people whatever it is and they're exhibiting this bias in the language that they're

48

using -- these are awful people; they deserve to go to jail -- and then we have Sergeant Venables on his own reaching out to plaintiff saying MPD -- like, current MPD members have a bias towards you; watch out.

THE COURT:  Now --

MS. LeDUC:  And then --

THE COURT:  --  I think that does arguably support more of a claim -- or a 1985, you know, against the City and defendants -- City defendants, City employee defendants.  But I'm still having a hard time making that connection all the way back to Mr. Mallory.

MS. LeDUC MONTGOMERY:  Sure.  And I think where I'm seeing this as collectively, if MPD and Mallory have a preexisting -- I'll call it a mutually beneficial professional relationship where he's inviting multiple different law enforcement on MPD on to his ThiefHunter shows and platforming, like, their livability team, inviting the former chief of police on is an overtly -- positioning himself as someone who supports police, has a close working relationship with them.

And we know from these other examples that police are willing to reach out and talk to folks or have this sort of latent bias.  Then it -- there's a plausible inference that, when we know they were also during this time emailing people specifically saying be outraged that the plaintiffs

have obtained this grant, collectively that creates a set of facts where it is plausible to infer at least in some capacity MPD or a member of the City reached out to or reached a tacit understanding with Ryan Mallory, hey, now we're platforming this Stabbin Wagon shouldn't have this grant because it would serve, you know, unhoused, or, you know, people with significant mental illness and drug use issues. We don't want to support that. We want to overturn Measure 110, not support what it's funding.

THE COURT: Is Mr. Mallory a political platform? a political media platform?

MS. LeDUC MONTGOMERY: I would say there's definitely elements to what he does that is political in terms of expressing views from a certain position. For example, they don't -- to my knowledge, they don't allow anti-police positions to be posted on his ThiefHunter pages. It's only pro-police-type commentary.

THE COURT: Is that part of your allegations in this -- in the second amended complaint?

MS. LeDUC MONTGOMERY: I -- I believe we kind of position -- yeah. We describe his platforms and how he positions himself.

But I don't -- I want to be careful here because I understand, you know, are we talking about a political dispute versus conspiracy to provide -- deprive or, you know, violate

50

rights?  And where I think it falls under more of the deprivation is this suppressive activity that's going on and sort of the targeting of the particular class and the exceptions that Mallory was making to his own rules in order to platform the verbatim language coming from MPD and City officials to undo this grant to serve this exact class.

And I understand the complaint -- you know, to some of the defendants' points about clarity, we have a First Amendment retaliation claim; so there's certain background or contextual facts that may go more towards, like, the political differences between the City and Stabbin Wagon.  But then we have the conspiracy which is about the discrimination or animos- -- you know, animus against the protected disabled, what we're saying is the protected disabled class.

So I don't disagree that some of the allegations in the complaint tend to go more towards the political aspect, but they're not all relevant directly to the 1985, Sub (3), claim.

THE COURT:  All right.

MS. LeDUC MONTGOMERY:  And to confirm, under paragraph 115 we do allege Mallory's publication of plaintiffs' home address and booking-style graphics mirrored official law enforcement arrest disclosures and on information and belief were designed to lend the appearance of official sanction to the City's retaliatory narrative which is similar

in many ways to the *Mendocino* case where one of the facts or aspects that led the Court to allow the 1983 claim against law enforcement there for colluding with a private party because they were publicizing or describing the plaintiffs as criminals or in this negative light.

That was one aspect of what was occurring that the Court considered as one aspect of the indirect evidence supporting the plausible inference of a meeting of the minds or a tacit agreement.

THE COURT:  Anything more on Mr. Mallory?  We'll take a recess once you're done talking about Mr. Mallory.  And then we'll come back, and I'll want to hear about your response to the City's -- City defendants.

MS. LeDUC MONTGOMERY:  Just quickly to respond to your earlier question, the SAC does allege Mallory as a media platform with over 100,000 members I think largely in the Southern Oregon area.

THE COURT:  It really does become a pretty blurry line, then, between, you know, speech -- protected speech and what you're describing as suppressive activity that's actionable under 1985.  I mean, I -- I -- I mean, then there ought to be several lawsuits against Fox News and MS NOW at this point for the very things that they say or do or take extreme positions on one side of a political issue.

So I'm having a hard time reconciling this idea

that, you know, speech however one might consider it to be reprehensible is still protected.

MS. LeDUC MONTGOMERY:  Sure.  I appreciate that.  I mean, some aspects of this -- you know, not all speech is protected, or there are some limitations or consequences for certain types of speech.  For example, Your Honor mentioned defamation as one aspect.  Intentional interference with economic relations is another.

So the grant at the time some of these publications were made, including Mr. Mallory's post contact your representatives, contact OHA, you know, in some kind of revoke this grant, the grant had already been awarded through a competitive point-scoring process.  So that in and of itself could be intentional interference with economic relations with third parties.

THE COURT:  But the plaintiffs didn't pursue those claims.

MS. LeDUC MONTGOMERY:  We agreed to withdraw some in order to just move the case forward past an anti-SLAPP motion.

THE COURT:  Well, I mean, there's no requirement that you have to -- well, maybe you're not required to pursue those claims as precursors to pursue a 1985 claim.

MS. LeDUC MONTGOMERY:  Correct.  And so I think part of -- and I get that that becomes, okay, is this a case within a case to kind of prove a larger claim?  But that's just one

aspect of not all speech is entirely protected just because it may be on a public issue.  And also not all of his publications were to the public.  These are closed groups people become members of.  But that's just one example.

There were some defamatory statements in his videos, you know, just things that literally weren't true factually. Then there's the aspect of intentional interference with economic relations.  There's also the aspects of doxing, you know, posting someone's name, photo, home address while, you know, encouraging people to be outraged about this grant.  And then, in fact, multiple people who had commented on his post in person physically confronted the Stabbin Wagon employees afterwards.

And to Your Honor's point and I think, you know, in our briefs request, if Your Honor does choose to dismiss any of these claims, we would request that it be with leave to amend so that we have a little bit of guidance on where we could supplement additional facts because there are a lot more -- you know, some that we're aware of.

And in one particular instance, because there were multiple posts Mr. Mallory made about Stabbin Wagon or the employees who are plaintiffs, one gentleman who responded or commented on one of his posts, like I said, something to the effect of, oh, I have more information.

And I think Mallory responds, okay, private message

me.

That same person lived near Plaintiff Jones and then confronted her at her home in person and made Plaintiff Jones very afraid basically following Mr. Mallory's post.

And a second incident which is detailed in the complaint, a woman posted -- who frequently posted on Mr. Mallory's post said I do have more information.

Mallory, okay, private message me.

We don't know what those messages contained or if she did. But then she showed up at Stabbin Wagon's outreach in the community and was yelling and threatening staff saying she was going to call Medford Police and turn them in because they were in violation of an exclusion zone order following the arrest incident that I described which they are not in violation of, but I think she mistakenly believed they were.

And so those are at least two instances where we know folks were communicating or responding with Mr. Mallory on his platform and, in fact, results in person, you know -- how would I describe it? Not like a physical altercation but placing them --

THE COURT: Confront?

MS. LeDUC MONTGOMERY: -- in fear of a confrontation that could get physical or was at least very elevated and intimidating.

THE COURT: Well, so all that you described, I mean,

55

is -- whether people value it or not is part of sort of the political action in this day and age.  I'm not trying to minimize the -- I mean, the alarm that any human being will experience when being confronted.  No doubt about that.

But I think -- I'm still struggling with trying to understand the balance that you're asking this Court to strike between, you know, protected speech and that which you are seeking to recover under 1985.  And maybe the threshold question really does come down to what is the scope of 1985 in terms of who it's supposed to protect as opposed to what activity is actionable.

How about we take a recess.  Come back in ten minutes, and we'll continue the discussion.  I think some of this could be wrapped into about -- or your response to the City's arguments well.  So I'll try to lay off asking you about Mallory for a little bit.

MS. LeDUC MONTGOMERY:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  This court is in recess.

(Brief recess taken at 11:26 AM.  Resume at
11:47 AM.)

THE COURTROOM DEPUTY:  Please remain seated.  This court is back in session.

THE COURT:  All right.  Ms. Montgomery, let's go ahead and continue the discussion including how 1985 may be implicated with respect to the City defendants.