UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

STABBIN WAGON; MELISSA JONES; SAMANTHA STRONG,

Plaintiffs,

v.

CITY OF MEDFORD; BRIAN SJOTHUN; RANDY SPARACINO; JUSTIN IVENS; DARRELL GRAHAM; GEOFF KIRKPATRICK; TREVOR ARNOLD; ARTURO VEGA; RYAN MALLORY; JOHN AND JANE DOES 1-9,

Defendants.

Case No. 1:25-cv-01632-MTK

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

Plaintiffs Stabbin' Wagon, Melissa Jones, and Samantha Strong (collectively "Plaintiffs") bring civil rights claims against the City of Medford, several of its employees, and Defendant Ryan Mallory, alleging the City and its officials retaliated against them for their protected speech and conspired with Defendant Ryan Mallory to violate the civil rights of individuals with disabilities and their supporters. Defendants City of Medford ("City") and Defendant Mallory move to dismiss. For the reasons discussed below, the City's Motion to Dismiss (ECF No. 35) is granted, and Defendant Mallory's Motion to Dismiss (ECF No. 37) is granted.

## BACKGROUND

### I. The Second Amended Complaint

The Court assumes the following alleged facts are true. Stabbin' Wagon is a Medford non-profit that provides clean needles, food and aid, and outreach services to unhoused people, particularly those suffering from drug addiction and mental illnesses. Second Am. Compl. ("SAC") ¶¶ 2, 11, 56-57, 178, ECF No. 32. Plaintiff Jones was the founder and executive director of Stabbin' Wagon and Plaintiff Strong was an employee. SAC ¶¶ 12-13. Plaintiffs frequently criticized the City's arrests of unhoused individuals and its failure to provide outreach services to those individuals. SAC ¶¶ 62-68.

Defendants Brian Sjothun, Randy Sparacino, Justin Ivens, Darrel Graham, Geoff Kirkpatrick, Trevor Arnold, Arturo Vega, and John and Jane Does (collectively, "City Defendants") are current and former Medford city officials and police officers. SAC ¶¶ 15-21, 23. City Defendants have criticized Plaintiffs and their needle exchange program. SAC ¶¶ 40, 83, 90-92, 97-99. Starting around 2021, Defendants Graham, Kirkpatrick, and Sparacino monitored the Plaintiffs' social media activities, protest attendance, and interviews with newspapers. SAC ¶¶ 82-85, 94-95. City Defendants removed Plaintiffs from police communications which alerted local outreach services when the police swept an encampment of unhoused individuals. SAC ¶ 81. Medford police have also stopped, arrested, and cited Stabbin' Wagon employees on several occasions from 2020 to 2023. SAC ¶¶ 5, 77, 79-80.

In 2023, Plaintiffs received a $1.5 million grant from the Oregon Health Authority ("OHA") to open a 'respite center' to provide more outreach services to unhoused people. SAC ¶¶ 4, 96, 187. Defendants Sjothun, Ivens, Arnold, and Kirkpatrick attempted to persuade OHA to rescind the grant. SAC ¶¶ 97-99. Plaintiffs allege that these Defendants "disseminated

inflammatory, false, and disparaging information about Plaintiffs to other providers, state officials, and community leaders" in their attempt to reverse the grant. SAC ¶ 97.

Defendant Ryan Mallory is "a law-enforcement-adjacent figure in Southern Oregon" who operates social media platforms and companies that investigate, report, and consult on matters related to law enforcement, including the Medford Police Department. SAC ¶¶ 22, 106-08. Defendant Mallory supported City Defendants' attempt to rescind the grant. SAC ¶¶ 101-03. He expressed his opposition to Plaintiffs' OHA grant on his Facebook group which has over 100,000 followers. SAC ¶¶ 22, 129. His followers commented in support, and on September 13, 2023, one approached Plaintiffs while they were working and threatened to call the police. SAC ¶¶ 130, 137-38, 141. On August 4, 2023, Defendant Mallory posted Plaintiffs' personal information, including their home addresses and birthdays, in a graphic with Plaintiffs' likenesses resembling "law enforcement booking records." SAC ¶ 114. On September 7, 2023, Defendant Mallory posted a video and a comment that urged the public to oppose the OHA grant, stating in part:

> Unqualified people that fill our Parks in greenways with needles, keep people addicted by promoting drug use, and misappropriate grant money by using it for public protest of the police rather than helping people are about to get a massive paycheck . . . . Ask for an audit of the stabbin wagon organization. . . . These folks are intending on renting a building to perpetuate drug use . . . . Melissa Jones and her marketing director [Sam Strong] have openly stated that they get grant money and use it to protest police and others.

SAC ¶¶ 120, 123 (fourth alteration in original).

Defendant Mallory and his followers continued making posts that "fomented animosity and disinformation regarding Plaintiffs and their services." SAC ¶¶ 136-38. On May 21, 2024, Defendant Mallory posted an article that discussed Plaintiff Jones's sentencing in municipal court and commented that she "[d]efinitely hasn't learned her lesson based on that. Guess we'll

see how probation goes." SAC ¶ 139. In March 2025, Defendant Mallory posted a video that showed needles on the ground in downtown Medford and commented that Stabbin' Wagon "shouldn't be in business at all, it worsens the problem." SAC ¶ 140.

OHA delayed Plaintiffs' grant but ultimately awarded the funds. SAC ¶ 132. "[M]unicipal and zoning barriers and Defendants' subversion campaign" forced Plaintiffs to end their attempt to open the respite center. SAC ¶ 144. Plaintiffs Jones and Strong resigned from Stabbin' Wagon due to the Defendants' "harassment, surveillance, doxing, and retaliatory pressure." SAC ¶ 143.

## II. Procedural History

The Court heard oral argument on June 23, 2026. During that hearing, Plaintiffs withdrew their Fourth Amendment claims against all Defendants and all claims against Defendant Vega, a Medford police officer. Plaintiffs' Fourth Amendment claims and claims against Defendant Vega are therefore dismissed with prejudice.

Plaintiffs maintain three causes of action: (1) § 1983 claims against the individual City Defendants for retaliation in violation of Plaintiffs First Amendment Rights, (2) a § 1983 *Monell* claim against the City of Medford, and (3) § 1985 claims against all individual Defendants.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Id.* To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but

must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *L.A. Lakers*, 869 F.3d at 800. The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

**DISCUSSION**

**III. Shotgun Pleading**

Defendants argue that Plaintiffs Second Amended Complaint is a "shotgun pleading." A shotgun pleading is one that indiscriminately incorporates assertions from one fact to another such that it prevents the opposing party from preparing a response or simply makes the burden to do so more difficult. *Gibson v. City of Portland*, 165 F.4th 1265, 1288 (9th Cir. 2026). Shotgun pleadings fall into four main categories:

> (1) a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to be a combination of the entire complaint; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) a complaint that fails to separate into a different count each cause of action or claim for relief; and (4) a complaint that asserts multiple claims against multiple

> defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Id.* (citation omitted). A district court need not accept a shotgun pleading and may dismiss a shotgun pleading if it fails to provide sufficient notice of the claims and their basis. *Id.*

Plaintiffs clarified, in response to Defendants' arguments, that they assert claims against Graham, Kirkpatrick, and Sparacino for surveilling them and claims against Defendants Sjothun, Ivens, Arnold, and Kirkpatrick for interfering with the OHA grant. Pls.' Resp. City Defs.' Mot. Dismiss 10, ECF No. 42. The claims are supported by specific allegations of misconduct attributed to particular Defendants. The Court therefore declines to dismiss Plaintiffs' Second Amended Complaint outright as a shotgun pleading because it suffices to give Defendants notice of Plaintiffs' central allegations. The Court takes up specific deficiencies in turn.

## IV. Section 1983 Claims Against Individual Defendants

"Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation marks omitted). To establish a violation of a federal constitutional right under Section 1983, a party must show "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Plaintiffs allege that they engaged in protected speech through their advocacy for the unhoused and those with substance use disorder and mental illness, and through their criticism of the City's polices towards those people. They allege that Defendants Sjothun, Ivens, Kirkpatrick, and Arnold retaliated against them for that advocacy by interfering with the OHA grant. SAC ¶ 97. They also allege that Defendants Sparacino, Graham, and Kirkpatrick retaliated with their online surveillance over the Plaintiffs' social media accounts, protest attendance, and newspaper

interviews. SAC ¶¶ 83, 85. Plaintiffs allege that Defendants retaliated against them by removing them from official communications and by making unlawful arrests and citations.

**A. Statute of Limitations**

City Defendants move to dismiss on grounds that Plaintiffs' claims are barred by the relevant statute of limitations. Although a statute of limitations defense is usually raised in responsive pleading, it "may be raised in a motion to dismiss if the running of the statute is apparent from the face of the complaint." *Ledesma v. Jack Stewart Produce, Inc.*, 816 F.2d 482, 484 n.1 (9th Cir. 1987).

"Section 1983 does not contain its own statute of limitations. Instead, claims brought under [Section] 1983 are subject to the forum state's statute of limitations for personal injury suits." *Thomas v. County of Humboldt*, 124 F.4th 1179, 1191 (9th Cir. 2024) (quotation marks and citations omitted). "Oregon's general tort statute provides a 2-year statute of limitations." *Plumeau v. School District No. 40*, 130 F.3d 432, 438 (9th Cir. 1997) (citing Or. Rev. Stat. § 12.110(1)). The applicable statute of limitations for Plaintiffs' claims is two years. *See Plumeau*, 130 F.3d at 438; *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1058 (9th Cir. 2002) (stating Section 1985 and 1983 claims use the same limitations period).

The statute of limitations begins to run on the date a claim accrues. *Pouncil v. Tilton*, 704 F.3d 568, 573 (9th Cir. 2012). "Although state law determines the length of the limitations period, federal law determines when a civil rights claim accrues." *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001) (quotation marks and citation omitted). A claim accrues "when the plaintiff knew or in the exercise of reasonable diligence should have known of the injury and the cause of that injury." *Lukovsky v. City of San Francisco*, 535 F.3d 1044, 1050 (9th Cir. 2008).

Plaintiffs filed the first complaint in this action on September 11, 2025. Compl. 1, ECF No. 1. Claims that accrued more than two years prior, before September 11, 2023, are untimely.

Plaintiff brings § 1983 claims against the individual City Defendants. City Defendants argue that Plaintiffs' claims are time barred. Plaintiffs argue that the thrust of their complaint alleges timely injuries. The Court addresses the circumstances giving rise to each of Plaintiffs' claims.

1. <u>2020 and 2021 Arrests and Park Sweeps</u>

Plaintiffs make several allegations about events in 2020 and 2021. For example, Plaintiffs allege that Defendant Sjothun was an architect of a 2020 sweep of Hawthorne Park, causing the jailing of several unhoused individuals and Plaintiff Jones. SAC ¶ 47. Plaintiffs allege that Defendant Barringer stopped and detained Jones without cause in January 2021 and that Medford police selectively cited Plaintiff Jones for excessively honking during a protest against Medford's eviction of homeless people during a heatwave in June 2021. SAC ¶¶ 79-80.

Plaintiffs do not attempt to establish the timeliness of these factual allegations in their moving papers, arguing instead that these allegations demonstrate a pattern of retaliatory conduct. Plaintiffs' complaint, however, alleges these facts give rise to a Section 1983 claim explicitly by reference. SAC ¶ 154 (incorporating all paragraphs); ¶ 155(g) (pretextual stops, arrests, citations). Plaintiffs allege no specific conduct by Defendant Barringer outside of the 2021 arrest. Plaintiffs' claims against Defendant Barringer are therefore dismissed with prejudice as untimely. Plaintiffs' claims related to the 2020 park sweeps and 2021 arrests are also dismissed with prejudice as time barred.

2. <u>Exclusion from Official Communications</u>

Plaintiffs allege that Medford police excluded them from official notices of encampment sweeps but notified other organizations that supported individuals with substance use disorder in Medford. SAC. ¶ 81. Plaintiffs allege that this exclusion took place "over the years" but appear to state that it occurred from 2021 to 2023. SAC ¶ 81; SAC 23 (heading I.). Plaintiffs do not

argue that this allegation is timely but state that it remains relevant as background evidence of retaliatory motive and custom. Notwithstanding Plaintiffs' arguments, the Second Amended Complaint alleges the exclusion gives rise to a Section 1983 claim. SAC ¶¶ 154, 155(d) (alleging "patterned exclusion of disfavored service providers from" official communications). The Court does not dismiss this claim on statute of limitations grounds because the date Plaintiffs discovered the exclusion is not clear on the face of the complaint but notes that to the extent that Plaintiffs were aware or should have been aware of the patterned exclusion before September 11, 2023, those claims are untimely.

3. Surveillance

Plaintiffs allege that Medford Police, including Defendants Graham and Kirkpatrick, collected and stored information about Plaintiffs' online activities and protest attendance by creating fake social media profiles and monitoring them. SAC ¶¶ 82-84. Plaintiffs allege that Medford police maintained a dossier of Plaintiffs' political activity and that a whistleblower contacted Plaintiff Jones on January 8, 2023, via Facebook messenger to alert her to a conversation with Defendant Kirkpatrick that indicated bias against Plaintiff Jones. SAC ¶¶ 85, 87, 90-91. Plaintiffs allege that by 2023, the City was paying an analyst to monitor their social media and political activity without suspicion that they committed a crime. SAC ¶ 95. Plaintiffs allege that they learned of the extent of the surveillance through public reporting and records disclosures. SAC ¶ 100.

City Defendants argue that an allegation in Plaintiffs' ongoing state court suit against the City indicates that Plaintiffs knew of the surveillance by January 2023. A court's review of a motion to dismiss under 12(b)(6) is limited to "the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Trader Joe's Co. v. Trader Joe's United*, 150 F.4th 1040, 1048 (9th Cir. 2025) (quoting *Abcarian v. Levine*,

972 F.3d 1019, 1022 (9th Cir. 2020)). Specifically, City Defendants ask this Court to take judicial notice of Plaintiffs' allegation that a whistleblower told Plaintiff "Jones in writing that [Medford Police were] spying on her out of malicious 'bias' against [her] for her Stabbin' Wagon activity and activism" in a January 8, 2023, exchange via Facebook messenger. Kucera Decl. Ex. 1 at ¶¶ 25-27, ECF No. 36.

a) Judicial Notice

A court may take judicial notice of facts "not subject to reasonable dispute" because they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This allows courts to take judicial notice of certain facts in public records such as court documents, public records of agencies, or transcripts submitted to the court. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1001 (9th Cir. 2018). Courts may also take judicial notice of a document through the incorporation by reference doctrine "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* at 1002 (citation omitted). Even if a document is judicially noticeable, a court may not assume the truth of facts in those documents "if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003.

Plaintiffs concede that their state court complaint is judicially noticeable but argue that the Court may not take judicial notice of the allegations in that complaint to resolve a factual dispute at this stage. Plaintiffs argue that while "[Plaintiff] Jones may have become aware of certain facts beyond the limitations period," the Second Amended Complaint plausibly alleges that Plaintiffs did not learn of the extent of Defendants' surveillance efforts until later. Pls.' Resp. City Defs.' Mot. Dismiss 5. The Court agrees that it may not notice the state court complaint to resolve a factual issue but finds that there is no factual dispute. The Second Amended Complaint alleges that Plaintiffs did not learn of the extent of Defendants' surveillance

until at some point in 2023. The state court complaint alleges that Plaintiff Jones was aware that City Defendants maliciously surveilled her in response to her activism on January 8, 2023. Judicial notice that Plaintiff Jones learned of the surveillance on January 8, 2023, is appropriate because the allegation in the state court complaint is a matter of public record, is not subject to reasonable dispute, and does not result in an impermissible factual determination. The Court declines, however, to draw any inference as to whether Stabbin' Wagon or Plaintiff Strong knew of the surveillance prior to the limitations period because that fact is not apparent from the face of Plaintiffs' Second Amended Complaint and the allegations in the state court proceeding.

The relevant question is, then, whether Plaintiff Jones's surveillance claims may proceed where she knew of some surveillance prior to the limitations period but did not learn the full extent of it until after. A cause of action accrues when a plaintiff "knows or has reason to know of the injury that is the basis of the action." *Pouncil*, 704 F.3d at 574. "The cause of action accrues even though the full extent of the injury is not then known or predictable." *Wallace v. Kato*, 549 U.S. 384, 391 (2007) (citation omitted). The state court complaint shows that Plaintiff Jones was aware that the City had surveilled her in response to her activism by January 8, 2023, and therefore knew of the retaliatory surveillance she now seeks to hold Defendants liable for. Plaintiff Jones's allegation that she did not learn the full extent of the surveillance until later does not save her allegations outside the limitations period.

b) Continuing Violation

Plaintiffs argue that surveillance occurring outside the limitations period is nonetheless actionable under the continuing violation theory. "The continuing violations doctrine functions as an exception to the discovery rule of accrual 'allowing a plaintiff to seek relief for events outside of the limitations period.'" *Bird v. Dep't Hum. Servs.*, 935 F.3d 738, 746 (citation omitted); *see also Knox*, 260 F.3d at 1013 (9th Cir. 2001) ("The continuing violation theory

applies to § 1983 actions.”). The “mere continuing impact from past violations is not actionable.” *Knox*, 260 F.3d at 1013 (emphasis, quotation marks, and citation omitted). Historically, the Ninth Circuit recognized two applications of the continuing violations doctrine: (1) to “a series of related acts, one or more of which falls within the limitations period” (known as the serial acts branch), and (2) to “the maintenance of a discriminatory system both before and during [the limitations] period” (known as the systematic branch). *Bird*, 935 F.3d at 746 (quoting *Gutowsky v. County of Placer*, 108 F.3d 256, 259 (9th Cir. 1997)) (bracketing in original).

However, the Supreme Court limited the continuing violation doctrine in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The Court held that “‘discrete . . . acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges’ because ‘[e]ach discrete . . . act starts a new clock for filing charges alleging that act.’” *Bird*, 935 F.3d at 747 (citing *Morgan*, 536 U.S. at 113); *see also Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003) (“Although *Morgan* was a Title VII case . . . we have applied *Morgan* to bar § 1983 claims predicated on discrete time-barred acts, not-withstanding that those acts are related to timely-filed claims.”). In 2019, the Ninth Circuit reasoned that “little remains of the continuing violations doctrine” because:

> Except for a limited exception for hostile work environment claims . . . the serial acts branch is virtually non-existent. Moreover, while we have left room for the systematic branch to apply to class-wide pattern-or-practice claims, . . . we have consistently refused to apply the systematic branch to rescue individualized claims that are otherwise time-barred.

*Bird*, 935 F.3d at 748.

Neither exception applies here. The statute of limitations therefore bars Plaintiff Jones’s allegations in so far as they are premised on discrete acts outside the limitations period. Plaintiff

Jones alleges several discrete acts of surveillance prior to January 11, 2023. SAC ¶ 85. For example, Plaintiffs allege that Defendant Graham communicated with other Medford Police officials in March 2021 regarding Plaintiffs' involvement in protesting Medford's sweep of the Hawthorne Park encampment and affiliation with the Siskiyou Abolition Project. SAC ¶¶ 85a.-b. Plaintiffs allege that Defendant Sparacino emailed another Medford Police official in May 2021 regarding Plaintiffs' statements about police raids of homeless camps so the official would be aware of what Plaintiffs were saying. SAC ¶ 85.c.

Plaintiff Jones may not seek relief on these allegations because they are time barred. Plaintiffs do not allege that Defendant Sparacino or Defendant Graham surveilled them inside the limitations period. Plaintiff Jones's retaliatory surveillance claims against Defendant Sparacino and Graham are therefore dismissed.

Plaintiffs, however, do make general allegations of surveillance that do not appear, on their face, to be outside the limitations period. Plaintiffs allege that "by 2023" Medford paid an analyst to continually monitor Plaintiffs social media and political activity. SAC ¶ 95. Viewing Plaintiffs' complaint in the light most favorable to them, they allege discrete acts of surveillance within the limitations period.

4. <u>Evidence of Intent</u>

Although some of Plaintiffs' allegations are barred by the statute of limitations, those allegations may be relevant, and admissible, to prove retaliatory or discriminatory motive. *See RK Ventures*, 307 F.3d at 1062 ("In assessing whether acts occurring within the limitations period are unconstitutional, we may look to pre-limitations period events as evidence of an unconstitutional motive.").

**B. First Amendment Retaliation**

City Defendants argue that Plaintiffs fail to state a First Amendment Retaliation claim because they have not alleged an actionable adverse action by any individual Defendant.

To establish a First Amendment retaliation claim, a plaintiff must show that "(1) [they] engaged in constitutionally protected activity; (2) as a result, [they were] subjected to adverse action . . . that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Mulligan v. Nichols*, 835 F.3d 983, 988 (9th Cir. 2016) (citation omitted). Adverse actions generally fall into four categories: (1) "exercise[s] of governmental power [that] are regulatory, proscriptive, or compulsory in nature and have the effect of punishing someone for his or her speech," (2) a "state action [that] affect[s] [a plaintiff's] rights, benefits, relationship or status with the state," (3) a "loss of a valuable governmental benefit or privilege," or (4) a "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow." *Mulligan*, 835 F.3d at 988-90 (first and fifth alterations in original) (quotation marks and citations omitted).

The parties do not dispute that Plaintiffs were engaging in protected activity in protesting Defendants' actions and policies towards unhoused individuals. The Court turns to each of Plaintiffs' alleged adverse actions below.

1. <u>Surveillance</u>

Plaintiffs allege that Defendants Graham, Sparacino, and the City collected information on them without any connection to criminal investigations. SAC ¶¶ 84, 85, 152. Generally, the mere fact that a government entity surveils or monitors someone's activity does not establish an adverse action that would chill a person of ordinary firmness. *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (holding that an individual's mere knowledge that the government was collecting their

information and fear that the government might act on it did not establish regulatory, proscriptive, or compulsory use of government power). In contrast, where a plaintiff alleges "discrete acts of police surveillance and intimidation directed solely at silencing them" they allege a specific and objective harm giving rise to a First Amendment retaliation claim. *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986) (holding allegations that police "engaged in frequent low-altitude helicopter flights over [the plaintiffs'] residence . . . to inhibit" their speech was a specific enough harm to bring a Section 1983 retaliation claim).

Plaintiffs here make several allegations as to the extent of Defendants surveillance. Plaintiffs allege that Medford Police created fake social media profiles to spy on Plaintiffs' activities and documented their attendance at protests. SAC ¶ 84. They allege that Medford police, including Defendants Graham and Sparacino, maintained a dossier of their political activity without connection to criminal investigations or suspicion that Plaintiffs committed a crime. SAC ¶ 85.

Without more, these allegations do not establish an adequate injury to bring a First Amendment Retaliation claim. Plaintiffs do not allege any facts to establish that Defendants' surveillance implied the regulatory, proscriptive, or compulsory use of government power to suppress their speech. Plaintiffs allege a generalized fear that the government might use information it collected on them as opposed to acts of surveillance, like regular helicopter flights overhead, that cause intimidation or threat or cause "palpable and direct" injuries. *Cf. The Presbyterian Church v. United States*, 870 F.2d 518, 521-22, 523 (9th Cir. 1989) (finding First Amendment standing to challenge surveillance of churches where churches alleged that members withdrew from participation, the church cancelled bible study, diverted clergy time away from pastoral duties, church support declined, and members were reluctant to seek counseling as a

result of surveillance). Plaintiffs' complaint does not identify a specific injury from the surveillance and attributes Plaintiffs Jones and Strong's resignation from Stabbin' Wagon to the "cumulative impacts of Defendants' actions." SAC ¶ 157.

Plaintiffs have also not sufficiently alleged that Defendants intended to chill Plaintiffs' speech through the surveillance because there are no allegations that Defendants intended to make their surveillance known to Plaintiffs or that state how Defendants' surveillance affected Plaintiffs' advocacy. *See Skoog v. County of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006) (stating in a First Amendment retaliation claim a Plaintiff must prove the "desire to cause the chilling effect was a but-for cause of the defendant's action.") *abrogated in part on other grounds by Nieves v. Bartlett*, 587 U.S. 391 (2019).

2. Grant Interference

Plaintiffs also allege that Defendants retaliated against Plaintiffs advocacy by opposing their grant from OHA and publicly and privately disparaging them. SAC ¶¶ 155.b., 155.f. Plaintiffs allege that immediately after OHA awarded Stabbin' Wagon the grant, the City and Medford police, including Defendants Sjothun, Ivens, Arnold, and Kirkpatrick disseminated false and misleading information to state officials, community leaders, and other organizations. SAC ¶¶ 96-97. Plaintiffs allege the City sought to portray Stabbin' Wagon as extreme and unqualified, lobbied OHA, and coordinated with other nonprofits hostile to Stabbin' Wagon like OnTrack Rogue Valley and the Addictions Recovery Center. SAC ¶¶ 98-99.

Courts take a cautious approach with retaliation claims involving government speech like those here.

> Restricting the ability of government decisionmakers to engage in speech risks interfering with their ability to effectively perform their duties. It also ignores the competing First Amendment rights of the officials themselves. The First Amendment is intended to "preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." That marketplace of ideas is undermined if public

> officials are prevented from responding to speech of citizens with speech of their own.

*Mulligan*, 835 F.3d at 989 (citations omitted). The Ninth Circuit has accordingly set a high bar for when government speech gives rise to a First Amendment retaliation claim. For example, an act of defamation does not give rise to a retaliation claim if it does not affect the plaintiff's rights, benefits, or status with the state. *Id.*

Government speech that results in reputational harm and ultimately a loss in employment also does not meet the high bar for adverse action. *Mulligan*, 835 F.3d at 988-89. In *Mulligan*, the plaintiff alleged that city officials accused him of using bath salts and released a tape in which he admitted to past bath salt use in a smear campaign to deter the plaintiff from suing the city. *Id.* at 988. The negative media coverage damaged the plaintiff's reputation and ultimately caused him to lose his job. *Id.* at 989. The Ninth Circuit held that the plaintiff's harm was not actionable "unless it is accompanied by 'some more tangible interests'" like an effect to the plaintiff's "rights, benefits, relationship or status with the state," or it intimates "the punishment [will] imminently follow." *Id.* at 989-90.

False accusations may give rise to a retaliation claim in certain contexts, however. In *Mendocino*, police officers falsely accused members of an environmental organization of criminal activity in connection with a criminal investigation. *Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1302-03 (9th Cir. 1999). The officers made false accusations to secure arrest and search warrants. *Id.* at 1289-91. The Ninth Circuit held that plaintiffs sufficiently alleged a First Amendment retaliation claim because the inclusion of the accusations in warrant affidavits permitted the inference that the acts would chill a person of ordinary firmness from future first amendment activities. *Id.* at 1300, 1302; *see also Mulligan*, 835 F.3d at 990

(describing *Mendocino* and stating that the officials' conduct in *Mendocino* "intimated that punishment would imminently follow").

At the outset, some of Plaintiffs' allegations fail because they seek to hold Defendants accountable for protected speech. For example, Plaintiffs allege that Defendants Ivens and Arnold "expressed outrage over the award and attempted to mobilize public opposition and influence OHA to rescind the grant." SAC ¶ 97. They also allege that the City portrayed "Stabbin' Wagon as untrustworthy, unqualified, and politically extreme." SAC ¶ 98. These allegations are insufficient to give rise to Plaintiffs' retaliation claim because the government must be allowed to express its own views, even when it is critical of some of its citizens. *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998).

Plaintiffs' other allegations of harm here are like the reputational harm in *Mulligan*. Plaintiffs allege that OHA delayed Stabbin' Wagon's grant in response to Defendants' conduct but ultimately awarded it. SAC ¶ 132. Plaintiffs Jones and Strong resigned from Stabbin' Wagon and Plaintiffs had to close their peer respite program. SAC ¶¶ 143-44. Plaintiffs, however, do not allege that Defendants had any control over the grant process and conceded that point at oral argument. This is fatal to Plaintiffs' allegations that Defendants "disseminated inflammatory, false, and disparaging information about Plaintiffs." SAC ¶ 97; *Cf. Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1045 (9th Cir. 1994) (holding defamatory statements did not give rise to a First Amendment violation where the officials "could not, and did not, make any decision or take any state action affecting [the plaintiff's] rights, benefits, relationship or status with the state").

Plaintiffs' retaliation claim against Defendants Sjothun, Ivens, Arnold, and Kirkpatrick for opposing Plaintiffs' grant award from OHA therefore fails. Plaintiffs have conceded that

these Defendants had no ability to affect or control the grant award. These claims are dismissed with prejudice because amendment would be futile.

3. Exclusion

Plaintiffs claim that the individual City Defendants retaliated against them by excluding them and other service providers from city-sponsored communications. SAC ¶ 155.d. The only allegation in Plaintiffs' complaint to this effect is that Medford police excluded Stabbin' Wagon from official notices sent to service providers ahead of encampment sweeps. SAC ¶ 81. To establish individual liability under Section 1983, the plaintiff must show "that the official . . . caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Plaintiffs here do not allege that any specific individual Defendant caused the alleged exclusion. Plaintiffs' exclusion from communication allegation fails to maintain a claim against the individual City Defendants and is accordingly dismissed.

## V. *Monell* Claim

Plaintiffs allege that the City had a policy and custom of surveilling them, removing them from official communication lists, engaging in retaliatory arrests, and interfering with the OHA grant. Section 1983 permits a cause of action for constitutional violations only against "person[s]." In certain circumstances, a municipality may be held liable as a "person" under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). However, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691. Liability only attaches where the municipality itself causes the constitutional violation through the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *see also Gillette v. Delmore*, 979 F.2d 1342, 1347

(9th Cir. 1992) ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988)).

To prove a *Monell* claim, Plaintiffs must show "(1) [the claimant] was deprived of a constitutional right; (2) the [municipality] had a policy; (3) the policy amounted to a deliberate indifference to her constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Mabe v. San Bernardino Cnty, Dept. of Pub. Soc. Serv.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (quotation marks omitted).

There are three methods by which a plaintiff may establish a municipal policy under *Monell*. "First, a local government may be liable where the 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[s] the injury.'" *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) (quoting *Monell*, 436 U.S. at 694). If the policy has not been written or formalized, a local government may still be liable if it has an implicit policy that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Gordon v. County of Orange*, 6 F.4th 961, 974 (9th Cir. 2021) (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 168 (1970)). "Second, a local government can fail to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right, such that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [government entity] can reasonably be said to have been deliberately indifferent to the need.'" *Rodriguez*, 891 F.3d at 802 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). "Third, a local government may be held liable if 'the individual who committed the constitutional tort was an official with final policy-making

authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Id.* at 802-03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)).

**A. Statute of Limitations**

The Court's statute of limitations findings above apply with equal weight to Plaintiffs' *Monell* claim. Plaintiffs' *Monell* claim therefore fails in so far as it seeks to hold the City liable for the arrests and park sweeps in 2020 and 2021. Plaintiff Jones may not maintain a *Monell* claim for allegations of surveillance prior to January 11, 2023. The Court addresses Plaintiffs remaining allegations below.

**B. Underlying Injury**

In light of the Court's findings with respect to Plaintiffs' claims against the individual defendants, Plaintiffs have not alleged the requisite deprivation of a constitutional right. "The Supreme Court . . . held that a public entity is not liable for § 1983 damages under a policy that can cause constitutional deprivations, when . . . individual officer[s], acting pursuant to the policy, inflicted no constitutional harm to the plaintiff." *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1991) (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). That is to say, a City is not liable under *Monell* for having a policy that enables constitutional violations if no violation occurred. *Id.*

Plaintiffs have not adequately alleged a constitutional violation by any individual Defendant. They therefore have not adequately pled a *Monell* claim. The Court nevertheless considers the sufficiency of Plaintiffs' allegations of official policy to assess whether leave to amend is appropriate.

### C. Sufficiency of the Allegations

Plaintiffs contend that they need not offer more than a bare allegation that an official's conduct conformed to official policy under *AE ex rel Hernandez v. County of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012). *AE* undermines that argument.

Historically, the Ninth Circuit allowed a *Monell* claim to proceed to discovery "even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice." *AE ex rel Hernandez v. County of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) (quoting *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007)). After the Supreme Court adopted *Iqbal's* higher pleading standards, the Ninth Circuit held that *Monell* claims "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* at 637 (quoting *Starr*, 652 F.3d at 1216 (9th Cir. 2011). The Court addresses each of Plaintiffs' *Monell* theories in turn.

1. <u>Policy or Custom</u>

Plaintiffs allege the City "adopted formal and informal policies to exclude and discredit service providers that refused to collaborate with law enforcement" and favored those that "operated under police influence." SAC ¶ 167. Plaintiffs identify no formal policy in their complaint, but allege Defendants Ivens, Arnold, and Sjothun were deeply involved with the boards of Medford addiction and homelessness service providers. SAC ¶¶ 45-47. Plaintiffs allege the City "maintained a longstanding custom and practice of retaliating against people and organizations that challenged the City's law enforcement priorities or political agenda, in the various ways described [in the Complaint]." SAC ¶ 168. Plaintiffs allege that Medford police

arrested John Malaer, a homelessness and disability rights advocate who criticized Medford's law enforcement abuse against the unhoused, after falsely designating him as homeless in July 2019. SAC ¶ 146. They also allege that the City, including Defendants Sparacino, Graham, and Arnold pressured a member of the City's police advisory committee to resign and ultimately removed him in April 2023 after he expressed concern over the police department's handcuffing practices. SAC ¶¶ 147-151.

Plaintiffs have sufficiently alleged a custom of retaliation by the City against those who criticized the City's law enforcement practices. Plaintiffs' allegations of the 2019 arrest and 2023 removal are more than mere "isolated and sporadic incidents" when viewed in the context of the full scope of their allegations including the exclusion from official communications and the arrest and selective citation of Plaintiff Jones in 2021, sweeps of the homeless encampments in 2020, and the exclusion from official communication. *Cf. Meehan v. County of Los Angeles*, 856 F.2d 102, 107 (holding that proof of two unconstitutional assaults, "standing alone," did not support a *Monell* claim); *RK Ventures, Inc.*, 307 F.3d at 1062 (recognizing evidence outside the limitations period may serve as relevant background to put timely claims in context).

2. <u>Policy Maker Approval, Ratification, or Direction</u>

Plaintiffs allege that the City Manager (Defendant Sjothun), Chief of Police (Defendants Sparacino and Ivens), and Mayor (Defendant Sparacino) "approved, directed or ratified the retaliatory conduct, surveillance, arrests, and interference" alleged in the complaint. SAC ¶ 166. The Court considers whether those allegations give rise to *Monell* liability on Plaintiffs' remaining claims of retaliatory surveillance and exclusion.

Plaintiffs allege Defendant Ivens "participated in or ratified the surveillance and retaliatory actions" in the complaint. SAC ¶ 17. Plaintiffs do not allege the specific conduct that Defendant Ivens undertook or ratified, referring instead to all the factual allegations in the

complaint. Plaintiffs therefore do not allege Defendant Ivens' ratification or official action with sufficient specificity.

Plaintiffs make similar allegations with respect to Defendant Sjothun, alleging that he "participated in the retaliatory actions described [in the complaint]." SAC ¶ 15. These allegations do not provide Defendant Sjothun's involvement or ratification with respect to the alleged surveillance or exclusion from official communications.

Defendant Sparacino allegedly "participated in the retaliatory actions described [in the complaint]." SAC ¶ 16. He opposed drug decriminalization policies, including Measure 110 and advocated for the recriminalization of drug possession. SAC ¶ 39. He sent an email to Medford police officials quoting Plaintiff Jones and telling them he wanted the officials "to be aware of what [Plaintiffs] are saying." SAC ¶ 85.c. These allegations are insufficient to establish Defendant Sparacino's direct involvement in the surveillance, exclusion from official communications, or his ratification of subordinates' conduct.

3. Failure to Train and Supervise

Plaintiffs allege that the City failed to train its staff in First Amendment rights, lawful surveillance, and use of force and failed to discipline officers engaging in retaliatory conduct. SAC ¶¶ 170-71. The Second Amended Complaint contains no other allegations of a failure to train or supervise and does not identify any specific instances where the failure to train caused Plaintiffs harm. Plaintiffs attribute their injuries only to the "acts and omissions described herein." SAC ¶ 173. Plaintiffs' allegations lack the specificity required to establish a failure to train employees such that the deficiency is so obvious and likely to cause injury that the municipality's policy makers can have said to be deliberately indifferent. *Rodriguez*, 891 F.3d at 802.

## VI. Section 1985(3) Claim

Plaintiffs allege that City Defendants conspired to deprive Plaintiffs and their clients with disabilities of their First Amendment right to advocate. Plaintiffs allege that City Defendants violated Plaintiffs' rights through their online surveillance, oppositional comments, removal from communications, and grant interference. Plaintiffs allege that Defendant Mallory joined in the conspiracy through his social media posts which expressed his opposition to Plaintiffs' OHA grant.

To establish a conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff must allege facts demonstrating: (1) a conspiracy; (2) a purpose to deprive, directly or indirectly, any person or class of persons of equal protection under the law; (3) an act in furtherance of the conspiracy; and (4) injury to a person or property, or deprivation of a right or privilege. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971); *United Bhd. of Carpenters and Joiners of America, Local 610-CIO v. Scott*, 463 U.S. 825, 833 (1983) ("The rights . . . that § 1985(3) vindicates must be found elsewhere.").

At the outset, the Court notes that the parties, in their briefing and at oral argument, dispute whether Plaintiffs have standing to assert a Section 1985(3) claim. Notwithstanding the parties' dispute, the Court begins with a discussion of the alleged acts of the conspiracy.

### A. Alleged Overt Acts and State Involvement

"[T]he absence of a section 1983 deprivation of rights precludes a section 1985 conspiracy claim predicated on the same allegations." *Caldeira v. County of Kauai*, 866 F.2d 1175, 1182 (9th Cir. 1989). Plaintiffs do not identify which individual defendant performed each overt act. SAC ¶ 203. Plaintiffs appear to rest their allegations as to City Defendants on the arrests and park sweeps, exclusion from official communications, surveillance, and grant

interference discussed above. SAC ¶ 203. These claims have all been dismissed and therefore do not give rise to a Section 1985 claim.

A plaintiff bringing a Section 1985 claim to vindicate rights secured by the First Amendment must "prove that the state was somehow involved in or affected by the conspiracy" because the First Amendment "restrains only official conduct." *United Bhd. of Carpenters*, 463 U.S. at 833. Plaintiffs remaining allegations are that unspecified Defendants coordinated "with anti-activist social media groups that published private information and incited public backlash" and disseminated "Plaintiffs' private identifying information, obtained through law enforcement channels, to more than 100,000 followers in order to incite harassment and vigilantism against Plaintiffs." SAC ¶¶ 203.d.-e.

Plaintiffs make numerous allegations attributing this conduct to Defendant Mallory who is not a City official. Much of Plaintiffs' allegations center on Defendant Mallory's speech via social media and other outlets. Digital communications like these generally fall within the First Amendment's protections. *See Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 745 (9th Cir. 2021). Speech is generally protected unless it falls into a category of unprotected speech. *See id.* at 745-46 (assessing whether speech was a "true threat"). Some of these allegations seek to impose liability for protected speech and therefore fail. *E.g.*, SAC ¶ 121 (alleging Defendant Mallory criticized Plaintiffs' qualifications). Plaintiffs summarily allege categories of potentially unprotected speech by Defendant Mallory. *E.g.*, SAC ¶¶ 129, 131 (alleging Plaintiffs experienced harassment); SAC ¶ 22 (alleging defamatory statements); SAC ¶ 203.e (incitement). To the extent Plaintiffs seek to hold Defendant Mallory liable for these acts, Plaintiffs must identify the alleged unprotected speech with more specificity and without relying on broad legal conclusions.

Plaintiffs also allege Defendant Mallory published Plaintiffs' names and home addresses in a "[b]usted" graphic, mimicking booking log services. *E.g.*, SAC ¶¶ 114-15. A party generally cannot maintain a claim for disclosure of publicly available information that is lawfully obtained. *The Florida Star v. B.J.F.* 491 U.S. 524, 534 (1989). Plaintiffs do not allege their names and home addresses were not publicly available or unlawfully obtained. *See* SAC ¶ 114. Plaintiffs therefore have not alleged an overt act by Defendant Mallory.

With respect to the City Defendants, Plaintiffs allege that the "City Defendants, in particular the members of the Medford Police Department, were aware of Defendant Mallory's pro-law enforcement social media influence." SAC ¶ 104. Plaintiffs further allege that Defendants Kirkpatrick and Sparacino appeared on Defendant Mallory's podcast. SAC ¶¶ 109-10. Plaintiff makes the general allegation that "Defendants . . . reached a tacit understanding that Defendant Mallory would" amplify the City Defendants' retaliation against Plaintiffs. SAC ¶ 196.

Viewed in light of the Court's rulings above, these allegations are insufficient to allege the participation of the City Defendants in the alleged disclosure of Plaintiffs' personal information. A plaintiff must allege a conspiracy with facts that rise above allegations of parallel conduct and sympathetic viewpoints. *See Twombly*, 550 U.S. at 556-57. Plaintiffs' general allegation of tacit agreement is insufficient. The Court has found that Plaintiffs have not adequately alleged the City Defendants retaliated against them, so Defendant Mallory cannot be said to have amplified it at this time. Plaintiffs' Section 1985(3) claim is dismissed because they must allege that "two or more persons conspire[d]" and that a state actor is "at least one of the wrongdoers." *Pasadena Republican Club v. W. Just. Ctr.*, 985 F.3d 1161, 1171 (9th Cir. 2021) (emphasis omitted).

The Court gives Plaintiffs leave to amend their complaint because amendment of the underlying Section 1983 claims is likely to affect Plaintiffs' ability to state a Section 1985(3) claim, *see Caldeira*, 866 F.2d at 1182.

**B. Protected Class**

"The original purpose of § 1985(3), which was passed as the Ku Klux Klan Act of 1871, was to enforce the rights of African Americans and their supporters." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005). It has since been expanded from that narrow historical purpose to reach other groups like "women purchasers of disability insurance." *Canlis v. San Joaquin*, 641 F.2d 711, 720 (9th Cir. 1981) (citing *Life Ins. Co. of N. Am. v. Reichardt*, 591 F.2d 499, 505 (9th Cir. 1979)). In the Ninth Circuit, § 1985(3) extends beyond race only where "the courts have designated the class in question a suspect or quasi-suspect classification requiring more exacting scrutiny or that Congress has indicated through legislation that the class required special protection." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992). This narrow expansion is motivated by the Supreme Court's warning that that § 1985(3) "is not to be construed as a general federal tort law." *Gerritsen v. de la Madrid Hurtado*, 819 F.2d 1511, 1518-19 (9th Cir. 1987).

The Ninth Circuit has declined to extend § 1985(3)'s protections beyond members of a protected class in several cases. *Canlis*, 641 F.2d at 721 ("The law of this circuit is clear: the plaintiff must be a member of the class discriminated against to claim the benefits of § 1985(3).)"; *accord RK Ventures*, 307 F.3d at 1056 (requiring owners of night club that served mostly African American people to establish that they themselves were African American or were otherwise designated to receive special federal assistance to protect their rights); *Voigt v. Savell*, 70 F.3d 1552, 1564 (9th Cir. 1995). That general rule, however, does not prohibit a Plaintiff from bringing a Section 1985 claim based on theories of third party standing. *See Mayer*

*v. Wedgewood Neighborhood Coal.*, 707 F.2d 1020, 1022 (9th Cir. 1983) (allowing a Section 1985(3) claim to proceed where a plaintiff asserted standing in a representative capacity for "third parties who lack an effective means of asserting their own rights"); *Voigt*, 70 F.3d at 1564 (considering whether Alaska resident had could assert a Section 1985(3) claim on behalf of non-Alaskan residents under theories of third party standing).

Plaintiffs here allege two theories of standing under § 1985(3). First, they allege that they "advocate for, support, and provide services" to individuals with disabilities under the American with Disabilities Act ("ADA"), specifically those with a "drug-related substance use disorder ('SUD') and/or a serious mental illness ('SMI')." SAC ¶¶ 178-80. They allege that these individuals are a protected class under § 1985, and that they may bring a claim for retaliation against those individuals. SAC ¶¶ 182, 190, 198. They also allege that they may bring a § 1985(3) claim on their own behalf as supporters and advocates of those with SUD or SMI. SAC ¶ 191. Defendants argue that (1) those with disabilities are not a protected class, (2) Plaintiffs cannot assert a § 1985(3) claim as supporters of a protected class, and (3) supporters of those with SUD or SMI are not, in and of themselves, a protected class.

The parties acknowledge that individuals with disabilities have not been recognized as a suspect class by the courts. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985). The parties dispute whether Congress has identified those with disabilities, or their supporters, as a class requiring special federal protection. Circuits are split on the issue with the Sixth, Seventh, and Tenth Circuits finding that individuals with disabilities are not protected under § 1985(3) and the Second and Third Circuits finding that they are. *See Lake v. Arnold*, 112 F.3d 682, 686 (3d Cir. 1997) (citing cases); *Post v. Trinity Health-Michigan*, 44 F.4th 572, 580 (6th Cir. 2022). The Ninth Circuit has not yet reached the issue in a published opinion.

Section 1985(3) is not frozen in time to protect only "racial or otherwise suspect classifications." *Life Ins. Co. of N. Am.*, 591 F.2d at 505 (citation omitted). Although § 1985(3) is a remedial statute, that construction does not prevent plaintiffs from asserting substantive rights conferred by contemporary legislation through the vehicle of § 1985(3). *See Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 377 (1979).

The Ninth Circuit has extended § 1985(3) claims to classes of people that, while not recognized as a suspect class or traditionally afforded protections at § 1985(3)'s enactment, have been recognized as needing special protection through more contemporary legislation. *See Maynard v. City of San Jose*, 37 F.3d 1396, 1403 (9th Cir. 1994). In *Maynard*, the Ninth Circuit held that a white plaintiff could bring a § 1985 claim because Title VII expressly "grants special protection to all employees—regardless of race—who are subjected to retaliation for assisting in the investigation of discriminatory employment practices." *Id.* (citing 42 U.S.C. §§ 2000e-5, 2000e-3(a)). In other words, the white plaintiff could bring a § 1985(3) claim because statutory provisions of Title VII indicated Congress afforded special protections to those affected by discriminatory employment practices regardless of their race. *Id.*

Congress extended considerable protections to individuals with disabilities in enacting Title II of the American with Disabilities Act in 1992. 42 U.S.C. § 12101 *et. seq*. Congress has specifically found that individuals with disabilities have faced discrimination and often lack legal resources to address such discrimination:

> [P]hysical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;
>
> * * *

> [F]orms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
>
> * * *
>
> [U]nlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

42 U.S.C. § 12101(a)(1)-(2), (4). Congress "invoke[d] the sweep of congressional authority, "including the power to enforce the [F]ourteenth [A]mendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." *Id.* § 12101(b)(4). The ADA "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Id.* § 12101(b)(1).

To that end, the ADA forbids local governments from discriminating against individuals with disabilities. *Id.* §§ 12132, 12131. It prevents discrimination in employment, *id.* § 12112, and public accommodations, *id.* § 12182. These protections are not limited to those with disabilities. The ADA prohibits retaliations against any individual who has opposed discrimination on the basis of disability. *Id.* § 12203(a). It prevents coercion of, intimidation of, threatening of, or interference with an individual exercising or enjoying the rights it provides or an individual who aids or encourages another in exercising and enjoying those rights. *Id.* § 12203. It protects those discriminated against in employment because of a relationship with an individual with a disability, *id.* § 12112(b)(4), and individuals and entities discriminated against in public accommodation because of a known relationship with an individual with a disability, *id.* § 12182(b)(1)(E).

In light of Congress's specific findings in the ADA and Ninth Circuit case law extending § 1985(3)'s protections based on similar acts of Congress, individuals with a disability and those retaliated against for associating with them are both cognizable classes under § 1985(3).

The Court does not reach the issue of whether Plaintiffs may assert their claims on behalf of the disabled as a protected class because it appears to the Court that Plaintiffs may establish standing as members of a protected class themselves. The Court notes, however, that Plaintiffs' assertion of § 1985(3) claims as supporters of a protected class lacks allegations to establish third party standing similar to those recognized by the Ninth Circuit in this context. *See Voigt*, 70 F.3d at 1564.

### C. Class-Based, Invidious Discrimination

In addition to identifying a protected class, a plaintiff must allege that the conspirator's actions were motivated by an "invidiously discriminatory animus." *Griffin*, 403 U.S.at 102. Plaintiffs allege that Defendants conspired to target those with SUD and SMI after Oregon legalized drug possession with the passage of Measure 110. SAC ¶ 204. Plaintiffs allege that Defendants retaliated against their First Amendment Rights because of their association and advocacy on behalf of those with SUD and SMI through surveillance and doxing. SAC ¶ 194. Alone, these allegations do not establish invidious discrimination as to individuals with disabilities or their supporters. The Court notes that Plaintiffs cite a broad history of the City's practices with respect to unhoused individuals, community activists, and those critical of law enforcement. *E.g.*, SAC ¶¶ 25, 35, 40, 77. To the extent Plaintiffs seek to rely on that history to allege discriminatory animus they must relate those allegations to the specific protected class asserted.

## VII. Doe Defendants

Plaintiffs allege that nine Jane or John Doe employees of the City "participated in the events described in this complaint." SAC ¶ 23. "[T]he use of 'John Doe' to identify a defendant is not favored . . . . However, . . . where the identity of alleged defendants will not be known

prior to [filing,] . . . the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) (citation omitted). A complaint must still "give the defendants adequate notice of the claims against them and the grounds upon which each claim rests" and may not rely on conclusory or vague facts "not obviously connected to any particular cause of action." *Gibson*, 165 F.4th at 1288 (citation omitted).

Plaintiffs' blanket allegation that the Doe Defendants "participated" in the events alleged in the complaint is insufficient to provide this notice, conclusory and vague, and not connected to any particular events giving rise to the factual allegations in the complaint. Plaintiffs' claims against the Doe Defendants are therefore dismissed.

### VIII. Leave to Amend

Plaintiffs have filed two amended complaints in this case. First Am. Compl. ECF No. 5; SAC. The Court grants Plaintiffs leave to amend their remaining allegations as consistent with this Opinion because it does not appear that amendment would be futile for all of Plaintiffs' claims. *See Price v. Kramer*, 200 F.3d 1237, 1250 (9th Cir. 2000) (stating district courts should grant leave to amend with "extreme liberality") (citation omitted).

The Court cautions Plaintiffs that any amended complaint must conform to pleading standards. Plaintiffs must identify which specific defendant performed the complained of conduct and which Defendant they assert each claim against. Failure to cure the deficiencies above in any amended complaint will result in dismissal with prejudice.

## CONCLUSION

For the reasons discussed above, Defendants' motions to dismiss for failure to state a claim (ECF Nos. 35, 37) are GRANTED as follows:

1. Plaintiffs' Fourth Amendment *Monell* claim is dismissed with prejudice;
2. Defendant Vega is dismissed with prejudice;
3. Defendant Barringer is dismissed with prejudice;
4. Plaintiffs' claims premised on discrete acts of unlawful arrest and citation in 2020 and 2021 are dismissed with prejudice;
5. Plaintiffs' claims that Defendants retaliated against them by interfering with their grant award are dismissed with prejudice;
6. Plaintiffs' retaliation claims arising from surveillance and exclusion from official communication are dismissed with leave to amend;
7. Plaintiffs' First Amendment *Monell* claim is dismissed with leave to amend; and
8. Plaintiffs' Section 1985(3) claim is dismissed with leave to amend.

Any amended complaint is due within thirty days of this Order.

DATED this 30th day of September 2026.

MUSTAFA T. KASUBHAI (he/him)
United States District Judge